CHAD A. READLER
Acting Assistant Attorney General
NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN, AUSA
Chief, Civil Division
DAVID K. BARRETT, AUSA
Chief, Civil Fraud Section
LISA A. PALOMBO, AUSA (SBN 169119)
       Room 7516, Federal Building
       300 N. Los Angeles Street
       Los Angeles, California 90012
       Tel: (213) 894-4042; Fax: (213) 894-7819
       Email: Lisa.Palombo@usdoj.gov
MICHAEL D. GRANSTON
SARA MCLEAN
WILLIAM C. EDGAR
ERIC SCHMELZER
Attorneys, Civil Division
United States Department of Justice
       601 D Street NW, Room 9220
       Washington, DC 20004
       Tel: 202-307-0256; Fax: (202) 307-3852
       Email:  Eric.Schmelzer@usdoj.gov

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MEI LING and FAIR HOUSING COUNCIL OF SAN FERNANDO VALLEY,<br><br>       Plaintiffs,<br><br>       v.<br><br>CITY OF LOS ANGELES, a municipal corporation, and CRA/LA, a Designated Local Authority, a public entity,<br><br>       Defendants. | No. CV-11-00974 PSG (JCx)<br><br>UNITED STATES' OPPOSITION TO CITY OF LOS ANGELES'S MOTION TO DISMISS<br><br>[LODGED HEREWITH:  [PROPOSED] ORDER RE: CITY OF LOS ANGELES'S MOTION TO DISMISS]<br><br>DATE:  February 5, 2018<br>TIME:   1:30 p.m.<br>COURTROOM:  6A<br>JUDGE:  Hon. Philip S. Gutierrez |

# TABLE OF CONTENTS

BACKGROUND ................................................................................................... 1

PROCEDURAL HISTORY ................................................................................. 1

ALLEGATIONS IN THE COMPLAINT ......................................................... 3

    I.     HUD PROGRAMS ..................................................................... 3

    II.    FEDERAL ACCESSIBILITY LAWS ..................................... 4

    III.   FUNDING SUBMISSIONS TO HUD ....................................... 5

         A.    Consolidated Plan ......................................................... 5

         B.    Executive Funding Agreements/Grant Agreements ......... 6

         C.    IDIS Drawdowns............................................................ 7

         D.    Other HUD Grants ......................................................... 8

    IV.   THE CITY'S FAILURE TO COMPLY WITH THE FEDERAL ACCESSIBILITY LAWS ............................ 8

         A.    The City's Housing is Inaccessible................................ 8

         B.    The City Failed to Affirmatively Further Fair Housing .................. 10

LEGAL STANDARD............................................................................................ 10

ARGUMENT…….................................................................................................. 11

    I.     THE FCA ..................................................................................... 11

    II.    THE COMPLAINT SUFFICIENTLY ALLEGES FALSE CLAIMS ....... 12

         A.    The Complaint Identifies Numerous False Claims and Statements ............... 12

         B.    The Complaint Sufficiently Asserts Claims for Express and Implied Certification ................ 13

         C.    The City's "Tying Argument" Misunderstands the Law.................. 18

    III.   THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER................. 19

    IV.   THE COMPLAINT SUFFICIENTLY ALLEGES MATERIALITY ........ 25

         A.    The Label of the Requirement ....................................... 26

         B.    The Essence of the Bargain............................................ 27

         C.    The Violations are Significant ....................................... 29

D.      Prior Government Action...................................................30

V.      NONE OF THE UNITED STATES' CLAIMS ARE TIME-
        BARRED UNDER THE FCA'S STATUTE OF REPOSE.......................35

VI.     THE COMPLAINT DOES NOT VIOLATE SEPARATION OF
        POWERS ............................................................................42

VII.    THE UNITED STATES SUFFICIENTLY PLEADS COMMON
        LAW CLAIMS OF NEGLIGENT MISREPRESENTATION,
        RESTITUTION/UNJUST ENRICHMENT, AND PAYMENT BY
        MISTAKE ...........................................................................45

CONCLUSION ...............................................................................50

1

# TABLE OF AUTHORITIES

2

**U.S. Supreme Court**

3

*Badaracco v. C.I.R.*,
4     464 U.S. 386 (1984) ................................................................ 42

5

*Cook Cty. v. United States ex rel. Chandler*,
6     538 U.S. 119 (2003) ................................................................ 45

7

*CTS Corp. v. Waldburger*,
     134 S Ct. 2175 (2014) ....................................................... 37, 38
8

*Hall v. United States*,
9     566 U.S. 506 (2012) ................................................................ 42

10

*INS v. Chadha*,
11     462 U.S. 919 (1983) ................................................................ 43

12

*Mead Corp v. Tilley*,
13     490 U.S. 714 (1989) ................................................................ 41

14

*Pa. v. Union Gas Co.*,
15     461 U.S. 1 (1989) ................................................................ 45

16

*Ratzlaf v. United States*,
     510 U.S. 135 (1994) ................................................................ 41
17

*Seaboard Air Line Ry. v. Koennecke*,
18     239 U.S. 352 (1915) ................................................................ 44

19

*Seminole Tribe* of *Fla. v. Florida*,
20     517 U.S. 44 (1996) ................................................................ 45

21

*Transcontinental & W. Air, Inc. v. Civil Aeronautics Bd.*,
22     336 U.S. 601 (1949) ................................................................ 41

23

*United States v. Batchelder*,
24     442 U.S. 114 (1979) ................................................................ 44

25

*United States v. Kimbell Foods*,
     440 U.S. 715 (1979) ................................................................ 45
26

*United States v. Mississippi*,
27     380 U.S. 128 (1965) ................................................................ 45

28

iv

*United States v. Neifert-White Co.*,
   390 U.S. 228 (1968) ........................................................................ 11, 13

*United States v. Texas*,
   143 U.S. 621 (1892) ............................................................................. 45

*Univ. Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ................................................................. *passim*

**U.S. Courts of Appeals**

*Bishop v. Wells Fargo & Co.*,
   870 F.3d 104 (2d Cir. 2017) ................................................................. 32

*Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
   911 F.2d 242 (9th Cir. 1990) ............................................................... 33

*Ebeid ex rel. United States v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) .............................................. 11, 13, 14, 18

*Fed. Deposit Ins. v. First Horizon Asset Sec., Inc.*,
   821 F.3d 372 (2d Cir. 2015) ................................................................. 38

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017) ............................................................. 37, 38

*Giles v. Gen. Motors Acceptance Corp.*,
   494 F.3d 865 (9th Cir. 2007) ............................................................... 47

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) ................................................................. 32

*Moore v. Greyhound Bus Lines*,
   No. 16-56312, 2017 WL 4422669 (9th Cir. Oct. 3, 2017) ...................... 10

*N.A.A.C.P. v. Sec. of Hous. & Urban Dev.*,
   817 F.2d 149 (1st Cir. 1987) ............................................................ 5, 29

*Nat'l Credit Union Admin. Bd. v. RBS Secs.*,
   833 F.3d 1125 (9th Cir. 2016) ............................................................. 38

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) .......................................................... 22, 23

*Rivera v. Peri & Sons Farms, Inc.*,
   735 F.3d 892 (9th Cir. 2013) ............................................................... 11

*United States ex rel. Campie v. Gilead Scis.,*
    Inc., 862 F.3d 890 (9th Cir. 2017) ..................................................... *passim*

*United States ex rel. Escobar v. Universal Health Servs.,*
    842 F.3d 103 (1st Cir. 2016) ................................................ 26

*United States ex rel. Hendow v. Univ. of Phoenix,*
    461 F.3d 1166 (9th Cir. 2006) ........................................... *passim*

*United States ex rel. Hopper v. Anton,*
    91 F.3d 1261 (9th Cir. 1996) ............................................. 44

*United States ex rel. Hyatt v. Northrop Corp.,*
    91 F.3d 1211 (9th Cir. 1996) ........................................ 37, 40, 42

*United States ex rel. Onnen v. Sioux Falls Indep. Scho. Dist. No. 495,*
    688 F.3d 410 (8th Cir. 2012) ........................................... 31, 44

*United States ex rel. Lee v. SmithKline Beecham, Inc.,*
    245 F.3d 1048 (9th Cir. 2001) ........................................... 24

*United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,*
    472 F.3d 702 (10th Cir. 2006) .......................................... 40

*United States ex rel. Swoben v. Un. Healthcare Ins. Co.,*
    848 F.3d 1161 (9th Cir. 2016) ......................................... *passim*

*United States ex rel. Thompson v. Honeywell Int'l, Inc.,*
    649 F. App'x 617 (9th Cir. 2016)...................................... 25

*United States ex rel. Wilkins v. Un. Health Grp., Inc.,*
    659 F.3d 295 (3d Cir. 2011) ........................................... 32

*United States v. Baylor Univ. Med. Ctr.,*
    469 F.3d 263 (2d Cir. 2006) ........................................... 39

*United States v. Borseau,*
    531 F.3d 1159 (9th Cir. 2008) ......................................... 20

*United States v. California,*
    655 F.2d 914 (9th Cir. 1980) (*California I*) ......................... 46

*United States v. California,*
    932 F.2d 1346 (9th Cir. 1991) (*California II*) ..................... 46, 48

*United States v. Corinthian Colls.,*
    655 F.3d 984 (9th Cir. 2011) ...................................... 10, 19, 25

*United States v. Hall*,
   617 F.3d 1161 (9th Cir. 2010) ............................................................ 42

*United States v. Starrett City Assocs.*,
   840 F.2d 1096 (2d Cir. 1988) ......................................................... 5, 29

**U.S. District Courts**

*Anderson v. P. Asian Enters., Inc.*,
   No. SACV 10-1807, 2011 WL 13227773 (C.D. Cal. Apr. 18, 2011) ...................... 47

*Glenn v. Hyundai Motor Am.*,
   No. SACV 15-2052, 2016 WL 7507766 (C.D. Cal. Nov. 21, 2016) ...................... 46

*In re Apple Comput., Inc.*,
   243 F. Supp. 2d 1012 (N.D. Cal. Mar. 31, 2015) ................................. 22, 23

*In re Int'l Rectifier Corp.*,
   No. CV 07-02544-JFW (VBKx), 2008 WL 4555794 (C.D. Cal. May 23, 2008)  22, 23

*LeBlanc Nutritions, Inc. v. Advanced Nutra LLC*,
   No. Civ. S-05-0581, 2005 WL 1398538 (E.D. Cal. June 14, 2005) ...................... 12

*Sec. of Hous. and Urban Dev. v. Sky Meadow Hous. Assoc.*,
   117 F. Supp. 2d 970 (C.D. Cal. July 24, 2000) ..................................... 46

*United States ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Westchester Cty.*,
   668 F. Supp. 2d 548 (S.D.N.Y. Feb. 24, 2009) ..................................... 21

*United States ex rel. Bennett v. Medtronic, Inc.*,
   747 F. Supp. 2d 745 (S.D. Tex. Sept. 30, 2010) ..................................... 24

*United States ex rel. Brown v. Celgene Corp.*,
   No. CV 10-3165, 2014 WL 3605896 (C.D. Cal. July 10, 2014) ...................... 10

*United States ex rel. Capriola v. Brightstar Educ. Grp., Inc.*,
   No. 1:11-cv-00135, 2013 WL 1499319 (E.D. Cal. Apr. 11, 2013) ...................... 13

*United States ex rel. Dresser v. Qualium Corp.*,
   No. 5:12-cv-01745, 2016 WL 3880763 (N.D. Cal. July 18, 2016) ...................... 40

*United States ex rel. Freedman v. Suarez-Hoyos*,
   781 F. Supp. 2d 1270 (M.D. Fla. Mar. 18, 2011) ..................................... 40

*United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*,
   No. 2:12cv1600, 2016 WL 1255294 (W.D. Pa. Mar. 31, 2016) ...................... 32

*United States v. Froehlich*,
  No. CV 10-3427 (C.D. Cal. Feb. 25, 2011) (copy of order attached)....................48

*United States ex rel. Hussain v. CDM Smith*,
  No. 14-9107, 2017 WL 4326523 (S.D.N.Y. Sept. 27, 2017) ...................................... 34

*United States ex rel. Johnson v. Golden Gate Nat'l Sr. Care, L.L.C.*,
  223 F. Supp. 3d 882 (D. Minn. Dec. 09, 2016) ......................................................... 32

*United States ex rel. Jordan v. Northrop Grumman Corp.*,
  No. CV 9502985, 2002 WL 35628747 (C.D. Cal. Aug. 5, 2002).............................. 47

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  51 F. Supp. 3d 9 (D.D.C. June 19, 2014) ........................................................... 40, 41

*United States ex rel. Mateski v. Raytheon Co.*,
  No. 2:06-cv-03614, 2017 WL 1954942 (C.D. Cal. Feb. 10, 2017) .......................... 11

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
  608 F.3d 871 (D.C. Cir. June 22, 2010) ................................................................... 40

*United States ex rel. Modglin v. DJO Global Inc.*,
  114 F. Supp. 3d 993 (C.D. Cal. May 8, 2015) ......................................................... 24

*United States ex rel. Pogue v. Diabetes Treatment Centers of America*,
  474 F.Supp.2d 75 (D.D.C. Feb. 7, 2007) ................................................................. 36

*United States ex rel. Robinson-Hill v. Nurses' Registry and Home Health Corp.*,
  No. 5:08-145, 2012 WL 4598699 (E.D. Ky. Oct. 2, 2012) ...................................... 40

*United States ex rel. Sainbury v. LB&B Assoc., Inc.*,
  58 F. Supp. 3d 37 (D.D.C. July 16, 2014) ............................................................... 36

*United States ex rel. Scutellaro v. Capitol Supply, Inc.*,
  No. 10-1094 (BAH), 2017 WL 1422364 (D.D.C. Apr. 18, 2017) ............................ 32

*United States ex rel. Seranno v. Oaks Diagnostics, Inc.*,
  568 F. Supp 2d 1136 (C.D. Cal. July 25, 2008) ....................................................... 37

*United States ex rel. Shemesh v. CA, Inc.*,
  89 F. Supp. 3d 36 (D.D.C. Mar. 31, 2015) .............................................................. 23

*United States v. Ctr. for Emp't Training*,
  No. 2:13-cv-01697, 2016 WL 4210052 (C.D. Cal. Aug. 9, 2016) ..................... 11, 32

*United States v. DynCorp Int'l, LLC*,
  253 F. Supp. 3d 89 (D.D.C. May 19, 2017) ............................................................. 24

*United States v. Philip Morris USA*,
   310 F. Supp. 2d 58 (D.D.C. Mar. 10, 2004) ............................................... 44

*United States v. Philip Morris USA, Inc.*,
   310 F. Supp. 2d 68 (D.D.C. Mar. 17, 2004) ............................................... 43

*United States v. Scan Health Plan*,
   CV 09-5013-JFW (JEMx), 2017 WL 4564722 (C.D. Cal Oct. 5, 2017) .......... *passim*

*United States v. Science Applications International Corp.*,
   626 F.3d 1257 (D.C. Cir. Dec. 3, 2010) .................................................. 23

*Waldmann v. Fulp*,
   259 F. Supp. 3d 579 (S.D. Tex. Oct. 13, 2016) ....................................... 32

*Waldrup v. Countrywide Fin. Corp.*,
   No. 2:13-cv-08833, 2014 WL 1463881 (N.D. Cal. Apr. 14, 2014) .......................... 46

**Federal Statutes**

15 U.S.C. § 78 ................................................................................. 22

28 U.S.C. § 2415 ....................................................................... 47, 48. 29

28 U.S.C. § 2416 .......................................................................... 47, 48

29 U.S.C. § 701 ............................................................................ 4, 28

29 U.S.C. § 794 ................................................................. 3, 4, 28, 33

31 U.S.C. § 3729 ....................................................................... *passim*

31 U.S.C. § 3730 ............................................................................. 36

31 U.S.C. § 3731 ....................................................................... *passim*

31 U.S.C. §§ 3729–3733 .................................................................... 1

42 U.S.C. § 3601 ......................................................................... 4, 28

42 U.S.C. §§ 3601–3619 ..................................................................... 3

42 U.S.C. § 3604 ......................................................................... 4, 28

42 U.S.C. § 5304 ............................................................................ 27

42 U.S.C. § 12101 ........................................................................... 28

42 U.S.C. § 12182 ........................................................................... 28

42 U.S.C. §§ 12131 ........................................................................... 5

42 U.S.C. §§ 12131–12213 ................................................................... 3

Fraud Enforcement and Recovery Act of 2009,
Pub. L. No. 111-21, § 4(b), 123 Stat. 1617 ...................................................... 38, 39, 41

**Federal Rules**

24 C.F.R. Part 5 ............................................................................................... 6, 7

24 C.F.R. Part 8 ..................................................................................................... 3

24 C.F.R. Part 100 ................................................................................................. 3

24 C.F.R. § 5.105 ............................................................................................... 6, 8

24 C.F.R. § 91.205 ................................................................................................ 6

24 C.F.R. § 91.225 ........................................................................................ 3, 5, 6

24 C.F.R. § 91.500 ................................................................................................ 6

24 C.F.R. § 8.22 .................................................................................................... 4

24 C.F.R. § 8.27 .................................................................................................... 4

24 C.F.R. § 8.3 ...................................................................................................... 4

24 C.F.R. § 8.32 .................................................................................................... 4

24 C.F.R. § 570.911 ............................................................................................ 44

24 C.F.R. § 570.913 ............................................................................................ 44

28 C.F.R. Part 35 .................................................................................................. 3

28 C.F.R. Part 36 .................................................................................................. 3

Fed. R. Civ. P. 8 ................................................................................................. 10

Fed. R. Civ. P. 9 ....................................................................................... 3, 10, 19

59 Fed. Reg. 2939 (Jan. 17, 1994) .................................................................... 29

**Other Authorities**

132 Cong. Rec. S11238-04 (Aug. 11, 1986) ..................................................... 39

155 Cong. Rec. 1295-03 (2009) ........................................................................ 39

H. Rep. 99-660 (Jun. 26, 1986) ......................................................................... 39

S. 1562 (Aug. 1, 1985) ...................................................................................... 39

S. Rep. No. 99-345 (1986), as reprinted in 1986 U.S.C.C.A.N. 5266 ................ 11, 20, 22

**State Courts**

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
102 P.3d 268 (Cal. Sup. Ct. Dec. 23, 2004) ............................................................. 47

The United States brings this civil action against the City of Los Angeles (the City) and the CRA/LA (CRA), for damages and penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733, and for damages under common law.  (Complaint-in-Intervention ¶¶ 353–73, ECF No. 98) (Compl.).  During the false claims period, defendants knowingly presented and caused the presentment of false or fraudulent claims for payment or approval to the Department of Housing & Urban Development (HUD), and knowingly made, used, and caused the making or use of, false records or statements material to false or fraudulent claims and to get false or fraudulent claims paid, in violation of the FCA and common law.  (*Id.* ¶¶ 353–73).

## BACKGROUND

Throughout the false claims period, the City accepted federal taxpayer dollars and then, contrary to its promises, used that money to discriminate against people with disabilities, depriving them of federally-assisted housing in the City.  (Compl. ¶¶ 2, 178–215, 250–71).  The City not only failed to make federally-assisted buildings physically accessible, but also abandoned its obligations to operate its housing programs and activities in a manner accessible to or usable by people with disabilities.  (*Id.* ¶¶ 196–215, 276–301).  Further, the City did not affirmatively further fair housing for people with disabilities, as required by law.  (*Id.* ¶¶ 216–49).  As a result of its false claims, the City obtained federal taxpayer dollars it was not entitled to.  (*Id.* ¶¶ 329–52).  The City knowingly failed to provide accessible housing, a core part of its bargain with HUD, and this lawsuit seeks to compensate the Government for that failure.  The City's Motion to Dismiss should be denied.

## PROCEDURAL HISTORY

In February 2011 two private whistleblowers, known as relators, filed a *qui tam* complaint against the City and CRA.  (Relators Compl., ECF No. 1).  Ms. Ling, a City

///
///
///

1

resident, is an advocate for people with disabilities and herself uses a wheelchair.  (*Id.* ¶ 11).  She tried to no avail to get the City to focus on its accessibility obligations.  (*Id.* ¶¶ 38–58).  As a result of the lack of accessible housing in the City, she was at times homeless, at times forced into transitional housing, and at other times living in public housing without basic accessible facilities.  (*Id.* ¶ 11).  The Fair Housing Council is a non-profit, civil rights advocacy organization founded to eliminate housing discrimination and expand housing choices for people with disabilities.  (*Id.* ¶ 12).

On July 31, 2017, the United States filed its Complaint joining this suit.  The lawsuit is brought on behalf of HUD, and of the citizens of the United States, only after years of refusal by the City to work with HUD and the Department of Justice to correct a systematic failure to ensure federal dollars are spent in compliance with critical civil rights laws.  This case, investigated and developed over a period of years, is not just about recovering misspent taxpayer funds.  It addresses the knowing and repeated past false claims of a jurisdiction that ignored its civil rights obligations to its own citizens.  Holding the City accountable is important to deter jurisdictions from such conduct in the future.  Ultimately, this suit seeks to protect people with disabilities in the City and throughout the country, as well as the HUD programs that serve people with disabilities.

Although the settlement the City reached in the case of *Independent Living Center of Southern California v. City of Los Angeles*, No. CV12-0551 (C.D. Cal.),[1] aims to increase the City's future accessible housing stock, (City Mem. 1), it does nothing to address the City's past misuse of HUD funds.  The City wants to limit the cost of its lengthy misconduct to conformance with its legal obligations going forward pursuant to the *Independent Living* settlement, and for this Court to ignore its history of submitting false claims to HUD.  If the City prevails, and there is no consequence for that misconduct, there will be little deterrent to false claims in the future.

In response to this suit, the City asks the Court to misapply the law, look beyond

---

[1] The case arose in January 2012 when a group of non-profit housing advocacy organizations sued the City for violations of federal and state accessibility laws.

the four corners of the Complaint, contradict Congress's intent, and ignore HUD's requirements.  Specifically, the City moves to dismiss the FCA claims under Federal Rules of Civil Procedure 9(b) and 12(b)(6), and pursuant to separation of powers and the FCA's "statute of repose."  (City Mem. 13–39).  The City moves to dismiss the common law claims pursuant to the California Torts Claims Act.  *Id.* at 40–42.  It also suggests the common law claims are time-barred and not actionable in light of the economic loss doctrine and existing contracts between the City and HUD.  *Id.* at 42–46.  All of the City's arguments lack merit; accordingly, this case should proceed.

**ALLEGATIONS IN THE COMPLAINT**

## I.    HUD PROGRAMS

HUD gives local governments federal funds for development and rehabilitation of affordable housing through various formula grant programs, including Community Development Block Grants (CDBG), HOME Investments Partnerships (HOME) grants, Housing Opportunities for People with AIDS (HOPWA) grants, and Emergency Solutions Grants (ESG) (collectively the Formula Grant Programs).  (Compl. ¶¶ 122–23).  HUD also provides local governments funding outside the Formula Grant Programs through Notice of Funding Availability (NOFA) announcements, including Economic Development Initiative (EDI) Grants and Neighborhood Stabilization funds.[2]  (*Id.* ¶ 169).

Before recipients get any Formula Grant Program or NOFA funds, they must promise compliance with federal civil rights laws protecting people with disabilities from discrimination, including:  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations at 24 C.F.R. Part 8 (Section 504); the Fair Housing Act, 42 U.S.C. §§ 3601–3619, and its implementing regulations at 24 C.F.R. Part 100 (the FHA); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12213, and its implementing regulations at 28 C.F.R. Parts 35 and 36 (the ADA); and the

---

[2] The United States pled EDI grants are part of the Formula Grant Program, but they are awarded competitively through the NOFA process.

duty to affirmatively further fair housing.  *E.g.*, 24 C.F.R. § 91.225.  (Compl. ¶¶ 9, 136–38, 143–49, 152–54, 157–58, 170–72) (collectively the Federal Accessibility Laws).

## II.   FEDERAL ACCESSIBILITY LAWS

The Federal Accessibility Laws guarantee equal opportunity for people with disabilities.  Section 504 prohibits discrimination against people with disabilities in "any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  In federally-assisted housing, it requires a minimum number of accessible units in each building for people with mobility, hearing, or vision impairments, and requires accessible common areas as well.  24 C.F.R. §§ 8.22(b), 8.32, 8.3.  Section 504 also imposes programmatic requirements for accessibility.  *E.g.*, 24 C.F.R. § 8.27.

In Section 504, Congress found "individuals with disabilities constitute one of the most disadvantaged groups in society" and "continually encounter discrimination" in housing accommodations.  29 U.S.C. § 701.  It also found disability "should not diminish" the right of individuals to live independently and enjoy full inclusion and integration in society.  *Id.*  Congress thus intended Section 504 to "empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society," and ensure the Federal Government leads in assisting to fulfill "the aspirations of such individuals." 29 U.S.C. § 701(b).

The FHA makes it unlawful to "discriminate against people with disabilities in the provision of services or facilities in connection with" a dwelling.  42 U.S.C. § 3604(f)(1)–(2).  Discrimination under the FHA includes the failure to meet certain design and construction requirements.  42 U.S.C. § 3604(f)(3).  The FHA declares it is United States policy "to provide, within constitutional limitations, for fair housing throughout the United States."  42 U.S.C. § 3601.  The Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619 (1988), expanded the FHA's protections to prohibit discrimination based on disability.  (Compl. ¶ 5).

The FHA includes the obligation to affirmatively further fair housing in order to achieve its policy objective of fair housing throughout the United States.  42 U.S.C. §

3608; *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972).  Congress "saw the ending of discrimination as a means toward truly opening the nation's housing stock to persons of every race and creed." *N.A.A.C.P. v. Sec. of Hous. & Urban Dev.*, 817 F.2d 149, 155 (1st Cir. 1987).  Thus, Congress meant the FHA to "do more than simply" prohibit discrimination; "it reflects the desire to have HUD use its grant programs to assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases." *Id.*  Only through "strict adherence to the anti-discrimination provisions of the [FHA]" did Congress believe that "residential integration" would be achieved.  *United States v. Starrett City Assocs.*, 840 F.2d 1096, 1100-01 (2d Cir. 1988).  As such, HUD requires that grantees "affirmatively further fair housing" for people with disabilities, which means each grantee will "conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." *E.g.*, 24 C.F.R. § 91.225 (2015); U.S. Dep't of Hous. & Urban Dev., Office of Fair Hous. & Equal Opportunity, Fair Housing Planning Guide 1-2 (1996).

The ADA is a comprehensive civil rights law prohibiting discrimination against people with disabilities.  Title II of the ADA prohibits discrimination on the basis of disability in all services, programs, and activities provided by states and local government entities.  42 U.S.C. § 12131 *et seq.*  Title III prohibits discrimination on the basis of disability in public accommodations and requires places of public accommodation to be designed, constructed, and altered to comply with ADA standards. 42 U.S.C. § 12181 *et seq.*  Examples include public facilities—such as leasing offices—and the parking lots, building entrances, access routes, and restrooms that serve those offices, as well as common areas available to the public beyond tenants and guests.

## III.   FUNDING SUBMISSIONS TO HUD

### A.   Consolidated Plan

A jurisdiction seeking Formula Grant Program funds must submit a consolidated

1   planning and application document, called the Consolidated Plan, to HUD.  (Compl. ¶

2   125).  The Consolidated Plan consists of an annual action plan and certifications that

3   jurisdictions must submit to HUD.  (*Id.* ¶ 126–27).

4           The action plan is the application for Formula Grant Program funds.  (Compl. ¶

5   132); 24 C.F.R. § 91.220.  With each action plan, the jurisdiction has to submit HUD's

6   Standard Form 424 (SF 424), containing certain "assurances and certifications."

7   (Compl. ¶ 132–33).  In HUD's Standard Form 424b (SF 424b), jurisdictions certify they

8   will comply with Section 504 and the FHA, and acknowledge both that their

9   "certifications and assurances are material representations of the fact upon which HUD

10  can rely when awarding a grant" and that, if a false certification is made, HUD may

11  "terminate the grant and take other available remedies."  (*Id.* ¶¶ 132-133).

12          Jurisdictions also have to make other annual certifications "satisfactory to HUD."

13  (*Id.* ¶ 135); 24 C.F.R. § 91.225(a).  HUD relies on these certifications in awarding

14  Formula Grant Program funds.  (*Id.* ¶ 135).  First, jurisdictions seeking grants must

15  certify they "will affirmatively further fair housing."  (*Id.* ¶ 136).  Second, for CDBG

16  funds, jurisdictions must certify compliance with the FHA.  (*Id.* ¶ 137).  Third,

17  jurisdictions seeking HOME funds must certify they are "using and will use HOME

18  funds for eligible activities and costs, as described in §§ 92.205 through 92.209 . . . ."

19  (*Id.* ¶ 138).  Since 2013, § 92.205 says activities and costs have to meet property

20  standards in § 92.251, including the requirements of Section 504, the FHA, and the

21  ADA.  (*Id.* ¶ 138).  HUD can disapprove a Consolidated Plan if any certifications are

22  false or otherwise "not satisfactory to the Secretary."  24 C.F.R. § 91.500.

### B.    Executive Funding Agreements/Grant Agreements

24          Once HUD approves a jurisdiction's Consolidated Plan, the parties sign an

25  Executive Funding Agreement (grant agreement).  Separate grant agreements are signed

26  for each CDBG, HOME, ESG, and HOPWA grant.  (Compl. ¶ 139).  Execution of the

27  grant agreement is material to HUD's awarding of the grant.  (Compl. ¶ 177).

28          The CDBG and HOME funding agreements acknowledge the CDBG and HOME

1   regulations "constitute part of the agreement." (*Id.* ¶¶ 143, 148).  Those regulations

2   expressly incorporate Section 504, the FHA, the ADA, and the duty to affirmatively

3   further fair housing.  (*Id.* ¶¶ 145, 149).

4         The ESG funding agreement incorporates by reference the ESG regulations and

5   HUD agrees to provide ESG funds "in reliance upon the Consolidated Plan and

6   certifications." (*Id.* ¶ 154).  ESG regulations expressly require compliance with HUD's

7   anti-discrimination provision included at 24 C.F.R. Part 5, which requires that "all HUD

8   programs" comply with Section 504, the FHA, and the ADA.  24 C.F.R. § 5.105.

9         In HOPWA agreements, jurisdictions acknowledge the HOPWA regulations

10  govern the agreements—which explicitly incorporate 24 C.F.R. Part 5's anti-

11  discrimination provision—and state, "Grantees and project sponsors shall comply with

12  the applicable provisions of the [ADA]." (Compl. ¶ 157–58).

13                    **C.    IDIS Drawdowns**

14        Once a specific Formula Grant Program agreement is executed, HUD transfers the

15  funds to a line of credit or an account each jurisdiction has with the U.S. Treasury.  (*Id*. ¶

16  159).  The account is managed through HUD's Integrated Disbursement Information

17  System (IDIS).  (*Id.* ¶ 160).  Before a jurisdiction draws down grant funds to a project, it

18  must input into IDIS project set-up information, including the name and location of the

19  project and the specific Formula Grant Program funds to be used.  (*Id.* ¶ 161).  A unique

20  identification number (IDIS Activity ID) is then assigned.  (*Id.* ¶ 161).

21        After the jurisdiction inputs this information, it may make electronic draws

22  through IDIS for the specified housing projects.  (*Id.* ¶ 162).  HUD conditions each draw

23  on compliance with its rules.  (*Id.* ¶ 163).  For HOME funds in particular, the jurisdiction

24  must certify:

25        [T]he funds that the Participating Jurisdiction has drawn and will draw shall

26        be used pursuant to the Participating Jurisdiction['s] approved housing

27        strategy and shall be used in compliance with all requirements of the HOME

28        Investment Partnerships Act, 42 U.S.C. 12701, et seq., and HUD regulations.

                                        7

(Compl. ¶ 164).  Each draw generates a voucher sent to HUD specifying the amount drawn, the date drawn, and the IDIS Activity ID.  (*Id.* ¶ 166).  Once a jurisdiction completes a project, it has to input into IDIS information about the project's completion, including whether the project complies with Section 504, the number of accessible units, and other accessible features.  (*Id.* ¶ 168).

### D. Other HUD Grants

HUD also awards discretionary funds to jurisdictions on a competitive basis. (Compl. ¶ 169).  HUD publicizes these grant programs through Notice of Funding Availability (NOFA) announcements, which condition NOFA awards on compliance "with all applicable fair housing and civil rights requirements in 24 C.F.R. § 5.105(a)"; applicants and their subrecipients must also promise to comply with "Civil Rights Laws, including the Americans with Disabilities Act of 1990."  Successful applicants "have a duty to affirmatively further fair housing opportunities for" people with disabilities. (Compl. ¶¶ 169–172).

## IV. THE CITY'S FAILURE TO COMPLY WITH THE FEDERAL ACCESSIBILITY LAWS

### A. The City's Housing is Inaccessible

The Complaint identifies over three hundred City multifamily properties constructed, rehabilitated, or altered with Formula Grant Program Funds or NOFA funds during the false claims period (the City's Housing Portfolio).  (Compl. ¶¶ 178, 250; Attachs. A and D to the Compl.).  All of the properties in the City's Housing Portfolio are subject to Section 504.  (Compl. ¶ 179).  Many are also subject to the FHA.  (*Id.* ¶ 180).  The properties are also subject to the ADA as part of the City's housing program, as are any places of public accommodations and commercial facilities within the developments.  (*Id.* ¶ 181–82).

These multifamily properties are inaccessible to people with disabilities and violate Section 504, the FHA and/or the ADA.  First, as described in detail in the Complaint and Attachment C, surveys of properties in the City Housing Portfolio reveal

8

that slopes and ramps are too steep for safe passage up or down for people with mobility disabilities; thresholds into and inside of units are too high, making it difficult for wheelchairs to cross; balconies are too narrow for wheelchair access; steps prevent access to common areas for individuals with mobility disabilities; kitchen cabinets, shelves, and surfaces are mounted above the reach of people in wheelchairs; cabinets are set back above counters too deep for people in wheelchairs to reach; sinks, grab bars, mailboxes, and circuit breakers are mounted outside of accessible reach; pipes below sinks and lavatories are uninsulated, creating a risk of burns or cuts for persons in wheelchairs; and there are not enough designated accessible parking spaces. (Compl. ¶¶ 184–85; Attach C. to the Compl.). Additionally, buildings lack visual alarms and tactile signs for people with hearing and visual impairments. *Id.* The Complaint identifies over two hundred accessibility violations in thirty-five buildings the United States surveyed in detail. *Id.* Violations occur both in individual units and in the public, common use, and general areas of the buildings. *Id.*

Second, the Complaint establishes the City's programs, services, and activities pertaining to the buildings within its Housing Portfolio are not accessible under the Federal Accessibility Laws. (*Id.* ¶¶ 196–215). The City did not designate staff to coordinate Section 504 or ADA matters, (*id.* ¶ 197–98), did not maintain an accurate list of accessible units or a centralized wait list for housing for people with disabilities, (*id.* ¶¶ 200, 205–06), and had little idea whether and where compliant units might be. (*Id.* ¶¶ 199, 202). It made no effort to communicate effectively with people with disabilities about the existence or availability of accessible units (to the extent any existed), (*id.* ¶ 203), allowed people who do not have disabilities to live in accessible units, (*id.* ¶ 204), and made no effort to match accessible units with people in need of those units' features. (*Id.* ¶ 205). Nor did the City ensure subrecipients of HUD funds were meeting accessibility requirements. (*Id.* ¶ 215). Its policies and procedures were not compliant with the Federal Accessibility Laws. (*Id.* ¶¶ 196–215).

### B.    The City Failed to Affirmatively Further Fair Housing

To affirmatively further fair housing, the City must: (1) conduct an Analysis of Impediments to fair housing choice (AI); (2) take appropriate action to overcome the effects of any impediments identified; and (3) maintain records reflecting that analysis and those actions.  (*Id*. ¶ 221).  Impediments to fair housing choice include impediments caused by discrimination or segregation based on disability.  (*Id*. ¶ 222).  Accordingly, the City must identify actions or omissions restricting housing choice for people with disabilities, and take appropriate action to overcome identified impediments.  (*Id*. ¶ 229).

During the false claims period, the City prepared an AI just once, in 2006.  (*Id*. ¶ 238).  That AI neither mentioned the lack of accessible housing nor identified any residential patterns or conditions related to fair housing choice for people with disabilities.  (*Id*. ¶¶ 240–41).

### LEGAL STANDARD

Federal Rules of Civil Procedure 8 and 9 govern FCA complaints.  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 898 (9th Cir. 2017).  Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  A complaint must contain sufficient factual matter "stat[ing] a claim for relief [that] is plausible on its face."  *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011).  In considering a motion to dismiss, a court "must accept the allegations of the complaint as true and construe them in the light most favorable to the plaintiff."  *United States ex rel. Brown v. Celegne Corp.*, No. CV 10-3165, 2014 WL 3605896, at *1 (C.D. Cal. July 10, 2014).  A complaint survives a 12(b)(6) motion to dismiss if the allegations, and all reasonable inferences drawn therefrom, cross the line "from conceivable to plausible."  *Moore v. Greyhound Bus Lines*, No. 16-56312, 2017 WL 4422669, at *1 (9th Cir. Oct. 3, 2017).

Rule 9 requires a party "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  All "other facts may be plead generally, or in accordance with Rule 8."  *Corinthian Colls.*, 655 F.3d at 991.  *Scienter*, however, need

10

not be plead with specificity.  Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).  Rule 9 thus encompasses the "who, what, when, where, and how of the misconduct charged." *United States ex rel. Mateski v. Raytheon Co.*, No. 2:06-cv-03614, 2017 WL 1954942, at *2 (C.D. Cal. Feb. 10, 2017).  But "a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." *United States ex rel. Swoben v. Un. Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).  Nor must the complaint "identify representative examples of false claims to support every allegation." *Id.*

Rather, "allegations constituting fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Id.*  Thus, "it is sufficient to allege 'particular details of a scheme to submit false claims with reliable indicia that leads to a strong inference that claims were actually submitted.'" *United States v. Ctr. for Emp't Training*, No. 2:13-cv-01697, 2016 WL 4210052, at *4 (C.D. Cal. Aug. 9, 2016) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998–99) (9th Cir. 2010)

**ARGUMENT**

## I.    THE FCA

The FCA is "the Government's primary litigative tool for combatting fraud."  S. Rep. No. 99-345, at 2 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5266.  Congress designed the FCA "broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims of were made." *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968).

In its current form, the FCA makes liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or

1   "knowingly makes, uses, or causes to be made or used, a false record or statement

2   material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). Congress

3   defined "claim" to include "any request or demand, whether under a contract or

4   otherwise, for money or property, and whether or not the United States has title to the

5   money or property," and "knowingly" to mean "that a person, with respect to

6   information—(i) has actual knowledge of the information; (ii) acts in deliberate

7   ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of

8   the truth or falsity of the information." 31 U.S.C. § 3729(b).

9   **II.   THE COMPLAINT SUFFICIENTLY ALLEGES FALSE CLAIMS**

10          **A.     The Complaint Identifies Numerous False Claims and Statements**

11          The City first argues the Complaint fails to allege a false claim, or fails to allege a

12  false claim with particularity. (City Mem. at 14–15, 46). The City argues the Complaint

13  did not identify a false certification, did not show how any certification was false, and

14  "did not tie" any false certifications to specific grant agreements. (City Mem. at 15).

15         The Complaint details the City's numerous false claims and statements. It

16  identifies FCA claims for payment in the form of annual funding agreements, (Compl. ¶¶

17  139–158, 251–253, 354, 357), NOFA applications for Neighborhood Stabilization Funds

18  (*Id*. ¶¶ 169–76, 262, 354, 357), and drawdown requests in IDIS for Formula Grant

19  Program funds. (*Id*. ¶¶ 159–68, 258–60, 354, 357). It also alleges false records or

20  statements in the form of annual certifications the City made in connection with the

21  Consolidated Plan process, (*id*. ¶¶ 132–33, 135–38, 360, 363), certifications the City

22  made with IDIS drawdowns, (*id*. ¶¶ 159–67, 360, 363), and false statements the City

23  made in IDIS concerning each project's accessibility features. (*Id*. ¶¶ 168, 360, 363).

24         The Complaint provides particularized detail of the circumstances surrounding the

25  City's false claims to HUD and the City's discriminatory conduct against people with

26  disabilities in its federally-assisted buildings and programs. The City is not left in the

27  dark as to where to look or what to defend. Its demand that the United States must attach

28  each document to the Complaint is without merit. *See, e.g.*, *LeBlanc Nutritions, Inc. v.*

*Advanced Nutra LLC*, Civ. S-05-0581, 2005 WL 13985338 (E.D. Cal. 2005) (noting that nothing in the Federal Rules "requires plaintiff to attach any document to the complaint").

**B.      The Complaint Sufficiently Asserts Claims for Express and Implied Certification**

The Ninth Circuit instructs district courts to "construe the [FCA] broadly, as it is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"   *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006), in turn quoting *Neifert-White Co.*, 390 U.S. at 232). Such instruction "has thus given rise to a number of doctrines," including those "that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false."   *Id.* (quoting *Hendow*, 461 F.3d at 1171).   As the Ninth Circuit notes, FCA liability attaches to claims or certifications that are expressly or impliedly false, and to those claims or statements giving rise to promissory estoppel. The Complaint sufficiently asserts each of those theories.

**1.      Express and implied false certification**

The Ninth Circuit attaches liability to express and implied false certifications. *See, e.g.*, *Ebeid*, 616 F.3d at 998.   Claims are false under an express false certification theory "simply when an entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." *United States ex rel. Capriola v. Brightstar Educ. Grp., Inc.*, No. 1:11-cv-00135, 2013 WL 1499319, at *3 (E.D. Cal. Apr. 11, 2013) (citing *Ebeid*, 616 F.3d at 998).   Under an implied false certification theory:

> [W]hen a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if the claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement . . . the defendant has made a misrepresentation that renders the claim "false or

13

1     fraudulent" under § 3729(a)(1)(A).

2 *Campie*, 862 F.3d at 901 (quoting *Univ. Health Servs., Inc. v. United States ex rel.*

3 *Escobar*, 136 S. Ct. 1989, 1999 (2016)); *see also Ebeid*, 616 F.3d at 998 ("Implied false

4 certification occurs when an entity has previously undertaken to expressly comply with a

5 law, rule, or regulation, and that obligation is implicated by submitting a claim for

6 payment even though a certification of compliance is not required in the process of

7 submitting the claim.").

8     For express and implied certification and promissory estoppel, falsity turns on the

9 certification of compliance. *Hendow*, 461 F.3d at 1171. But the Ninth Circuit assigns

10 no "talismanic significance" to the phrase "certification." *Id.* at 1172. As explained in

11 *Hendow*, "So long as the statement in question is knowingly false when made, it matters

12 not whether it is a certification, assertion, statement, or secret handshake." *Id.*

### a.     Express false certification

14     The Complaint alleges false claims under a theory of express false certification.

15 Each year throughout the false claims period, the City executed separate CDBG, HOME,

16 HOPWA, and ESG grant agreements to obtain HUD funds. (Compl. ¶¶ 139, 253). For

17 each and every grant agreement, the City promised to comply with the Federal

18 Accessibility Laws, and the Complaint specifically alleges where and how the City broke

19 those promises. (*Id.* ¶¶ 143–49, 152–54, 157–58, 253, 257). Similarly, since at least

20 2003, each time the City requested a drawdown of HOME Program funds from its IDIS

21 account, it expressly certified compliance with HOME requirements. (Compl. ¶ 164).

### b.     Implied false certification

23     The Complaint also adequately alleges falsity under a theory of implied false

24 certification. The Supreme Court has recognized liability under the FCA based on the

25 implied certification theory of liability at least in situations where: (1) "the claim does

26 not merely request payment, but also makes specific representations about the goods or

27 services provided"; and (2) "the defendant's failure to disclose noncompliance with

28 material statutory, regulatory, or contractual requirements must make those

representations misleading half-truths." *Escobar*, 136 S. Ct. at 1995 (footnote omitted).[3]

In *Escobar*, a relator asserted a mental health facility submitted false Medicaid claims. 136 S. Ct. at 1997. The defendant's employees lacked necessary licenses to provide counseling or prescribe medication without physician supervision, as required by regulation, and misrepresented their qualifications in applications for Federal National Provider Identification (NPI) numbers, "which are submitted in connection with Medicaid reimbursement claims and correspond[ed] to specific job titles." *Id.* Each time the defendant submitted Medicaid reimbursement claims, it provided payment codes and NPI numbers corresponding to the services its staff provided. *Id.*

The Supreme Court held the relator's claims "fall squarely within the rule that half-truths—misrepresentations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Id.* at 2000. In the Court's view, "by submitting claims for payment using payment codes that corresponded to specific counseling services, [defendant] represented that it had provided" therapy and other types of treatment; moreover, defendant "allegedly made further representations in submitting Medicaid reimbursement claims by using [NPI] numbers corresponding to specific job titles." *Id.* Such representations "were clearly misleading in context" because the payment codes and NPI numbers conveyed services provided by qualified, licensed, and properly supervised professionals "without disclosing [defendant's] many violations of basic staff and licensing requirements." *Id.*

Following *Escobar*, the Ninth Circuit revisited the implied certification theory. *Campie*, 862 F.3d at 901. There, the relator alleged a drug producer made false representations in an application to the Food and Drug Administration for approval to manufacture a new drug. *Id.* at 895. The application noted the drug's active ingredient would be sourced from registered facilities in approved countries, but according to

---

[3] The Supreme Court did not resolve "whether all claims for payment implicitly represent that the billing party is legally entitled to payment," leaving the question open. *Escobar*, 136 S. Ct. at 2000.

relator's complaint, the defendant sourced the active ingredient from an unregistered facility. *Id.* at 895–96. The Ninth Circuit held that relator sufficiently pled falsity, because, assuming the truth of the allegations, the defendant represented it "provided medications approved by the FCA that were manufactured at approved facilities" and that this "necessarily refer[s] to specific drugs under the FDA's regulatory regime.". *Id.* at 902–03. These were misleading half-truths since "[a]lthough the drugs at issue were at all times ostensibly 'FCA approved,'" the defendant "requested payment for drugs that fell outside of that approval and omitted critical information regarding compliance with FDA standards." *Id.* at 903.

Here the City's IDIS drawdown requests for each project are impliedly false. For every drawdown, the City input into IDIS the specific City project where the funds would be invested. (Compl. ¶ 166). As *Campie* holds, "[J]ust as payment codes correspond to specific health services," 862 F.3d at 903 (quoting *Escobar*, 136 S Ct. at 2000), and "drug names necessarily refer to specific drugs under the FDA's regulatory regime," *id.* at 903–04, each IDIS submission identified a specific building subject to the Federal Accessibility Laws. With each drawdown, then, the City did not merely request payment, but also "necessarily" and impliedly made representations about each building's accessibility, including that construction would occur in compliance with Federal Accessibility Laws and when complete, would meet Federal Accessibility Law requirements. When the City failed to disclose noncompliance with the Federal Accessibility Laws, those representations were misleading half-truths.

### 2.    Promissory Fraud

Another basis for FCA liability well-recognized in the Ninth Circuit is the "promissory fraud theory," also referred to as "fraud-in-the-inducement." *Campie*, 862 F.3d at 901. Promissory fraud attaches liability "to each claim submitted to the government under a contract, when the contract or extension of the government benefit was originally obtained through false statements or fraudulent conduct." *Id.* As such, "subsequent claims are false because of an *original fraud* (whether a certification or

1    otherwise).” *Id.* (quoting *Hendow*, 461 F.3d at 1173).  The theory “is not so different

2    from the false certification theory” and “even requires the same elements.” *Id.* at 1174.

3         In *Hendow*, the relator alleged a university made false statements in a Program

4    Participation Agreement with the Department of Education for Title IV subsidies where

5    the university agreed “to abide by a panoply” of requirements, including a ban on

6    incentive compensation. *Id.* at 1168.  According to the relator’s complaint, the

7    university had violated the ban, thereby rendering subsequent funding requests to the

8    Department of Education false. *Id.* at 1169–70.  The district court dismissed the

9    complaint for failure to state a claim, but the Ninth Circuit reversed, holding the relator

10   sufficiently alleged the university’s promises to comply with the incentive compensation

11   ban made to become eligible to receive Title IV funds were false. *Id.* at 1173–75.

12        The Complaint is replete with allegations of false statements made by the City to

13   receive Formula Grant Program funds.  In each action plan submitted to HUD, which

14   constituted the City’s annual application for Formula Grant Program Funds throughout

15   the false claims period, the City expressly certified compliance with Section 504 and the

16   FHA in SF 424b.  (Compl. ¶¶ 131–34).  In mandatory annual certifications submitted to

17   HUD, which HUD requires before it awards Formula Grant Program funds, the City

18   certified it will affirmatively further fair housing and conduct its CDBG grants in

19   conformity with the FHA.  (*Id.* ¶¶ 136–37).  For HOME funds in particular, the City

20   certified it “*is using* and will use HOME funds for eligible activities and costs, as

21   described in §§ 92.205 through 92.209.” (*Id.* ¶ 138) (emphasis added).[4]  Section 92.205,

22   since 2013, makes applicable the requirements of Section 504, the FHA, and the ADA.

23   (*Id.* ¶ 138).  In each separate grant agreement for Federal Grant Program funds,

24   moreover, the City agreed to comply with the Federal Accessibility Laws.  (*Id.* ¶¶ 143–

25   45, 148–49, 152–54, 157–58, 253, 257).

26        The City obtained a government benefit through false statements of compliance

27

28   ───────────────
     [4] The City wrongly argues that the certifications were forward-looking only.  (City
     Mem. 16).

with the Federal Accessibility Laws.  HUD required such statements in order for the City to receive Formula Grant Program funds.  Its subsequent requests for payment were therefore false or fraudulent.  *See Campie*, F.3d at 904.

### C.  The City's "Tying Argument" Misunderstands the Law

The City erroneously argues the Complaint did not tie false certifications to specific funding requests.  Yet the relevant inquiry is whether the alleged claim or statement "affected [the agency's] payment decision."  *Campie,* 862 F.3d at 903.  A claim is material under the FCA if it "is integral to a causal chain leading to payment."  *Id.*  Here, the City's false claims and statements were either direct requests to HUD to pay out money or caused HUD to pay out money.  For example, each IDIS drawdown was a direct request for Formula Grant Program funds.  (U.S. Compl ¶¶ 159–68, 258– 63).  Likewise, each grant agreement was a prerequisite to HUD transferring Formula Grant Program funds to the City's line of credit or U.S. Treasury account under HUD's appropriation.  (Compl ¶¶ 139–141, 159, 253, 263, 324).

Other false certifications and statements made by the City in its Formula Grant Program and NOFA applications were integral to funding.  The City's annual entitlement to Formula Grant Program funds were expressly conditioned on the City's certifications of compliance with the Federal Accessibility Laws.  (*Id*. ¶¶ 10, 75, 80, 92, 117, 137, 140, 163, 170, 319–321).  As the Ninth Circuit has repeatedly held, "liability will attach to each claim submitted to the government under a contract, when the contract or extension of the government benefit was originally obtained through false statements or fraudulent conduct."  *Campie*, 862 F.3d at 902.  Liability will also occur "when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required" in submitting a claim."  *Ebeid*, 616 F.3d at 998.  The Complaint adequately alleges a causal chain between false claims and statements and the payment of funds.

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER

The City next argues the Complaint does not adequately plead *scienter* because: (1) the Complaint does not allege the City knew its certifications were false, in part because the certifications are prospective; (2) the Complaint does not identify individuals who acted with *scienter*; and (3) the allegations amount to "simple negligence" and lack "deliberate efforts" to violate the Federal Accessibility Laws.  (City. Mem. 15–21).

Under Federal Rule of Civil Procedure 9(b), "'[m]alice, intent, knowledge, and other conditions of a person's mind,' including *scienter*, can be alleged generally." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011).  The FCA defines "knowledge" to include "actual knowledge," "deliberate ignorance," or "reckless disregard."  31 U.S.C. § 3729(b)(1).  As such, the Complaint adequately pleads *scienter* by alleging the City knew its statements and claims for payment were false, or it deliberately ignored or acted with reckless disregard of, the truth of such statements or claims.  *Corinthian Colls.*, 655 F.3d at 996.

The relators in *United States ex rel. Lee v. Corinthian Colleges* alleged a school's statements in a Program Participation Agreement with the Department of Education subsidies were false because the school violated a ban on paying incentive compensation.  *Id.* at 989.  The Ninth Circuit reversed a district court's order dismissing the complaint for failure to state a claim, holding the relators adequately pled *scienter*:

> In the operative complaint, Relators allege that [the school] requested federal grant money from the [Department of Education] although it "knew that it was not eligible to receive such funds based on its recruiting compensation practices . . . ."  Relators also allege, in reciting the FCA counts raised in the Complaint, that Defendants acted "knowingly" or "in deliberate ignorance or reckless disregard."  The Complaint, therefore, does allege that [the school] acted with *scienter*.

*Id.* at 997.  Likewise, the instant Complaint sufficiently alleges both that the City knew of its requirement to comply with the Federal Accessibility Laws and that it was knowingly

violating that requirement.  Regarding the former, the Complaint asserts:  (1) the City received at least five notices from HUD between 2000 and 2005 advising the City of its obligation to prohibit discrimination based on disability and to establish requirements for program accessibility in connection with its housing programs, (Compl. ¶¶ 331–32); (2) the City entered into loan agreements with the CRA and private developers explicitly requiring compliance with Section 504 and the FHA, (*id*. ¶ 333); and (3) the City's internal guidance required compliance with HOME program requirements, including accessibility in individual units, common areas, and the exterior of each building.  (*Id*. ¶ 334).

Regarding the latter, the Complaint adequately alleges the City knowingly violated the Federal Accessibility Laws.  The Ninth Circuit has explained:

> In defining knowingly, Congress attempted "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."  S. REP. No. 99-345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286.  Congress adopted "the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek."  *Id.* at 20.

*United States v. Un. Healthcare Ins. Co.*, 848 F.3d 1161, 1174 (9th Cir. 2016) (quoting *United States v. Borseau*, 531 F.3d 1159, 1168 (9th Cir. 2008)).  For fifteen years, the City failed to enforce Federal Accessibility Laws, despite knowing they applied to each building in its housing program.  (Compl. ¶¶ 183–195).  Throughout the false claims period, the City systematically failed to make federally-assisted projects accessible.  (*Id*. ¶ 183).  The City also failed to evaluate architectural plans for compliance with the Federal Accessibility Laws, (Compl. ¶ 188), failed to require compliance with the Federal Accessibility Laws in bid solicitations for housing projects, (*id*. ¶¶ 190–93), did not appoint a single qualified Section 504/ADA coordinator, (*id*. ¶ 197), did not maintain an

accurate list of accessible units sufficiently identifying the location of such units or the units' accessibility features, (*id*. ¶ 200), did not have a centralized application or wait-list process to match accessible units with people with disabilities, (*id*. ¶¶ 205–06), and failed to ensure accessible units were occupied by individuals requiring accessibility features. (*id*. ¶¶ 204). The complaint asserts numerous failures by the City to implement the requirements of the Federal Accessibility Laws, despite knowing of them for over fifteen years. (Compl. ¶¶ 183–95).  The City could and should have prevented these failures, but did not, meaning people with disabilities could not find or live in federally-assisted properties. (*Id*. ¶¶ 184-185; Attach. C).  Allegations of the City's nonfeasance for more than a decade and a half satisfy the general pleading requirements for *scienter*.

The City's argument it cannot act with the requisite *scienter* because all certifications are "prospective" or "forward-looking" is factually and legally erroneous. To begin with, since 2013, the City annually certifies in connection with HOME funds that it "*is using* and will use HOME funds for eligible activities and costs, as described in §§ 92.205 through 92.209." (*Id*. ¶ 138) (emphasis added).  In any event, the Ninth Circuit has rejected the argument that liability cannot attach to forward-looking certifications.  *Hendow*, 461 F.3d at 1176 (noting such "grammatical haggling is unmoored in the law").  There, the Ninth Circuit held the relators properly alleged an FCA claim based on the university's prospective certifications it would comply with the incentive compensation ban.  *Id.*  To hold otherwise, according to the Ninth Circuit, would mean "the University would be virtually unfettered in its ability to receive funds from the government while flouting the law." *Id.*[5]

---

[5] Even assuming the City's argument that forward-looking certifications are not themselves false claims or statements, the City's periodic IDIS drawdowns are properly considered implied false certifications.  *See, e.g.*, *United States ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Westchester Cty.*, 668 F. Supp. 2d 548, 566 (S.D.N.Y. 2009) (rejecting argument that a municipality cannot be liable under the FCA for prospective certifications and finding relator properly pled each drawdown request was an implied false claim).

21

1    The City's argument, moreover, is inconsistent with the FCA's purpose.  S. REP.

2    NO. 99-345, at 21 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5286 ("In fashioning

3    the appropriate standard of knowledge for liability under the civil False Claims Act, [this

4    bill] adopts the concept that individuals and contractors receiving public funds shall have

5    some duty to make a limited inquiry so as to be reasonably certain they are entitled to the

6    money they seek.").  Under the City's argument, it could certify year after year it will

7    comply with the Federal Accessibility Laws as a precondition to participating in grant

8    programs, without ever implementing the Federal Accessibility Laws' requirements or

9    inquiring whether such requirements were, in fact, implemented, and not be liable for

10   false claims and statements.  Its argument runs counter to Ninth Circuit precedent, *e.g.*,

11   *Hendow*, 461 F.3d at 1176, and Congressional intent.  S. REP. NO. 99-345, at 9 (noting

12   the FCA is intended to reach false claims and statements where "the claimant is

13   ineligible to participate in the program").

14       Second, the City relies on a handful of cases in arguing a complaint does not

15   adequately plead *scienter* under Rule 9(b) unless it identifies specific individuals.  (City

16   Mem. at 17–20).  Each of these cases, however, is legally and factually distinct, and the

17   City's reliance on them is misplaced.

18       At the outset, *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1428 (9th Cir.

19   1995), *In re International Rectifier Corp.*, No. CV 07-02544, 2008 WL 4555794, at *8

20   (C.D. Cal. 2008), and *In re Apple Computer, Inc.*, 243 F. Supp. 2d 1012, 1021–22 (N.D.

21   Cal. 2002), involved claims against corporations filed under section 10(b) of the

22   Securities Exchange Act of 1943, subsequently amended by the Private Securities

23   Litigation Reform Act of 1995 (PSLRA).  A PSLRA complaint must, "with respect to

24   each act or omission alleged to violate this chapter, state with particularity facts giving

25   rise to a strong inference that the defendant acted with the required state of mind."  15

26   U.S.C. § 78u-4(b)(2).  Thus, "although Rule 9(b) does not require that scienter be plead

27   with particularity, the PSLRA does."  *In re Apple Comput., Inc.*, 243 F. Supp. 2d at

28   1022; *see also In re Int'l Rectifier Corp.*, 2008 WL 4555794, at *9.  The FCA contains

22

1   no comparable heightened pleading requirement for *scienter*.  Even if courts require that

2   PSLRA plaintiffs identify individual corporate officers and the facts giving rise to their

3   *scienter*, there is no similar requirement supplanting Rule 9(b) in FCA matters.

4       Although *United States ex rel. Swoben*, No. CV 09-5013, 2017 WL 4564722, at

5   *5 (C.D. Cal. Oct. 5, 2017), involved an FCA action against several corporations—

6   where the district court ultimately dismissed the Complaint for failure to identify

7   individuals who possessed the requisite knowledge—it inexplicably relied upon

8   *Nordstrom, Inc.*, *In re International Rectifier Corp.*, and *In re Apple Computer, Inc.*,

9   without acknowledging the PSLRA's heightened pleading requirement for *scienter*.  The

10  district court then compounded its error by relying upon *United States v. Science*

11  *Applications International Corp.* (*SAIC*), 626 F.3d 1257, 1274 (D.C. Cir. 2010).  There,

12  the D.C. Circuit vacated a jury verdict because the district court's instruction

13  "improperly allowed the government to prove FCA liability without having to

14  demonstrate that any particular SAIC employee" acted with the requisite *scienter*.  626

15  F.3d at 1273.  Yet even district courts in D.C. acknowledge the error of applying *SAIC*'s

16  rationale to a motion to dismiss:

17      As defendant points out, relator has failed to identify a specific

18      employee who knew he or she was submitting a false claim for payment or

19      was making a false statement to the government. However, this shortcoming

20      is not fatal as this stage. [*SAIC*] involved defective jury instructions following

21      a trial . . . . By contrast, during the motion to dismiss stage, relator must only

22      allege facts accepted as true from which "the court [can] draw the reasonable

23      inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.*

24      *Iqbal*, 556 U.S. 662, 678 (2009).

25  *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 50 (D.D.C. 2015); *see also*

26

27

28

1   *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 109 (D.D.C. 2017).[6]

2       At bottom, the Ninth Circuit holds a complaint sufficiently alleges fraud when it

3   includes "particular details of a scheme to submit false claims with reliable indicia that

4   leads to a strong inference that claims were actually submitted."  *United States ex rel.*

5   *Swoben v. Un. Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).  As such,

6   "allegations constituting fraud must be specific enough to give defendants notice of the

7   particular misconduct which is alleged to constitute the fraud charged so that they can

8   defend against the charge and not just deny that they have done anything wrong."  *Id.*

9       As to Formula Grant Program funds, the Complaint identified specific:

10  (1) programs where the City submitted false claims and statements; (2) applications the

11  City submitted to HUD and the exact false statements made in each application for

12  funds; (3) requests for payment the City submitted for funds under each program;

13  (4) amounts the City caused to be invested in each building; and (5) failures of the City

14  to implement the requirements of the Federal Accessibility Laws.

15         [6] The last case the City relies upon, *United States ex rel. Modglin v. DJO Global*

16  *Inc.*, 114 F. Supp. 3d 993 (C.D. Cal. 2015) is likewise unpersuasive and factually

17  distinct.  There, the court cited five cases in support of its finding that an FCA complaint

18  involving off-label promotion did not satisfy Rule 9(b) because the relators did not

19  "identify the speakers by their job titles and/or responsibilities."  114 F. Supp. 3d at

20  1016.  Only two of those cases, however, involved the FCA.

    The first, *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048,

21  1051–52 (9th Cir. 2001), held the relator's complaint was "not specific enough to give

22  defendants notice of the particular misconduct which is alleged to constitute the fraud

23  charged" because relator did not identify the who, what, or when.  But the court did not

hold failure to identify individuals, by itself, was dispositive.

24      The second, a nonbinding FCA matter from the Southern District of Texas also

25  involving off-label promotion, found that relators failed to satisfy Rule 9(b) because they

did not identify the employees who engaged in the off-label promotion, the physicians

26  who received the promotions, and the false statements made.  *United States ex rel.*

*Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 779 (S.D. Tex. 2010).  Although notice

27  concerns in off-label cases like *Modglin* and *Bennett* may justify that a complaint specify

the specific individuals who promoted off-label and the physicians who received the

28  promotions, the concerns are not applicable here where the fraud does not turn on

statements made between private parties of different employers.

As to NOFA funds, the Complaint likewise identified: (1) the NOFA program where the City submitted false claims and statements—namely the Neighborhood Stabilization Program; (2) the particular applications the City prepared and the exact false statements made in each application; and (3) the years the City received Neighborhood Stabilization Program funds, the amount of funds received, and the specific buildings such funds were invested in.

Accordingly, the Complaint has sufficiently pled "particular details of a scheme to submit false claims," including the false claims and statements at issue.  The individuals who signed the claims and statements can be divined from the face of those documents, and the City has not explained how naming specific individuals would give it any additional "notice of the particular misconduct which is alleged to constitute the fraud charged."  *Id.*  The additional facts demanded by the City are inconsistent with the Ninth Circuit's pleading requirements pursuant to Rule 9(b).

Third, the City argues the Complaint has not sufficiently pled *scienter* because the allegations amount to "simple negligence" and lack "deliberate efforts" to violate the Federal Accessibility Laws.  (City Mem. at 20).  As the United States noted above, nothing about the City's conduct—systematically violating its obligations to people with disabilities in its federally-subsidized housing program for more than fifteen years— amounts to "simple negligence."  The City, moreover, wrongly conflates "deliberate ignorance" with "deliberate efforts."  *See, e.g.*, *United States ex rel. Thompson v. Honeywell Int'l, Inc.*, 649 F. App'x 617, 618 (9th Cir. 2016) (noting relator must plead facts leading to the plausible inference the defendant "knew that its statements were false, or that it was deliberately indifferent to or acted with reckless disregard of the truth of the statements") (Mem. Op.) (*quoting United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011)).

## IV. THE COMPLAINT SUFFICIENTLY ALLEGES MATERIALITY

Relying extensively on material outside the pleadings, the City next attempts to argue this action should be dismissed for lack of materiality.  The FCA defines

"material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Accordingly, a misrepresentation is material if it is "relevant to the government's decision to confer a benefit."  *Hendow*, 461 F.3d at 1166; *see also Escobar*, 136 S. Ct. at 2002 ("[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'").  Courts are "more likely" to find materiality "where the information at issue goes 'to the very essence of the bargain.'"  *United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 110 (1st Cir. 2016) (*Escobar II*) (quoting *Escobar*, 136 S. Ct. at 2003 n.5).

The Supreme Court recently clarified the materiality standard in *Escobar*, emphasizing "materiality cannot rest on 'a single fact or occurrence as always determinative.'"  136 S. Ct. at 2001.  To assess whether a violation is material, *Escobar* articulated a holistic, multi-factor analysis where no single factor is dispositive.  136 S. Ct. at 2003–04; *see also Escobar II*, 842 F.3d at 110 ("The language that the Supreme Court used in [*Escobar*] makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive.").  The non-exhaustive factors identified by the Court were: (1) the label of the requirement, which examines whether the violated requirement is expressly identified as a condition of payment, and which is strong evidence of materiality even if "not automatically dispositive;" (2) whether the violation goes to the "essence of the bargain," which examines whether the violated requirements were important to the Government's overall purpose; (3) whether the violation is significant or "minor or insubstantial," which discounts violations that are limited in scope or magnitude; and (4) what actions the Government took in response to the same or similar violations.  *Id.* at 2003–04.  The Complaint has adequately pled materiality.

## A.   The Label of the Requirement

First, as the Complaint describes, Congress itself identified the violated requirements as conditions of payment.  The Housing and Community Development Act

26

of 1974, Pub. L. No. 93-383, 88 Stat. 633 (1974), establishing the CDBG Program, says "Any grant under [the Housing and Community Development Act of 1974] shall be made only if the grantee certifies to the satisfaction of the Secretary that . . . the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing."  42 U.S.C. § 5304(b)(2); U.S. Compl. ¶ 320.

HUD has also identified the violated requirements as conditions of payment. First, SF 424, which, as noted above, the City submits each year—and through which the City certifies compliance with Section 504 and the FHA as part of the Formula Grant Program application process in SF 424b—contains the following acknowledgment:

> These certifications and assurances are material representations of the fact upon which HUD can rely when awarding a grant.  If it is later determined that, I the applicant, knowingly made an erroneous certification or assurance, I may be subject to criminal prosecution.  HUD may also terminate the grant and take other available remedies.

(Compl. ¶ 133).  Second, HUD may reject a jurisdiction's request for Formula Grant Program funds or take other corrective action if it rejects a jurisdiction's certifications. 24 C.F.R. §§ 91.500, 91.515(a); U.S. Compl. ¶ 323.  Third, HUD requires NOFA recipients to explicitly certify compliance with each of the Federal Accessibility Laws in applications for assistance.  (Compl. ¶¶ 170–72).

### B.    The Essence of the Bargain

Second, the importance Congress attached to preventing the discrimination against people with disabilities in housing is evident from the text of Section 504, the FHA, the ADA, and the context in which Congress enacted these laws.

In passing Section 504, Congress found "individuals with disabilities constitute one of the most disadvantaged groups in society"; "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . housing [and] public accommodations"; and disability should "in no way diminish[] the

right of individuals to . . . live independently . . . [and] enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society." 29 U.S.C. § 701(a).  Accordingly, Congress proclaimed:

> [T]he goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to . . . achieve equality of opportunity, full inclusion and integration in society, employment, *independent living*, and economic and social self-sufficiency . . . .

29 U.S.C. § 701(a)(6) (emphasis added).  Congress also proclaimed its purpose in passing Section 504:

> [T]o empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence, and inclusion and integration into society*, through . . . the guarantee of equal opportunity [and] . . .
>
> [T]o ensure that the Federal Government plays a leadership role in . . . assisting States and providers of services in fulfilling the aspirations of such individuals with disabilities for meaningful and gainful employment and *independent living.*

29 U.S.C. § 701(b) (emphasis added).  Thus, Section 504 prohibits discrimination against people with disabilities in "*any* program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (emphasis added).  Congress made similar findings and prohibitions under the ADA.  *See* 42 U.S.C. §§ 12101, 12132, 12182.  The Congressional purpose of supporting independent living, inclusion, and integration for people with disabilities can hardly be realized when such people cannot participate in housing opportunities.

Further, Congress declared in the FHA that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.  At the time of its enactment, the FHA banned discrimination because of race, color, or national origin, in connection with the sale or rental of housing. 42 U.S.C. § 3604; U.S. Compl. ¶ 5.  Congress saw ending discrimination "as a means

28

toward truly opening the nation's housing stock to persons of every race and creed." *N.A.A.C.P. v. Sec. of Hous. & Urban Dev.*, 817 F.2d 149, 155 (1st Cir. 1987). Only through "strict adherence to the anti-discrimination provisions of the [FHA]" did Congress believe that "residential integration" would be achieved. *Starrett City Assocs.*, 840 F.2d at 1101.

The Fair Housing Amendments Act of 1988 expanded the FHA's coverage to prohibit discrimination based on disability. (Compl. ¶ 5). Congress thus afforded people with disabilities similar protection as those historically discriminated against on grounds of race, color, and national origin. (*Id*.). That same "strict adherence to the anti-discrimination provisions" Congress saw necessary to achieve integration for racial minorities was necessary to achieve integration for people with disabilities.[7]

The duty to affirmatively further fair housing is rooted in the FHA. Congress explicitly requires HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of [the FHA]." The duty applies to participants in HUD programs and activities through a variety of statutes, regulations, and Executive Order No. 12892, 59 Fed. Reg. 2939 (Jan. 17, 1994).

As these many public laws and statements attest to, the United States does not get the benefit of its bargain when local entities use federal funds to discriminate against people with disabilities.

## C.    The Violations are Significant

Third, the City's violations are by no means "minor or insubstantial." The Complaint identifies over two hundred accessibility violations in thirty-five of the City's housing projects. (Compl., Attach. C). It also identifies numerous failures on a programmatic level to make local housing programs, services, and activities accessible. (Compl. ¶¶ 196–215). The list of programmatic failures is extensive and spans over a

---

[7] Indeed, Congress understood that unique protections, such as the design and construction requirements of the FHA that apply to many of the developments at issue in this litigation and for which the City made false certifications, were necessary to further the FHA's goals of nondiscrimination and truly integrated housing.

decade and a half.  The City's systematic disregard of the Federal Accessibility Laws is more than substantial.

### D.     Prior Government Action

Fourth, the record before the Court is of actions by the United States that support a finding of materiality, not least of which is its intervention on behalf of HUD in this lawsuit.  The Complaint identifies that HUD rejected the City's NOFA application for discretionary FY16 funds under the Choice Neighborhood Program because the City was not in compliance with the Federal Accessibility Laws.  (*Id.* ¶ 328).  The Complaint describes that in November and December of 2011, HUD conducted a Section 504 and ADA compliance review of the City's properties, identified numerous accessibility violations, and detailed the results of its review in a January 2012 Letter of Findings.  (*Id.* ¶¶ 341, 343).  The Complaint identifies that the Letter of Findings noted substantial noncompliance by the City.  (*Id.* ¶¶ 346–348).  The Complaint describes that immediately thereafter, HUD sought to remedy the City's failures and bring the City into compliance through a voluntary compliance agreement (VCA).  (*Id.* ¶ 350).  The Complaint describes how, despite negotiations since January 2012, the City did not sign a VCA.  (*Id.* ¶ 352).  All of these facts demonstrate the importance HUD attached to the accessibility requirements and the City's knowledge of that importance.

The City's arguments against materiality completely misunderstand the law.  The City argues:  (1) the relevant statutes and regulations generally call for compliance to a degree satisfactory to the Secretary of HUD, thus reflecting "a recognition of the need for flexibility," (City Mem. 25; (2) HUD's regulations are complex and grantees "will almost assuredly" violate those regulations "from time-to-time," *id.* at 26; (3) HUD has administrative mechanisms for addressing non-compliance, including remedies other than withholding entitlement funding, *id.* at 27; (4) HUD has issued Letters of Finding to over one dozen other jurisdictions for accessibility issues, but did not withhold funding from those jurisdiction or bring actions under the FCA, *id.* at 20; (5) HUD has "been aware of the City's alleged non-compliance since at least November 2011" but has not

"terminated, reduced, or withheld" the City's Formula Grant Program Funds, *id.* at 31; and (6) the alleged issues of noncompliance are "minor" and "insubstantial." *Id.* at 33.

First, the City's argument that the violations are not material because "the relevant statutory and regulatory provisions generally call for compliance to a degree that is satisfactory to the Secretary of HUD," (City Mem. 25), finds no support in the Ninth Circuit or text of the FCA. Nor is the language the City cites unique: all regulatory certifications must necessarily be made to the satisfaction of the agency. That Congress made the requirement here explicit does nothing to lessen the significance of the grantee's underlying regulatory obligations to ensure federal funds are not used to discriminate or the fact that the City violated these obligations.

Second, the City's argument the violations are not material because HUD's regulations are "extensive and highly complex" and grantees "will almost assuredly face various instances of non-compliance from time-to-time," (City Mem. 26), is likewise unavailing. The FCA contains no exemption for unusually complicated statutory schemes. In any event, the alleged violations in *Escobar* also involved a complex state Medicaid regulatory scheme, but the Supreme Court did not adopt the complexity of a regulatory scheme as an element of the materiality analysis.

Third, the City's reliance on HUD's "extensive administrative mechanisms for managing and correcting non-compliance" is misplaced. Congress did not include an exception in the FCA for the many instances where a parallel administrative enforcement scheme exists. On the contrary, "Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." *United States ex rel. Onnen v. Sioux Falls Indep. Scho. Dist. No. 495*, 688 F.3d 410, 415 (8th Cir. 2012);; *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 905 (9th Cir. 2017) ("[J]ust as it is not the purpose of the False Claims Act to ensure regulatory compliance, it is not the [agency's] purpose to prevent fraud on the government's fisc."). If anything, an agency's past decision to exercise its administrative enforcement discretion emphasizes the materiality of the alleged violation

31

under *Escobar*.

Notably, the City premises its first three materiality arguments almost exclusively on *United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, No. 2:12cv1600, 2016 WL 1255294, at *29–31 (W.D. Pa. Mar. 31, 2016).  (City Mem. 26–29), but that decision is not persuasive.  *City of Pittsburgh* was decided before *Escobar* and is currently on appeal.  There, relators alleged the City of Pittsburgh submitted false certifications to HUD—including compliance with its duty to affirmatively further fair housing—to obtain certain Formula Grant Program funds.  2016 WL 1255294, at *4. Unlike here, the United States there declined to intervene, and the court subsequently found that relators failed to adequately plead materiality.  *Id.* at *25–31.  Before *Escobar*, courts in the Second and Third Circuits determined materiality by asking whether the regulation at issue was a "condition of participation" or a "condition of payment," of which liability attached only to the latter.  *United States ex rel. Wilkins v. Un. Health Grp., Inc.*, 659 F.3d 295, 309 (3d Cir. 2011); *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001).  In *City of Pittsburgh*, the court found the regulations at issue were conditions of participation only.  *Id.* at *27–31.

That materiality test "did not survive *Escobar*," as *Escobar* "directly abrogated" case law distinguishing conditions of participation and payment.  *Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 106 (2d Cir. 2017) (per curium); *see also United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-1094, 2017 WL 1422364, at *20 n.25 (D.D.C. Apr. 18, 2017); *United States ex rel. Johnson v. Golden Gate Nat'l Sr. Care, L.L.C.*, 223 F. Supp. 3d 882, 894 (D. Minn. 2016) (citing *Escobar*, 136 S. Ct. at 2001–04); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 600 (S.D. Tex. 2016).  Even before *Escobar*, courts in the Ninth Circuit rejected distinguishing conditions of participation from conditions of payment.  *See, e.g.*, *United States ex rel. Handal v. Ctr. for Emp't Training*, No. 2:13-cv-01697, 2016 WL 4210052, at *7 (E.D. Cal. Aug. 9, 2016).

For its fourth materiality argument, the City points to a number of instances where HUD resolved accessibility violations with other jurisdictions informally through VCAs.

(City Mem. 29–30).  The City notes that none of those jurisdictions "faced an equivalent FCA claim."  (City Mem. 30.)  As a preliminary point, HUD took action in each of the cited jurisdiction to resolve accessibility violations, which evidences the importance HUD ascribes to compliance with the Federal Accessibility Laws.  That the other jurisdictions resolved HUD's accessibility concerns short of FCA litigation, while the City did not, says more about the City's failure to address its malfeasance than it does about HUD's opinion of that malfeasance.  Further, bringing recipients of federal financial assistance and other covered entities into voluntary, as opposed to involuntary, compliance is the preferred Congressional policy.  *See* 29 U.S.C. § 794a(a)(2) (adopting voluntary compliance requirements for Section 504); 42 U.S.C. § 12212 (providing in the ADA that "the use of alternative means of dispute resolution . . . is encouraged to resolve disputes arising under this chapter").

Whether the circumstances surrounding HUD's actions with other jurisdictions are sufficiently similar to preclude a finding of materiality here, moreover, is a question of fact not suitable for resolution on a motion to dismiss.  *See, e.g.*, *Cook, Perkiss and Liehe, Inc. v.  N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("It is well-established that questions of fact cannot be resolved or determined on a motion to dismiss for failure to state a claim upon which relief can be granted.").  The nature of the other jurisdictions' misconduct, HUD's findings in response, the actions of HUD and each jurisdiction to resolve such findings, and the ultimate resolutions reached, are not before the Court in the pleadings presented here.  The City inappropriately attempts to have the Court go beyond the pleading.[8]

---

[8] Even if it were appropriate to address facts outside the complaint, which it is not, the examples the City cites are factually distinct.  For instance, HUD issued a letter of finding of non-compliance to the City of Orlando on April 2, 2014, and executed a VCA with it on April 29, 2015.  (City Decl. 12, Ex. 10).  Likewise, HUD issued a letter of finding of non-compliance to Jackson County on November 28, 2012, and executed a VCA with it on February 14, 2013.  (City Decl. 8, Ex. 6).  Although HUD issued a letter of finding to the City on January 11, 2012, (Compl. ¶ 343), to date the City has not

Fifth, the City argues HUD's continuous payment of Formula Grant Program funds, despite knowledge of the City's accessibility issues since November 2011, precludes a finding of materiality.  At the outset, payment of a particular claim is one of a number of *Escobar* factors, none of which by itself is dispositive of materiality.  Nevertheless, the Ninth Circuit has cautioned against reading "too much into" continued agency approval.  *Campie*, 862 F.3d at 906.  There, in the FDA context, the circuit court noted "there are many reasons the FDA may choose not to withdraw a drug approval, unrelated to the concern that the government paid out billions of dollars for non-conforming and adulterated drugs."  *Id.*; *see also United States ex rel. Hussain v. CDM Smith, et al.,* No. 14-9107, 2017 WL 4326523 (S.D.N.Y. 2017) ("As *Escobar* made clear, the misrepresentation does not have to be so grievous that the government would have completely denied payment upon discovering the truth—it is enough that the omission would have affected the government's payment decision. This holistic question can be answered fully only after discovery.") (internal citation omitted).   Here, there were other reasons for HUD not withdrawing the City's Formula Grant Program funds even in the face of materially false statements or claims, including HUD's ongoing efforts to settle the claims with the City prior to initiating any litigation.  (Compl. ¶¶ 350, 352).  Significantly, when this effort failed, the United States *for HUD* filed this suit seeking recovery of the funds paid.

Sixth, the City claims the accessibility violations are too "minor" and "insubstantial" to support materiality under *Escobar*.  As the United States already noted above, the City systematically failed to provide accessible housing for a fifteen year period.  Nothing about this conduct is minor or insubstantial.

_____

executed a VCA with HUD.  (*Id.* ¶ 352).  The City's argument that other jurisdictions did not "face[] an equivalent FCA claim," (City Mem. at 30), is undermined by the very fact the City never resolved the outstanding accessibility issues with HUD.

1  **V.    NONE OF THE UNITED STATES' CLAIMS ARE TIME-BARRED**

2  **UNDER THE FCA'S STATUTE OF REPOSE**

3      The FCA limitations provision has two parts.  Section 3731(b)(1) provides an

4  FCA case must be brought within six years of the date an FCA violation was committed.

5  Section 3731(b)(2) provides a civil action may not be brought more than three years after

6  a responsible government official learns of facts material to the alleged fraud, but in no

7  event more than ten years after the date on which the violation was committed. The

8  United States is allowed to take advantage of whichever is longer.  Section 3731(c)

9  provides, in addition, that if the government intervenes, it "may file its own complaint or

10  amend the [relator's] complaint" and that "any such Government pleading shall relate

11  back to the filing date of the complaint of the person who originally brought the action,

12  to the extent that the claim of the Government arises out of the conduct, transactions, or

13  occurrences set forth, or attempted to be set forth, in the prior complaint of that person."

14  31 U.S.C. § 3731(c).  Although the United States maintains that it may assert FCA

15  claims for conduct occurring ten years prior to the date the relators filed their *qui tam*

16  complaint, in this action, the United States is asserting FCA claims for misconduct only

17  on or after February 1, 2005, *i.e.*, six years prior to the date relators filed their action.[9]

18      Citing *United States v. Scan Health Plan*, CV 09-5013-JFW (JEMx), Dkt. 340,

19  2017 U.S.Dist. LEXIS 174308 (C.D.Cal Oct. 5, 2017), the City argues the Government's

20  claims occurring before July 2007 are time barred.  The logic of the City's argument is

21  as follows.  Although § 3731(c) says the United States' Complaint "relate[s] back to the

22  filing date of the [relator's] complaint" it only does so "[f]or statute of limitations

23  purposes."  Section 3731(b)(2), which provides claims may not be brought "more than 3

24  years after the date when facts material to the right of action are known or reasonably

25  should have been known by the official of the United States charged with responsibility

26  _____

27      [9] The time period applies only to the United States' FCA claims.  As the United
States notes later on, none of its common law claims for unjust enrichment/restitution
28  and payment by mistake are time-barred; for negligent misrepresentation, the relevant
time period is on or after February 1, 2008.

1    to act in the circumstances, but in no event more than 10 years after the date on which

2    the violation is committed," is a statute of repose, it says, not a statute of limitations.

3    (City Mem. at 34-35).  As a result, the City argues, relation back only applies to (b)(1),

4    the six year limitation, and not to (b)(2), the "three years but no longer than ten"

5    limitation.  The City concludes the hard ten-year limit counts backwards from the filing

6    of the Complaint, not the filing of relators' complaint, and as a result the United States

7    can only make claims for violations occurring after July 2007.  City Mem. at 36.[10]

8         The City's argument, and the decision in *Scan Health*, are contrary to the plain

9    meaning of the FCA, contrary to legislative intent, and inconsistent with how other district

10   courts have applied the statute.  When § 3731(c) says "for statute of limitations purposes"

11   it is referring to the entirety of § 3731(b).

12        Although *Scan Health* comes to a different conclusion, the plain language of the

13   FCA is contrary to the City's position.  The City's effort to parse the statute of

14   limitations and the statute of repose in § 3731(b) into two separate pieces, by cutting out

15   the second phrase of (b)(2), should be rejected.  The entirety of subsection (b) is a single

16   provision.  First, the structure of the section, which opens with an introductory phrase

17   "A civil action under section 3730 may not be brought . . ." and closes with the clause

18   "whichever occurs last" indicates that (b)(1) and (b)(2) should be read together and that

19   the two clauses are interrelated. *United States ex rel. Pogue v. Diabetes Treatment*

20   *Centers of America*, 474 F. Supp. 2d 75, 85 (D.D.C. 2007); *United States ex rel.*

21   *Sainbury v. LB&B Assoc., Inc.*, 58 F. Supp. 3d 37, 51 (D.D.C. 2014).  Second, if

22   Congress intended the relation back provision in (c) to apply only to (b)(2) it would have

23   put the relation back language in (b)(2), or referred to (b)(2) explicitly in (c), but it did

24   not.  It put the relation back language in section (c), indicating relation back applies to

25   more than just one sub-clause of section (b).  Third, if the United States' claims were

26   limited the way the City proposes, under Ninth Circuit law, the relators would be entitled

27

28   ───────────
       [10] Relators filed their complaint on February 2, 2011. Dkt. 1. The United States
     filed the Complaint-in-Intervention on July 31, 2017

                                        36

to take advantage of the tolling provision and make claims for time periods, in circumstances where the United States would not. *United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1213-16 (9th Cir. 1996).[11]  The City provided no reasonable explanation for why Congress would have intended relators to pursue a broader set of claims than the United States.  To the contrary, the amendment to § 3731(c) was intended to make clear that this is not the case.  The City's proposition— and *Scan Health*'s conclusions—are fatally flawed, and create conflicts and inconsistencies between different parts of the FCA, and between the United States and the relators, and should be rejected.

The Supreme Court recently discussed the differences between a statute of limitations and repose in a preemption of state law analysis involving a federal environmental statute (CERCLA).  *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182– 2184 (2014).  Based on CERCLA's text, and the fact that Congress had expressly considered whether to preempt state statutes of limitations and repose in CERCLA, but chose only to preempt the former, the Court concluded that CERCLA's reference to "statute of limitations" did not encompass statutes of repose.  *Id.* at 2187.  It made clear, however, that while "the term 'statute of limitations' has acquired a precise meaning, distinct from 'state of repose,' and while that is its primary meaning, it must be acknowledged that the term 'state of limitations' is sometimes used in a less formal way.'"  *Id.* at 2185.  As such, "In that sense, it can refer to any provision restricting the time in which a plaintiff must bring suit."  *Id.*  In fact, the *Waldburger* petitioner could not "point out an example in which Congress has used the term 'statute of repose.'"  *Id.*; *see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 113 (2d Cir.

---

[11] Additionally, *United States ex rel. Serrano v. Oaks Diagnostics, Inc.*, 568 F. Supp. 2d 1136, 1140 (C.D. Cal. 2008) noted "[s]ome courts have reasoned that it would unfairly prejudice the Government to, in one instance, allow for extensions of the seal through Court approval and then dismiss the actions based on those very extensions." Thus, reading the statute the way the City advocates, creates an internal, inequitable, inconsistency in the statute.

2017) (noting Congress "has never used the expression 'statute of repose' in a statute codified in the United States Code").

In this case, there is no preemption question; rather, § 3731 provides the exclusive limitations framework for any action under the FCA.

In *Nat'l Credit Union Admin. Bd. v. RBS Secs.*, 833 F.3d 1125 (9th Cir. 2016), the Ninth Circuit held that in an appropriate statutory context, the term "statute of limitations" includes "statute of repose." *Id.* at 1133–35. Specifically, the court was considering whether an extender statute in the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) that referenced "statute of limitations" preempted state statutes of repose as well. *Id.* at 1130–31. It concluded it did: in the Ninth Circuit's view, FIRREA was fundamentally different from CERCLA because FIRREA created an entirely new statutory limitations provision rather than borrowing from state statutes. *Id.* at 1134. The FCA's limitations provision, § 3731, is likewise entirely federal. Unlike in *Waldburger*, moreover, there was no evidence in FIRREA that Congress explicitly intended to exclude "statutes of repose" when it used the phrase "statutes of limitations." *Id.* at 1134–35. The legislative history discussed below makes clear the same is true with the FCA. Congress used the term "statute of limitations" in § 3731(c) in the "less formal way" acknowledged by the *Waldburger* Court. *Waldburger*, 134 S. Ct. at 2185.[12]

Congress added § 3731(c)'s relation-back provision in the Fraud Enforcement and Recovery Act (FERA) of 2009, Pub. L. No. 111-21, § 4(b), 123 Stat. 1617, 1625. In support of FERA, Representative Howard Berman of California expressed concern the FCA, at the time, did not "expressly provide that the United States may amend the *qui tam* plaintiff's complaint—or, if more practical, file its own complaint upon intervention in a *qui tam* case—subject to the same rules on 'relation back' of amended claims as

---

[12] Other cases have concluded the term "statute of limitations" in federal statutes includes "statute of repose." *Nomura Holding*, 873 F.3d at 113 (holding use of the terms "limitations" and "repose" are not always precise; quoting case law identifying that courts have long used the term "state of limitations" to refer to "statutes of repose"; and noting that Congress has never used the expression 'statute of repose' in the past); *Fed. Deposit Ins. v. First Horizon Asset Sec., Inc.*, 821 F.3d 372, 379–80 (2d Cir. 2015).

1    would apply if it were amending its own complaint" under Federal Rule of Civil

2    Procedure 15(c)(2).  155 CONG. REC. 1295-03 (2009) (statement of Rep. Berman).

3    Representative Berman then criticized the Second Circuit's decision in *United States v.*

4    *Baylor University Medical Center*, 469 F.3d 263, 268 (2d Cir. 2006), where the court

5    held the United States' Complaint in Intervention did not relate back to the relator's *qui*

6    *tam* complaint:  "The implication of [the Second Circuit's] ruling is that the United States

7    could sometimes be forced to forgo a thorough investigation of the merits of *qui tam*

8    allegations in order to ensure that it does not lose claims due to the running of the statute

9    of limitations." *Id.*  Representative Berman thus explained FERA:

10           [C]larifies that the Government's complaint in intervention or amended

11           complaint will relate back to the date of the original *qui tam* complaint so long

12           as the conditions of Federal Rule of Civil Procedure 15(c)(2) otherwise are

13           met.  Thus, [FERA] adds a new paragraph (c) to Section 3731 that expressly

14           provides that the United States' complaint-in-intervention or amended

15           complaint relates back to the date of the complaint filed by the *qui tam*

16           plaintiff "to the extent that the claim of the Government arises out of the

17           conduct, transactions, or occurrences set forth, or attempted to be set forth, in

18           the prior complaint of that person."

19   *Id.* [13]  Neither *Scan Health* nor the City identifies any legislative history from FERA

20   suggesting the United States may not relate back to the relators' complaint.[14]

21

22   _____

23           [13] By their silence, Defendants have conceded that the United States' claims arise
     out of the same conduct, transactions, or occurrences set forth, or attempted to be set
24   forth, in relators' complaint. In any event the fact of the two documents establish they
     relate to the same conduct.

25           [14] The "three years but no more than ten" language in (b)(2) was added to the FCA
26   in 1986.  In 1986, when Congress talked about the tolling provision in (b)(2) it included
     it in its discussion of what it labeled or described generally as the "statute of limitations."
27   *See, e.g.,* .H. Rep. 99-660 (Jun. 26, 1986); 132 Cong. Rec. S11238-04 (Aug. 11,
     1986)(Statement of Senator Grassley); S. 1562 (Aug. 1, 1985)(Remarks of Senator

28

                                              39

Notably, the City's and *Scan Health*'s interpretation of § 3731(c) is contrary to the prevailing view of several courts that have understood the language "[f]or statute of limitations purposes" in section 3731(c) to allow the United States to relate back to the relators' complaint and have held that the date of filing of the relators' complaint controls whether any claims are time-barred. *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 879–90 (D.C. Cir. 2010), cert. denied, 563 U.S. 987 (2011) (allowing the Complaint in Intervention to relate back to the relator's complaint to assert claims for conduct occurring more than ten years before the Complaint in Intervention); *United States ex rel. Dresser v. Qualium Corp.*, No. 5:12-cv-01745, 2016 WL 3880763, at *9 (N.D. Cal. July 18, 2016) (same); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 32–33 (D.D.C. 2014) (same), *clarified on other grounds*, 2016 WL 3197550 (D.D.C. 2016); *see also United States ex rel. Robinson-Hill v. Nurses' Registry and Home Health Corp.*, No. 5:08-145, 2012 WL 4598699, at *4–5 (E.D. Ky. Oct. 2, 2012) (allowing the Complaint in Intervention to relate back to the relator's complaint to assert claims for conduct occurring more than six years before the United States' complaint); *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp.

_____

Grassley). When Section 3731(c) says "for statute of limitations purposes," then, Congress' prior discussion suggests it intends to refer to all of Section 3731(b) together.

In addition, (b)(2) was added to protect the United States. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 15 at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5280 ("[B]ecause fraud is, by nature, deceptive, such tolling of the statute of limitations is necessary to ensure the Government's rights are not lost"); H.R.Rep. No. 660, 99th Cong., 2d Sess. 25 (1986) ("[F]raud is often difficult to detect and ... the statute of limitations should not preclude the Government from bringing a cause of action under this Act if they were not aware of the fraud."); *see also United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1216(9th Cir. 1996). The Senate intended "'the False Claims Act tolling provision be liberally construed because the conduct addressed here is so inherently deceptive and carefully concealed.'" *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah.*, 472 F.3d 702, 724 (10th Cir. 2006) (quoting 132 Cong. Rec. S11,238 (1986)). The interpretation offered by City here is contrary to this Congressional intent, and would punish, not protect, the United States in circumstances of deception and concealment.

40

1  2d 1270, 1282 (M.D. Fla. 2011) (same).

2  In *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9 (D.D.C.

3  2014), the defendants moved to dismiss on statute of limitations grounds citing a

4  Delaware wind-up statute that required notice of a claim to a dissolved corporation within

5  three years of the dissolution.  Although relator's complaint was filed within the three

6  year window, the United States complaint was not.  The defendants argued the Delaware

7  statute was not a "statute of limitations' and so the U.S. complaint could not defeat the

8  state statute by relating back to the date of the relator's complaint under § 3731(c), which

9  only applied "for statute of limitations purposes."  *Id.* at 30.  The court rejected the

10 arguments, holding "Rule 3 of the federal rules answers the question of when a lawsuit

11 'begins' in federal court, and provides it 'is commenced by filing a complaint.'  FRCP 3."

12 *Id.* at 31.  The court rejected defendants "hyper-technical" FERA arguments and held

13 § 3731(c) allows the government's complaint to relate back to the date of the relator's

14 original complaint as long as it "arises out of the conduct, transactions, or occurrences set

15 forth, or attempted to be set forth, in the prior complaint."  *Id.* at 30-33.  The *Landis* court

16 concluded the U.S. complaint arose out of the same conduct as the relator's complaint

17 and allowed the U.S. complaint to relate back.  *Id.* at 33.

18 The only authority *Scan Health* relies on for its conclusion on the statute of repose

19 is the testimony of a member of the False Claims Act defense bar, who appeared before

20 the 110th Congress on behalf of the U.S. Chamber of Commerce, and explicitly testified

21 against the "relation back" provision ultimately adopted in a different bill by a later

22 Congress.  *Compare* Hearing before the S. Comm. on the Judiciary, 110th Cong. 101

23 (2008) (statement of John T. Boese, Fried Frank Harris Shriver & Jacobson LLP) at 27-

24 28 *with* 31 U.S.C. § 3731(c).  Despite Mr. Boese's objection, the 111th Congress

25 included the § 3731(c) relation back language in FERA.  Thus, Mr. Boese's opinion,

which related to a bill that was never passed,[15] sheds no light on Congress's intent or the meaning of the bill that was ultimately passed. *Ratzlaf v. United States*, 510 U.S. 135, 148 n.18 (1994) *Mead Corp v. Tilley*, 490 U.S. 714, 723 (1989) *see also United States v. Hall*, 617 F.3d 1161, 1167 (9th Cir. 2010), aff'd. 566 U.S. 506 (2012). *But see Transcontinental & W. Air, Inc. v. Civil Aeronautics Bd.*, 336 U.S. 601, 605 n.66 (1949).

Where the interests of the United States are at stake, the Supreme Court interprets statutes of limitations in favor of the United States. *Badaracco v. C.I.R.*, 464 U.S. 386 (1984) ("'Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.'"). Such construction is even more warranted where the allegations involve fraud against the public fisc. *Cf. United States ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1216 (9th Cir. 1996) ("[B]ecause fraud is, by nature, deceptive, such tolling of the statute of limitations is necessary to ensure the Government's rights are not lost through a wrongdoer's successful deception."). Because relators' complaint was filed in 2011, the United States is entitled to assert claims back until 2005.

## VI.  THE COMPLAINT DOES NOT VIOLATE SEPARATION OF POWERS

The City insists the Complaint "seeks to abrogate" separation of powers because: (1) funding decisions regarding the Formula Grant Program rests with Congress in the first instance and then with HUD; and (2) "oversight and enforcement" under the Formula Grant Program "rests squarely with HUD." (City Mem. 36–39). Its argument, however, has no grounding in the Constitution or case law. The City fails to identify any decision ever holding an FCA action brought by the United States violates separation of powers.

First, nothing about this matter encroaches on Congress's constitutionally-assigned functions or intrudes on its prerogatives. Congress explicitly authorized the

---

[15] Mr. Boese's testimony related to the False Claims Act Corrections Act of 2007, S. 2041, an act that never became law which proposed to replace § 3731(b) with a simple ten year statute of limitations.

Attorney General to bring suits under the FCA, 31 U.S.C. § 3729(a), and the City cites no authority for the proposition that when the United States acts pursuant to such authority, it is, as the City puts it, "undermin[ing] Congress's legislative judgment." (City Mem. at 37). On the contrary, when the Attorney General sues under the FCA, he or she is enforcing the law and carrying out Congress's intent to protect the public fisc from false claims. *Cf. United States v. Philip Morris USA, Inc.*, 310 F. Supp. 2d 68, 72 (D.D.C. 2004) ("[W]hen the Government sues under RICO, it is enforcing the law and carrying out Congress' intent to ensure that the laws it enacts are complied with."). Accordingly, "when the Attorney General performs his duties pursuant to a statute that delegates authority to him 'he does not exercise legislative power' but acts 'in his presumptively Art. II capacity.'" *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983)). Such Executive action is subject to check only "by the terms of the legislation that authorized it." *Chadha*, 462 U.S. at 953 n.16. Certainly the FCA contains no limits on suits by the Attorney General protecting HUD's Formula Grant Program.

As to HUD, the City's argument collapses under its own weight: the Attorney General and HUD are both part of the Executive Branch, so their actions toward each other cannot, by definition, violate any separation of powers. Nor does this action "undermine . . . HUD's agency expertise." (City Mem. 37). To begin with, the Attorney General brought this suit "on behalf of HUD." (Compl. ¶ 19). In any event, activities funded by HUD with Formula Grant Program and NOFA funds must be accessible to people with disabilities. (*Id.* ¶¶ 71–121). Because the City invested Formula Grant Program and NOFA funds in inaccessible housing, the City did not use the funds in the manner HUD intended. This action—seeking damages for the City's violation of HUD rules—is consistent with HUD statutes and regulations, and does not undermine HUD's agency expertise in any way.

Second, the existence of an administrative scheme granting HUD "enforcement and oversight," (City Mem. at 37), does not bar the United States' suit under the FCA, constitutionally or otherwise. Virtually every government agency has a remedial scheme

43

1   to address instances of non-compliance, and the City identifies no case in which a court

2   dismissed an FCA action on separation of powers grounds.  Moreover, the FCA is

3   distinct from HUD's enforcement scheme.  FCA liability attaches not to the underlying

4   regulatory violation, but to the submission of false claims for payment.  *United States ex*

5   *rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 ("[M]ere regulatory violations do

6   not give rise to a viable FCA action . . . ."); *United States ex rel. Hopper v. Anton*, 91

7   F.3d 1261, 1266 (9th Cir. 1996), cert. denied, 519 US 1115 (1997) ("[T]he [FCA]

8   attaches liability . . . not to underlying fraudulent activity, but to the claim for payment.")

9   (internal quotations omitted).  It imposes damages on those persons who, *inter alia*,

10  knowingly present false or fraudulent claims for payment.  HUD's regulations, on the

11  other hand, authorize the agency to impose sanctions on grantees for failure to resolve

12  performance deficiencies.  *See, e.g.*, 24 C.F.R. §§ 570.900(b)(3); 570.911; 570.913;

13  570.602

14        The Executive Branch acts within its constitutional authority when different

15  agencies bring separate actions under different sources of law for the same underlying

16  conduct.  *See, e.g.*, *United States v. Batchelder*, 442 U.S. 114, 125 (1979); *Seaboard Air*

17  *Line Ry. v. Koennecke*, 239 U.S. 352, 354 (1915).  A Secretary's enforcement authority

18  does not diminish the Attorney General's duty to enforce the FCA, even in instances of

19  overlapping conduct.  *Cf. Philip Morris*, 310 F. Supp. 2d 58, 73 (D.D.C. 2003) (noting

20  the Government has a duty "to enforce overlapping federal statutes, as long as they are

21  capable of co-existence").  As the Eight Circuit stated, "Congress intended the United

22  States to choose among a variety of remedies, both statutory and administrative, to

23  combat fraud."  *Onnen v. Sioux Falls Indep. Scho. Dist. No. 495*, 688 F.3d 410, 415 (8th

24  Cir. 2012).  That the City's conduct violates both HUD regulations and the FCA does

25  not mean the United States must choose between an administrative action and an FCA

26  lawsuit.

27

28

**VII.  THE UNITED STATES SUFFICIENTLY PLEADS COMMON LAW CLAIMS OF NEGLIGENT MISREPRESENTATION, RESTITUTION/UNJUST ENRICHMENT, AND PAYMENT BY MISTAKE**

Lastly, the City argues the United States' "state law" claims should be dismissed for several additional reasons.  First, the California Tort Claims Act (CTCA) immunizes the City from tort liability.  (City Mem. 40).  Second, assuming the City could be liable, the Complaint has not met the CTCA's procedural requirements.  *Id.* at 41.  Third, the United States cannot maintain its claims for restitution/unjust enrichment and payment by mistake because the parties have an enforceable agreement.  *Id.* at 43.  Fourth, California's "economic loss doctrine" bars any claim for negligent misrepresentation.  *Id.* at 43–44.  Fifth, common law claims for conduct prior to February 1, 2005, are time-barred.  *Id.* at 44.

At the outset, the Complaint asserts federal common law claims against the City, not "state law" claims.  Its claims for negligent misrepresentation, restitution, and payment by mistake are rooted in federal common law rather than any California statute.  When the United States disburses federal funds in connection with a federal program, federal interests apply and federal law governs.  *United States v. Kimbell Foods*, 440 U.S. 715, 726 (1979) (holding federal law governs questions involving the rights of the United States arising under nationwide federal programs).

First, municipalities are not immune from suit in federal court in instances where the United States is the plaintiff.  S*ee Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 127 (2003) (observing the long-held understanding that "municipal corporations, like private ones, should be treated as natural persons for virtually all purposes of constitutional and statutory analysis") (internal quotations and citations omitted); *see also See, Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996); *Pa. v. Union Gas Co.*, 461 U.S. 1, 11–12 (1989), *overruled on other grounds by Seminole Tribe*, 517 U.S. at 66; *United States v. Mississippi*, 380 U.S. 128, 140 (1965); *United States v. Texas*, 143 U.S. 621, 644–45 (1892).  No state statute may immunize states and

1   local entities from suit by the Federal Government without upsetting the constitutional

2   balance. *United States v. Texas*, 143 U.S. at 645 (holding that the power of the Federal

3   Government to bring suit in federal court against a State is necessary to the "permanence

4   of the Union"). The City relies on cases where private plaintiffs sued a state or local

5   entity, and as such, are inapplicable.

6        Second, the City cites *United States v. California*, 655 F.2d 914, 919–20 (9th Cir.

7   1980) (*California I*), for the proposition that the CTCA's procedural requirements apply

8   to claims brought by the United States. (City Mem. 41 n.14). There, however, the

9   United States brought suit under a state statute. *Id.* at 919. The City does not point to

10  any authority that the United States must comply with the CTCA for suits unrelated to a

11  California cause of action. It also fails to cite the cases holding to the contrary. For

12  example, in *United States v. State of California* (*California II*), 932 F.2d 1346, 1349 (9th

13  Cir. 1991), the Ninth Circuit held that, where an issue concerns a nationwide federal

14  program, whether "the asserted remedy be for money had and received or restitution for

15  unjust enrichment, the right to recover under controlling federal law is plain." *California

16  II*, 932 F.2d at 1349; *see also Sec. of Hous. and Urban Dev. v. Sky Meadow Hous.

17  Assoc.*, 117 F. Supp. 2d 970, 978 (C.D. Cal. 2000) ("It doubtful, here, that Congress in

18  enacting the Single Family Mortgage Insurance Program, intended the outcome to

19  depend upon varying characterizations of state law.") (internal citations omitted);

20  *Waldrup v. Countrywide Fin.*, No. 2:13-cv-08833, 2014 WL 1463881, *8 (N.D. Cal.

21  2014) (holding *California I* is inapplicable where the right at issue was created by a

22  federal statute, and the United States is acting in its sovereign capacity in an effort to

23  enforce rights ultimately grounded on federal law).

24       Third, the City says the United States' claims for unjust enrichment/ restitution

25  and payment by mistake cannot proceed in light of funding agreements executed

26  between HUD and the City. (City Mem. 43). At the outset, the Complaint did not plead

27  the funding agreements were binding contracts; rather, the Complaint pled they were

28  false or fraudulent claims for payment or approval to HUD. (Compl. ¶¶ 353, 357). In

any event, whether the funding agreements are enforceable contracts is a question of fact not suitable for resolution on a motion to dismiss.  Further, "restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was *procured by fraud . . . ."  Glenn v. Hyundai Motor Am.*, No. SACV 15-2052, 2016 WL 7507766, at *5 (C.D. Cal. Nov. 21, 2016).

Fourth, the City argues California's "economic loss" rule bars claims for negligent misrepresentation where the loss is caused by negligent performance of a contract.  (City Mem. 43).  Not only is it inapplicable because it is a state rule of law, but application of the economic loss rule "outside the product liability context is discouraged as it produces "difficulty and confusion."  *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 874 (9th Cir. 2007).  In addition, "California law classifies negligent misrepresentation as a species of fraud for which economic loss is recoverable."  *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 274 n.7, 275 (2004).

Fifth, the United States' common law claims in Counts Five, Six, and Seven, are not time-barred.  The City wrongly argues that the United States' common law claims of unjust enrichment/restitution, payment by mistake, and negligent representation are precluded by the federal statute of limitations.  (City Mem. 34).  To begin with, any statute of limitations argument is an affirmative defense for which defendant bears the burden.  *See Anderson v. P. Asian Enters., Inc.*, No. SACV 10-1807, 2011 WL 13227773, at *2 (C.D. Cal. Apr. 18, 2011).  On the one hand, 28 U.S.C. § 2415 sets forth the statute of limitations for claims by the United States for money damages founded on a contract or money erroneously paid.  *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 9502985, 2002 WL 35628747, at *4 (C.D. Cal. Aug. 5, 2002).  Under § 2415, the United States' claims for payment by mistake and unjust enrichment/restitution "must be filed within six years after the right of action accrues."  *Id.* (citing 28 U.S.C. § 2415).

On the other hand, 28 U.S.C. § 2416(c) sets forth a statutory tolling provision "[f]or the purpose of computing the limitations periods established in section 2415."

47

Under § 2416(c), all periods are tolled "during which . . . facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  Section 2416 thus "excludes from the six-year limitation period those periods of time when the government:  (1) did not know the facts material to its right of action; and (2) reasonably could not have known of the facts material to its right of action."  *Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993).

Here, taking as true the allegations in this Complaint, the earliest date facts material to the right of action were known, or reasonably could have been known, by the United States, was January 11, 2012.  (Compl. ¶ 343).  On that day HUD issued a Letter of Findings to the City detailing the results of its Section 504 compliance review occurring in November and December of 2011.  (Compl. ¶ 342).  Accordingly, the United States had until January 11, 2018, to bring its common law claims.  *United States v. California*, 932 F.2d 1346, 1350 (9th Cir. 1991) ("[S]ection 2415 . . . provides for a six year time period during which the United States may sue . . . .").  In light of § 2416(c), which tolled all periods prior to January 11, 2012, none of the United States' common law claims are time-barred.  *See United States v. Froehlich*, No. CV 10-3427 (C.D. Cal. Feb. 25, 2011) (Walter, J.) (copy of order attached) (holding that the United States properly filed within six years of learning of the fraud under § 2415, and that § 2416(c) tolled the entire period during which the government had not learned of the fraud, extending more than ten years back); *United States v. Reinhardt Coll.*, 597 F. Supp. 522, 526 (N.D. Ga. 1983) ("[S]ection 2416 tolled the running of the six-year period until the material facts were known, or reasonably should have been known . . . . This occurred when the government completed its audit on July 25, 1997.  Since the complaint was filed on June 13, 1983, within six years of the time the cause of action accrued, it is not barred by the statute of limitations.").  In light of the City's fraudulent conduct, § 2416(c) tolls the period prior to January 11, 2012, when HUD reasonably knew of the City's systemic discriminatory conduct in the City's federally-assisted

48

1    housing programs.  In any event, the question of when the facts material to the right of

2    action were known, or reasonably could have been known, by the United States, is a

3    fact-intensive inquiry not suitable to a motion to dismiss.

4         The United States' claims for negligent misrepresentation must be filed "within

5    three years after the right of action accrues" under section 2415.  *United States ex rel.*

6    *Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 37, 52 (D.D.C. 2014).  The FCA and

7    Federal Rule of Procedure 15(c) allow the United States to relate back to the relator's

8    complaint.  31 U.S.C. § 3731(c) provides:

9         If the Government elects to intervene . . . the Government may file its own

10        complaint . . . to add any additional claims with respect to which the

11        Government is entitled to relief.  For statute of limitations purposes, any such

12        Government pleading shall relate back to the filing date of the [relator's

13        complaint], to the extent that the claim of the Government arises out of the

14        conduct, transactions, or occurrences set forth, or attempted to be set forth, in

15        the [relator's complaint].

16   Likewise, Federal Rule of Civil Procedure 15(c) provides that an amendment to a

17   pleading relates back to the date of the original pleading when "the law that provides the

18   applicable statute of limitations allows relation back" or "the amendment asserts a claim

19   or defense that arose out of the conduct, transaction, or occurrences set out—or

20   attempted to be set out—in the original pleading."  Pursuant to § 2415 and the relation-

21   back provisions of § 3731(c) and Rule 15(c), the United States may relate back to the

22   relators' complaint—filed February 1, 2011—to assert claims for negligent

23   misrepresentation for conduct beginning February 1, 2008.  The City does not dispute

24   that the United States' claims for negligent misrepresentation from February 1, 2008 to

25   February 1, 2011 arise out of the conduct, transactions, or occurrences set forth, or

26   attempted to be set forth, in the relators' *qui tam* complaint.  (City Mem. 46).

27

28

                                        49

**CONCLUSION**

In light of the foregoing, the United States respectfully requests this Court deny the City's Motion to Dismiss. The United States has sufficiently pled FCA liability under the theories of factually false certification, express and implied false certification, and promissory estoppel. The City's discriminatory conduct stripped people with disabilities of fair housing opportunities. As a result of the City's malfeasance with respect to accessibility issues, it received federal taxpayer dollars from HUD to which it was not entitled.

Dated:  January 12, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN, AUSA
Chief, Civil Division
DAVID K. BARRETT, AUSA
Chief, Civil Fraud Section
MICHAEL D. GRANSTON
SARA MCLEAN
WILLIAM C. EDGAR
ERIC SCHMELZER
Attorneys, Civil Division
United States Department of Justice


_/s/ Lisa A. Palombo_
LISA A. PALOMBO
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

50