JOSEPH H. HUNT
Assistant Attorney General
NICOLA T. HANNA
United States Attorney
DAVID K. BARRETT, AUSA
Chief, Civil Fraud Section
LISA A. PALOMBO, AUSA (SBN 169119)
    Room 7516, Federal Building
    300 N. Los Angeles Street
    Los Angeles, California 90012
    Tel: (213) 894-4042; Fax: (213) 894-7819
    Email: Lisa.Palombo@usdoj.gov
MICHAEL D. GRANSTON
SARA MCLEAN
WILLIAM C. EDGAR
ERIC SCHMELZER
Attorneys, Civil Division
United States Department of Justice
    175 N St. NE, Rm. 9.121
    Washington, DC 20002
    Tel: 202-307-0256; Fax: (202) 307-3852
    Email: Eric.Schmelzer@usdoj.gov
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MEI LING and FAIR HOUSING COUNCIL OF SAN FERNANDO VALLEY,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal corporation, and CRA/LA, a Designated Local Authority, a public entity,<br><br>Defendants. | No. CV-11-00974 PSG (JCx)<br><br>FIRST AMENDED COMPLAINT-IN-INTERVENTION AND DEMAND OF THE UNITED STATES FOR JURY TRIAL |

The United States brings this action against Defendants the City of Los Angeles (the City) and the CRA/LA, a Designated Local Authority (CRA/LA) (formerly the Community Redevelopment Agency for the City of Los Angeles), for damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733, and for damages under the common law theories of negligent misrepresentation, payment by mistake, and unjust enrichment.

Since February 1, 2005 (the relevant period), Defendants knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States Department of Housing & Urban Development (HUD), and knowingly made, used, and caused to be made or used, false records or statements material to false or fraudulent claims, and to get false or fraudulent claims paid, in violation of the FCA and common law. In support of its claims, plaintiff the United States of America alleges as follows:

## I. SUMMARY OF THE ACTION

1. Each year, HUD grants hundreds of millions of taxpayer dollars to states and local governments for the development of affordable housing which, by law, must be accessible to people with disabilities.

2. When the funds are not used to create and operate accessible housing, taxpayer dollars are used in a manner that violates the civil rights of people with disabilities who cannot access affordable, accessible housing that should have otherwise been made available.

3. Throughout the relevant period, Defendants received many millions of federal taxpayer dollars from HUD by falsely promising to create affordable, accessible housing.

4. Annually throughout the relevant period, Defendants received HUD funds through:

      a.      the Community Development Block Grant (CDBG) Program;

      b.      the HOME Investment Partnerships (HOME) Program; and

2

c.    Housing Opportunities for Persons With AIDS (HOPWA).

5.    Defendants also received funds from HUD's Neighborhood Stabilization Program during the relevant period.

6.    Defendants used the taxpayer dollars they received from HUD to discriminate against people with disabilities in Los Angeles by depriving them of an equal opportunity to participate in assisted housing programs.

7.    HUD paid out many millions of dollars for accessible housing that the United States—and the residents of Los Angeles—did not receive.

## II.    FEDERAL PROTECTION FOR PEOPLE WITH DISABILITIES

8.    As early as 1973, Congress sought a solution to architectural barriers impeding people with disabilities. Rehabilitation Act of 1973, 29 U.S.C. § 701(a) (Supp. IV 1974).

9.    To that end, Congress commissioned a comprehensive study to develop methods to meet the current and future needs of people with disabilities, initiate and expand services to people with disabilities, and evaluate existing impediments to people with disabilities. *Id.* Most notably, Congress prohibited discrimination against people with disabilities in any program or activity receiving federal financial assistance, including a local government's subsidized housing program. 29 U.S.C. § 794 (Section 504).

10.    In 1981, Congress amended Section 109(a) of the Housing and Community Development Act of 1974—the statute creating the CDBG Program—making explicit what was already true as a legal matter, that discrimination on the basis of disability is prohibited in the CDBG program, by incorporating Section 504 into the Act. *See* Pub. L. 97-35, title III, § 306, 95 Stat. 392 (1981) ("Any prohibition against discrimination . . . with respect to an otherwise qualified handicapped individual as provided in [section 504 of the Rehabilitation Act of 1973] shall also apply to" any program or activity funded in whole or in part under the CDBG Program) (codified at 42 U.S.C. § 5309(a)).

11.     In 1968, Congress passed the Fair Housing Act, announcing, "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

12.     In 1988, Congress amended the Fair Housing Act, 42 U.S.C. §§ 3601–3619, to prohibit discrimination by any person or entity because of a disability in the provision of housing.  *See* Fair Housing Amendments Act, Pub. L. No. 100-430, § 6, 102 Stat. 1619 (1988).

13.     At the time of its initial passage in 1968, the Fair Housing Act prohibited discriminatory conduct based only on race, color, religion, or national origin.  *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 728 n.1 (1995).

14.     The Fair Housing Amendments Act of 1988 thus afforded people with disabilities the same protected-class status as those historically discriminated against on grounds of race, color, religion, and national origin.

15.     Unlike Section 504, the Fair Housing Amendments Act is not limited in its application to housing supported by federal financial assistance.

16.     The plain text of the Fair Housing Amendments Act makes clear that Congress sought to extend federal protections against housing discrimination to people with disabilities. This is also evident in the legislative history. *See* H.R. REP. NO. 100-711, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179 ("The Fair Housing Amendments Act, like [Section 504], is a clear pronouncement of a national commitment to end the unnecessary exclusion of [people with disabilities] from the American mainstream.").

17.     Congress understood "housing discrimination against [people with disabilities] is not limited to blatant, intentional acts of discrimination"; rather, "[a]cts that have the effect of causing discrimination can be just as devastating as intentional discrimination." *Id.* at 25.

18.     In fact, Congress noted that "[a] person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of

4

access into a unit and by too narrow doorways as a posted sign saying '**No Handicapped People Allowed.**'" *Id.* According to Congress, discrimination on the basis of disability is not limited to invidious animus, but also results from "thoughtlessness and indifference" or "benign neglect." *Id.*

19.     Two years after passing the Fair Housing Amendments Act, Congress found that discrimination against people with disabilities continued to persist in housing, public accommodations, and access to public services, and that "the continuing existence of unfair and unnecessary discrimination . . . costs the United States *billions of dollars* in unnecessary expenses resulting from dependency and nonproductivity." Americans with Disabilities Act of 1990, 42 U.S.C. § 12101(a)(8) (emphasis added).

20.     Accordingly, Congress enacted the Americans with Disabilities Act in 1990, prohibiting discrimination against people with disabilities in any service, program, or activity of a public entity, including local governments and any of their departments, agencies, special purpose districts, or other instrumentalities. 42 U.S.C. §§ 12131–32.

21.     The purpose of the Americans with Disabilities Act was to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for people with disabilities, and to "invoke the sweep of congressional authority . . . to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. §§ 12101–02.

22.     Also in 1990, with passage of the Cranston-Gonzalez National Affordable Housing Act—the statute creating the HOME Program—Congress again made explicit what was already true as a legal matter, requiring that grantees under the HOME Program comply with Section 504. 42 U.S.C. § 12832 ("Any prohibition against discrimination . . . with respect to an otherwise qualified handicapped individual as provided in [Section 504 of the Rehabilitation Act of 1973] shall also apply to any program or activity" funded in whole or in part with funds made available under the HOME program.).

23.     The House report to the Cranston-Gonzalez National Affordable Housing Act emphasized there is a "lack of affordable housing" for people with disabilities which creates "critical problems" for them. H.R. REP. NO. 101-199, at 42 (1990).

24.     In 1992, as part of the Rehabilitation Act Amendments to Section 504, Congress completed its comprehensive study, finding that "millions of Americans have one or more physical or mental disabilities," "individuals with disabilities constitute one of the most disadvantaged groups in society," "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . housing," and "the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to . . . achieve equality of opportunity, full inclusion and integration in society, employment, independent living, and economic and social self-sufficiency, for such individuals." 29 U.S.C. § 701(a) (Supp. IV. 1992).

25.     As announced in the Rehabilitation Act Amendments of 1992, the purpose of Section 504 is to empower people with disabilities to maximize their independence—as well as their inclusion and integration into society—through the guarantee of equal opportunity, and to ensure that the Federal Government plays a leadership role in fulfilling the aspirations of people with disabilities for independent living. 29 U.S.C. § 701(b) (2012).

26.     By law, then, HUD may not provide housing funds to a local government unless it promises to comply with certain civil rights laws protecting people with disabilities. In particular, local governments must certify compliance with:

        a.      Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended, and its implementing regulations at 24 C.F.R. Part 8 (Section 504);

        b.      the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, as amended, and its implementing regulations at 24 C.F.R. Part 100 (the FHA);

        c.      as part of the FHA, the duty to affirmatively further fair housing. *See* 42 U.S.C. § 3608(e)(5); 24 C.F.R. §§ 5.160(e); 91.225 (2015); and

d.     Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12213, as amended, and its implementing regulations at 28 C.F.R. Part 35 (the ADA). The laws referenced in this paragraph are referred to as the "federal accessibility laws" below.

27.     Throughout the relevant period, the City repeatedly certified to HUD it would comply with the federal accessibility laws as a precondition to receiving federal funds from HUD.

28.     For example, it certified compliance with the federal accessibility laws in annual submissions to HUD and executed numerous funding agreements with HUD for federal funds in which the City expressly and/or impliedly agreed to comply with the federal accessibility laws.

29.     Additionally, the City expressly and/or impliedly agreed to comply with particular program regulations and with all laws applicable to HUD's housing programs, which include compliance with the federal accessibility laws.

30.     Based on these certifications and agreements, HUD provided to the City many millions of dollars for the City's affordable housing program.

31.     During the relevant period, the City provided the CRA/LA with a portion of the funds it received from HUD.

32.     Contrary to the City's certifications and agreements, however, the City and the CRA/LA failed to use funds for rehabilitation or construction of affordable multifamily rental housing that complied with accessibility requirements, and failed to operate their housing programs and activities in a manner accessible to or usable by people with disabilities.

33.     For example, the City and the CRA/LA did not take appropriate steps to ensure effective communication with people with disabilities and did not adopt and implement procedures to ensure that interested people could obtain information concerning the existence and location of accessible services, activities, and facilities, as required by law.

34. During the relevant period, moreover, the City failed to take appropriate actions to overcome the effects of impediments to fair housing for people with disabilities, as required by its duty to affirmatively further fair housing.

35. Defendants' discriminatory and illegal conduct stripped people with disabilities of fair housing opportunities and contravened federal law requiring that federal recipients provide people with disabilities equal opportunity to achieve independent living, full inclusion and integration in society, and economic and social self-sufficiency.

36. As a result of their nonfeasance with respect to accessibility requirements, Defendants received federal taxpayer dollars to which they were not entitled.

37. Defendants knowingly and systematically failed to provide a core part of their bargain with HUD, and this lawsuit seeks a proper remedy under the False Claims Act and common law for that failure.

### III.    JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.

39. In addition, this Court has subject matter jurisdiction over the FCA claims (the First through Fourth claims) and federal common law claims (the Fifth through Seventh claims) under 28 U.S.C. § 1331.

40. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in, and has committed the alleged acts, in the Central District of California.

41. Venue is proper in the Central District of California, pursuant to 28 U.S.C. § 1391(b)–(c) and 31 U.S.C. § 3732(a), because at least one of the Defendants can be found in, resides in, and transacts business in, the Central District of California, and many of the alleged acts occurred in this District.

# IV. PARTIES

A. **Plaintiffs**

    42.    Plaintiff is the United States of America, suing on behalf of HUD.

    43.    The *qui tam* plaintiffs (relators) are Mei Ling, an individual City resident, and the Fair Housing Council of San Fernando Valley, a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in Panorama City, California.

    44.    The relators initiated this action by filing a complaint against Defendants under the FCA's *qui tam* provisions on February 1, 2011.

B. **Defendant City of Los Angeles**

    45.    Defendant City of Los Angeles is a municipal corporation organized pursuant to Article XI of the California Constitution and located in the Central District of California.

    46.    At all times relevant, the City has been a public entity within the meaning of Title II of the ADA.

    47.    The City has received federal financial assistance within the meaning of Section 504.

    48.    The City used federal financial assistance for its housing programs.

    49.    The City is sued in its own capacity and in its capacity as the housing successor to the former Community Redevelopment Agency of the City of Los Angeles, pursuant to CALIFORNIA HEALTH & SAFETY CODE (CAL. HSC) § 34176.

C. **Defendant CRA/LA**

    **i.**    **Community Redevelopment Law**

    50.    Pursuant to the Community Redevelopment Law, CAL. HSC §§ 33000–33855 (West 1963), *repealed by* CAL. HSC §§ 34171–34191.6, the State of California authorized legislative bodies, including cities, to create redevelopment agencies. CAL. HSC § 33101.

51.     Redevelopment agencies prepared and carried out plans for the improvement, rehabilitation, and redevelopment of areas within each legislative body's jurisdiction, CAL. HSC § 33131(a), including purchasing or leasing real property, CAL. HSC § 33391; renting, maintaining, managing, operating, and repairing real property, CAL. HSC § 33400(b); and leasing, selling, exchanging, assigning, and transferring real property. CAL. HSC § 33430.

52.     The Community Redevelopment Law directed each mayor whose city created a community redevelopment agency, with approval of the city council, to appoint five or seven residents of the community as members of the redevelopment agency. CAL. HSC § 33110.

53.     The powers of each community redevelopment agency were vested in the members in office. CAL. HSC § 33121.

**ii.     The former CRA**

54.     The City created the Community Redevelopment Agency of the City of Los Angeles (the former CRA) to conduct redevelopment activities within its boundaries. Los Angeles Administrative (L.A. Admin.) Code § 8.90.

55.     The former CRA's Board consisted of seven members appointed by the Mayor with approval of the City Council. L.A. Admin. Code § 8.99.01.

56.     Until February 1, 2012, the former CRA was the redevelopment agency for the City and a public agency operating within the City and in the Central District of California. L.A. Admin. Code § 8.90; CAL. HSC § 33100.

57.     The former CRA carried out its activities using federal, state, local, and private funds in designated areas of the City.

58.     From February 1, 2005 to February 1, 2012, the former CRA was a public entity with the meaning of Title II of the ADA.

59.     From February 1, 2005 to February 1, 2012, the former CRA was a recipient of federal financial assistance within the meaning of Section 504.

60. From February 1, 2005 to February 1, 2012, the former CRA invested HUD funds in at least twenty-two of the City's multifamily housing projects.

61. Actions of the former CRA were subject to City Council approval, including but not limited to establishing and changing redevelopment project areas; initiating and amending redevelopment plans; entering into agreements for development; executing loan, borrowing, bond issues, and grant agreements in the amount of $250,000 or more; entering into contracts for services for which compensation totaled $25,000 or more during any twelve month period; and all actions to establish personnel classifications, position authorities, salaries, bonuses, and benefits for agency staff. L.A. Admin. Code §§ 8.99.04–8.99.07.

62. From February 1, 2005 to February 1, 2012, the former CRA's redevelopment plans were submitted to the City Council for approval. L.A. Admin. Code § 8.90.

63. From February 1, 2005 to February 1, 2012, the City Council and Mayor approved the former CRA's budget and any budget modifications. L.A. Admin. Code § 8.99(d).

64. Any expenditure or indebtedness by the former CRA not in conformity with the former CRA's budget or modification was prohibited. L.A. Admin. Code § 8.99(f).

65. From February 1, 2005 to February 1, 2012, the Controller of the City was the Controller of the former CRA in a manner similar to the Controller's duties and responsibilities for City departments under the City Charter, and oversaw all controller functions of the former CRA. L.A. Admin. Code § 8.99.02.

66. The Controller of the City was to cause a yearly audit to be conducted of the former CRA's financial condition, and other audits of the former CRA as the Controller deemed appropriate. L.A. Admin. Code § 8.99.02.

67. The Los Angeles City Attorney served as General Counsel for the former CRA. L.A. Ad. Code § 8.99.03.

11

68. The mayor had authority to remove a member of the former CRA for inefficiency, neglect of duty, or misconduct in office. Cal. HSC § 33115. Subject to Cal. HSC § 33115, City Council also had authority to remove a former CRA member. L.A. Admin. Code § 8.99.01(b).

### iii. The former CRA's dissolution

69. On June 28, 2011, the Governor of the State of California approved California Assembly Bill ABx1 26 (2011) (AB 26), dissolving all redevelopment agencies in the state and transferring to successors all authority, rights, powers, duties and obligations previously vested with the former redevelopment agencies, other than as specified.

70. Each redevelopment agency's assets, liabilities, and responsibilities were divided between two distinct entities: a "successor agency" and a "housing successor."

71. All assets and liabilities of each redevelopment agency, other than the redevelopment agency's housing assets, would be assumed by the successor agency.

72. Each redevelopment agency's housing assets would be assumed by the housing successor.

73. Any municipality that created a redevelopment agency had the option to become either the agency's successor agency, housing successor, or both.

74. If the municipality elected not to become the successor agency, AB 26 automatically created a successor agency in the former redevelopment agency's place.

75. As of February 1, 2012, the former CRA was dissolved.

76. The City elected to become the housing successor of the former CRA, thereby accepting transfer of all rights, powers, duties, and obligations of the former CRA's housing assets and functions, but did not elect to become the successor agency to the former CRA.

### iv. The CRA/LA

77. The CRA/LA came into existence on February 1, 2012 to serve as the former CRA's successor agency.

12

78. The CRA/LA is charged with winding down the affairs of the former CRA.

79. The CRA/LA follows the organizational status of the former CRA, but without any legal authority to participate in redevelopment activities, except to complete any work related to an approved enforceable obligation, as defined by CAL HSC § 34171.

80. All litigation involving the former CRA is automatically transferred to the CRA/LA. CAL. HSC § 34173(g).

81. AB 26 and CALIFORNIA HSC § 34179 *et seq*. requires the establishment of an oversight board consisting of seven members to approve and direct specified activities of the successor agencies.

82. On or about May 2, 2012, the City established an Oversight Board to assume the statutorily specified functions of the CRA/LA, including fulfilling its fiduciary responsibilities to holders of enforceable obligations. CAL. HSC § 34179(i).

83. The CRA/LA is a public entity formed pursuant to CALIFORNIA HSC 34173(d).

84. Since the CRA/LA came into existence, it has been a public entity within the meaning of Title II of the ADA, and has received federal financial assistance and therefore was required to comply with Section 504.

## V. APPLICABLE LAW

### A. The FCA

85. The FCA reflects Congress' objective to "enhance the government's ability to recover losses as a result of fraud against the Government." S. REP. NO. 99-345, at 1 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5266.

86. To that end, the FCA imposes liability on a variety of fraudulent conduct involving claims for federal money or property. 31 U.S.C. § 3729(a).

87. Congress substantively amended the FCA in 2009. Fraud Enforcement and Recovery Act of 2009 (FERA) § 4, Pub. L. No. 111-21, 123 Stat. 1617 (May 20, 2009).

88.     The FCA currently makes liable any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Before FERA, the FCA made liable any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006).

89.     The FCA also currently makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The amendments to this provision apply retroactively to claims for payment pending on or after June 7, 2008. Before FERA, the FCA made liable any person or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2006).

90.     Presently, the FCA defines claim to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

   (i) is presented to an officer, employee, or agent of the United States; or

   (ii) is made to a contractor, grantee, or other recipient, if the money or property

   is to be spent or used on the Government's behalf or to advance a Government

   program or interest, and if the United States Government . . . (I) provides or

   has provided any portion of the money or property requested or demanded; or

   (II) will reimburse such contractor, grantee, or other recipient for any portion

   of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A). Before FERA, the FCA defined "claim" to include:

   [A]ny request or demand, whether under a contract or otherwise, for money

   or property which is made to a contractor, grantee, or other recipient if the

   United States Government provides any portion of the money or property

   which is requested or demanded, or if the Government will reimburse such

14

contractor, grantee, or other recipient for any portion of the money or property
which is requested or demanded.

31 U.S.C. § 3729(c) (2006).

91. Throughout the relevant period, the terms "knowing" and "knowingly" have been defined to mean that a person, with respect to information—"has actual knowledge of the information"; "acts in deliberate ignorance of the truth or falsity of the information"; or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1); *see also* 31 U.S.C. § 3729(b) (2006). The term does not require proof of specific intent to defraud. *Id.*

92. Congress included "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person would have made under the circumstances to be reasonably certain that the person was entitled to the money sought from the Government. S. Rep. No. 99-0345, at 21.

93. In its current form, the FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Before FERA, the word "materiality" did not appear in section 3729. Nevertheless, the Ninth Circuit held that the FCA included a materiality requirement, and defined the term "materiality" consistent with its current statutory meaning. *United States v. Borseau*, 531 F.3d 1159, 1170–71 (9th Cir. 2008).

94. Throughout the relevant period, the FCA has entitled the United States to recover three times the amount of damages it sustained because of a defendant's violation of the statute and, for each act by the defendant violating the statute, a civil penalty. For violations occurring before November 2, 2015, the FCA imposes a penalty for each violation of not less than $5,500 and not more than $11,000. For violations occurring after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation. Bipartisan Budget Act of 2015 (BBA) § 701, Pub. L. No. 114-74, 129 Stat. 584 (Nov. 2, 2015).

15

**B.** **Civil Rights Statutes**

    **i.** **Section 504 and its implementing regulations**

95.    Section 504 prohibits discrimination against persons with disabilities in the operation of all programs and activities receiving federal financial assistance. 29 U.S.C. § 794. It provides in relevant part:

> No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

96.    As part of the 1992 amendment to Section 504 , Congress specifically found that:

> (1) millions of Americans have one or more physical or mental disabilities and the number of Americans with such disabilities is increasing;
>
> (2) individuals with disabilities constitute one of the most disadvantaged groups in society;
>
> (3) disability is a natural part of the human experience and in no way diminishes the right of the individuals to . . . live independently . . . [and] enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society.
>
> . . .
>
> (5) individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . housing [and] public accommodations; [and]
>
> (6) the goals of the Nation properly include the goal of providing individuals with disabilities with the tools necessary to . . . make informed choices and decisions; and . . . achieve equality of opportunity, full inclusion and integration in society, employment,

independent living, and economic and social self-sufficiency, for such individuals . . .

Rehabilitation Act Amendments of 1992, 29 U.S.C. § 701(a) (Supp. IV. 1992).

97.     Likewise, Congress' proclaimed purpose in passing the Rehabilitation Act Amendments of 1992 was to:

(1) empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society through . . . the guarantee of equal opportunity; [and]

. . .

(3) ensure that the Federal Government plays a leadership role in . . . assisting States and providers of services in fulfilling the aspirations of such individuals with disabilities for meaningful and gainful employment and independent living.

29 U.S.C. § 701(a) (Supp. IV 1992).

98.     Congress announced the policy of the United States to be that:

[A]ll programs, projects, and activities receiving [federal financial assistance] shall be carried out in a manner consistent with the principles of—

(1) respect for individual dignity, personal responsibility, self-determination, and pursuit of meaningful careers, based on informed choice, of individuals with disabilities;

(2) respect for the privacy, rights, and equal access (including the use of accessible formats), of the individuals;

(3) inclusion, integration, and full participation of the individuals; [and]

. . .

(5) support of individual and systemic advocacy and community involvement.

17

1    29 U.S.C. § 701(c) (Supp. IV 1992).

2        99.    Among other things, HUD implements Section 504 through 24 C.F.R. Part

3    8, which sets forth mandatory accessibility requirements for recipients of HUD funds.

4        100.    A recipient means:

5            [A]ny State or its political subdivision, any instrumentality of a State or

6            its political subdivision, any public or private agency, institution,

7            organization, or other entity, or any person to which Federal financial

8            assistance is extended for any program or activity directly or through

9            another recipient, including any successor, assignee, or transferee of a

10           recipient.

11   24 C.F.R. § 8.3.

12       101.    Defendants are recipients for purposes of Section 504 and 24 C.F.R. Part 8.

13       102.    The City and the CRA/LA were responsible for monitoring and managing

14   federally-assisted housing activities to assure compliance with all applicable Federal

15   requirements. *See, e.g.*, 2 C.F.R. § 200.331(d); 24 C.F.R. § 85.40 (2013).

16           **a.    Discrimination prohibited**

17       103.    In providing any housing, aid, benefit, or service in a program or activity

18   that receives HUD funds, a recipient may not, directly or through contractual, licensing,

19   or other arrangements, among other things, solely on the basis of disability:

20           (i)    Deny a qualified individual with handicaps the opportunity to

21           participate in, or benefit from, the housing, aid, benefit, or service;

22           . . .

23           (iii) Provide a qualified individual with handicaps with any housing,

24           aid, benefit, or service that is not as effective in affording the individual

25           an equal opportunity to obtain the same result, to gain the same benefit,

26           or to reach the same level of achievement as that provided to others;

27           . . .

28

(v) Aid or perpetuate discrimination against a qualified individual with handicaps by providing significant assistance to any agency, organization, or person that discriminates on the basis of handicap in providing any housing, aid, benefit, or service to beneficiaries in the recipient's federal assisted program or activity.

24 C.F.R. § 8.4(b)(1).

104.  In any program or activity receiving HUD funds, a recipient may not, directly or through contractual or other arrangements, use criteria or methods of administration, of which the purpose or effect would:

(i) Subject qualified individuals with handicaps to discrimination solely on the basis of handicap;

(ii) Defeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap involved in the program or activity, unless the recipient can demonstrate that the criteria or methods of administration are manifestly related to the accomplishment of an objective or a program or activity; or

(iii) Perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

24 C.F.R. § 8.4(b)(4).

**b.      Program accessibility: architectural requirements for new construction, substantial alteration, other alterations, and existing housing facilities**

105.  Consistent with Section 504, "[N]o qualified individual with handicaps shall, because a recipient's facilities are inaccessible to or unusable by individuals with handicaps, be denied the benefits of, be excluded from participation in, or otherwise be

subjected to discrimination under any program or activity that receives federal financial assistance." 24 C.F.R. § 8.20.

106. Facility "means all or any portions of buildings, structures, equipment, roads, walks, parking lots, rolling stock or other real or personal property or interest in the property." 24 C.F.R. § 8.3. The term facility broadly includes, among others, units and public and common use areas in multifamily housing developments.

107. Federal financial assistance "means any assistance provided or otherwise made available by [HUD] through any grant, loan, contract or any other arrangement, in the form of" funds, services of federal personnel, or real or personal property or any interest in or use of such property. 24 C.F.R. § 8.3

108. New multifamily housing projects receiving federal financial assistance must "be designed and constructed to be readily accessible to and usable by [people with disabilities]." 24 C.F.R. § 8.22–23.

109. A multifamily housing project means a project containing five or more dwelling units. 24 C.F.R. § 8.3.

110. A new multifamily housing project means a project built after July 11, 1988. 24 C.F.R. §§ 8.24(c); 8.32(e).

111. A multifamily housing project that undergoes substantial alteration must meet the same requirements as a new multifamily housing project. 24 C.F.R. § 8.23(a).

112. Substantial alteration means alterations undertaken to a project that has fifteen (15) or more units and the cost of the alterations is seventy-five (75) percent or more of the replacement cost of the completed facility. 24 C.F.R. § 8.23(a).

113. A minimum of five (5) percent of the total dwelling units in a new multifamily housing project must be made accessible for persons with mobility impairments. An additional two (2) percent of the units in such a project must be accessible for persons with hearing or vision impairments (5 Percent/2 Percent Rule). 24 C.F.R. § 8.22(b).

114. In addition to the requirements applicable to substantial alterations, all other alterations to dwelling units in a multifamily housing project must, to the maximum extent feasible, be made to be readily accessible to and usable by people with disabilities. 24 C.F.R. § 8.23(b).

115. Buildings designed, constructed, or altered in accordance with the Uniform Federal Accessibility Standards (UFAS) are deemed to comply with 24 C.F.R. §§ 8.22–23. 24 C.F.R. § 8.32.

116. UFAS sets forth uniform standards, including minimum technical requirements, for the design, construction, and alteration of buildings so that people with disabilities will have ready access to and use of them.

117. Buildings designed, constructed, or altered in accordance with UFAS, then, are deemed by HUD to be readily accessible to and usable by people with disabilities, consistent with Section 504 and HUD's implementing regulations

118. Following a May 24, 2014 Notice, recipients of federal financial assistance were permitted to use an alternative accessibility standard for purposes of complying with Section 504 and its implementing regulations. *See* Nondiscrimination on the Basis of Disability in Federally Assisted Programs and Activities, 79 Fed. Reg. 29671 (May 23, 2014) ("HUD's Deeming Notice").

119. HUD's Deeming Notice allows recipients of federal financial assistance to use the 2010 ADA Standards for Accessible Design as an acceptable alternative to UFAS, except for certain specific provisions identified in the Notice, for purposes of new construction and alterations commenced after May 23, 2014. *Id.*

### c. Program accessibility: operational requirements

120. A recipient must operate each existing housing program or activity receiving HUD funds so the program or activity, when viewed in its entirety, is readily accessible to and usable by people with disabilities. 24 C.F.R. § 8.24(a).

121. Accessible dwelling units must, to the maximum extent feasible, be distributed throughout projects and sites and must be available in a sufficient range of

sizes and amenities so that choice of living arrangements for people with disabilities is, as a whole, comparable to that of other people eligible for housing assistance under the same program. 24 C.F.R. § 8.26.

122.    Owners and managers of multifamily housing projects must adopt suitable means to assure that information regarding the availability of accessible units reaches eligible people with disabilities, and must take reasonable non-discriminatory steps to maximize the utilization of such units by eligible people whose disability requires the accessibility features of the particular unit. 24 C.F.R. § 8.27.

123.    When an accessible unit becomes vacant, the owner or manager—before offering such units to a non-disabled applicant—must offer such unit:

(1) First, to a current occupant of another unit of the same project, or comparable projects under common control, having [disabilities] requiring the accessibility features of the vacant unit and occupying a unit not having such features, or, if no such occupant exits, then

(2) Second, to an eligible qualified applicant on the waiting list having a [disability] requiring the accessibility features of the vacant unit.

24 C.F.R. § 8.27.

124.    When offering an accessible unit to an applicant without disabilities who does not require the accessibility features of the unit, the owner or manager may require the applicant to agree (and may incorporate this agreement in the lease) to move to a non-accessible unit when available. 24 C.F.R. § 8.27.

125.    A recipient must modify its housing policies and practices to ensure they do not discriminate, on the basis of disability, against qualified people with disabilities. 24 C.F.R. § 8.33.

126.    An applicant for HUD funds shall submit an assurance to HUD, or in the case of a subrecipient to a primary recipient, on a form specified by the responsible civil rights official, that the program or activity will be operated in compliance with 24 C.F.R. Part 8. 24 C.F.R. § 8.50.

127. A recipient that employs fifteen or more people must designate at least one person to coordinate its efforts to comply with 24 C.F.R. Part 8 (Section 504 Coordinator). 24 C.F.R. § 8.53(a).

128. A recipient that employs fifteen (15) or more people must adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited by 24 C.F.R. Part 8. 24 C.F.R. § 8.53(b).

129. If there appears to be a failure or threatened failure to comply with 24 C.F.R. Part 8, and the noncompliance is not corrected through informal means, HUD may suspend or terminate federal grant program funds, refuse to grant or continue granting federal grant program funds, initiate debarment proceedings, initiate a referral to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States, or any assurance or contractual undertaking, or pursue other applicable proceedings under State or local law. 24 C.F.R. § 8.57(a).

130. HUD may refuse to provide federal financial assistance to any applicant or recipient that fails or refuses to furnish an assurance of Section 504 compliance required under 24 C.F.R. § 8.50, 24 C.F.R. § 8.57(b).

**ii.    The Americans with Disabilities Act**

131. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

132. "Public entity" includes any local government and any department, agency, special purpose district, or other instrumentality of a local government. 42 U.S.C. § 12131(1).

133. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disability" with

"clear, strong, consistent, enforceable standards . . . to address the major areas of discrimination faced day-to-day by people with disabilities." 42. U.S.C. § 12101(b).

134.    The U.S. Department of Justice promulgated regulations implementing Title II of the ADA. 28 C.F.R. Part 35.

135.    In providing any aid, benefit, or service, a public entity may not:
[D]irectly or through contractual, licensing, or other arrangements, on the basis of disability . . . [a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program, [or] [o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1).

136.    A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control . . .

28 C.F.R. § 35.130(b)(3).

137.    Title II of the ADA generally provides that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits

of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. §§ 35.149 and 35.150.

138.    Title II also provides that a "public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150.

139.    Each facility, or any part thereof, constructed by, on behalf of, or for the use of a public entity:

> [S]hall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992 [unless] . . . a public entity can demonstrate that it is structurally impracticable to meet the requirements.
>
> . . .
>
> Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities,

28 C.F.R. § 35.151.

140.    Except as otherwise permitted in the regulations, housing and other facilities must comply with the 2010 ADA Standards for Accessible Design, the UFAS, or the 1991 ADA Standards for Accessible Design, or in some cases, a combination of these standards. 28 C.F.R. § 35.151.

### iii.    The FHA

141.    The FHA makes it unlawful to "make unavailable or deny" a dwelling to any buyer or renter because of a person's disability, or to discriminate against people with disabilities "in the provision of services or facilities in connection with" a dwelling. 42 U.S.C. § 3604(f)(1)–(2).

142. Discrimination under the FHA includes a failure to design and construct dwellings in such a manner that:

(i) the public use and common use portions of such dwellings are readily accessible to and usable by [people with disabilities];

(ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by [people with mobility impairments];

(iii) all premises within such dwellings contain the following features of adaptive design:

(I) an accessible route into and through the dwelling;

(II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

(III) reinforcements in bathroom walls to allow later installation of grab bars; and

(IV) usable kitchens and bathrooms such that [people with mobility impairments] can maneuver about the space.

42 U.S.C. § 3604(f)(3).

143. The design and construction requirements of the FHA apply to "covered multifamily dwellings" for first occupancy on or after March 13, 1991. 24 C.F.R. § 100.205(a).

144. "Covered multifamily dwelling" for purposes of the FHA means "buildings consisting of four or more dwelling units if such buildings have one or more elevators; and ground floor dwelling units in other buildings consisting of four or more dwelling units." *Id.*

145. A housing provider may satisfy the FHA's design and construction requirements by following the technical requirements set forth in the Fair Housing Accessibility Guidelines, March 6, 1991 (FHA Guidelines). 24 C.F.R. § 100.205(e)(2)(i).

146.   Under the FHA, the HUD Secretary must administer HUD programs in a manner to affirmatively further fair housing. In connection with the Secretary's duty under the FHA, program statutes like the Housing and Community Development Act and the Cranston-Gonzalez National Affordable Housing Act, and their implementing regulations, require grantees to certify that they will affirmatively further fair housing to receive HUD funds. *See* 42 U.S.C. §§ 5304(b)(2), 12705(b)(15); 24 C.F.R. 91.225.

147.   Each state and local government awarded HUD Formula Grant Program funds must annually certify "that it will affirmatively further fair housing."

148.   Under regulations effective August 17, 2015, a jurisdiction's promise to affirmatively further fair housing meant that "it will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225 (2014).

149.   Consistent with the Congressional mandate to ensure that people with disabilities are not discriminated against, HUD declared the following laws apply to "all HUD programs"—

*Nondiscrimination and equal opportunity.* . . . The Fair Housing Act (42 U.S.C. 3601–19) and implementing regulations at 24 CFR Part 100 *et seq.*; . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at part 8 of this title; title II of the Americans with Disabilities Act, 42 U.S.C. 1210 *et seq.*, [and] 24 CFR part 8 . . . .

24 C.F.R. § 5.105.

## VI.   HUD PROGRAMS

### A.   Formula Block Grant Programs

150.   As noted above, throughout the relevant period, the Defendants received HUD funding through the following formula grant programs:

      a.     the Community Development Block Grant (CDBG) Program;

      b.     HOME Investment Partnerships (HOME) Program; and

          c.      Housing Opportunities for Persons With AIDS (HOPWA).

151.   The grant programs referenced in the above paragraph are referred to below as the "Formula Grant Programs," and the funds the United States provides under them as "Formula Grant Program Funds" or "Formula Grants."

152.   Formula Grant Program Funds are proportionally awarded based on Congressional appropriations and a formula using demographic criteria as opposed to being awarded competitively.

153.   The authorizing legislation and regulations pertaining to the Formula Grant Program Funds set forth the demographic criteria used to determine, proportionally, the size of the jurisdiction's Formula Grant Program Funds.

154.   Jurisdictions may use Formula Grant Program Funds to assist eligible housing activities.

155.   For instance, HOME funds may be used in the development and rehabilitation of affordable housing.

156.   CDBG funds may be used for housing rehabilitation and new construction of housing as part of neighborhood revitalization projects.

157.   HOPWA funds may be used for the acquisition, rehabilitation, or new construction of housing units for people living with HIV/AIDS.

158.   The "overall goal" of the Formula Block Grant Programs "is to develop viable urban communities by providing decent housing and a suitable living environment . . . principally for low- and moderate-income persons."  24 C.F.R. § 91.1.

159.   "Decent housing" includes "increasing the availability of permanent housing in standard condition and affordable cost to low-income and moderate-income families, particularly to members of disadvantaged minorities, without discrimination on the basis of . . . disability."  *Id.*

### i. The Consolidated Plan

160. To obtain funding from HUD under the Formula Grant Programs, a jurisdiction must submit to HUD one consolidated planning and application document, called the Consolidated Plan. 24 C.F.R. § 91.1.

161. The Consolidated Plan must include the following: (1) a housing and homeless needs assessment; (2) a housing market analysis; (3) a strategic plan; (4) an action plan; and (5) certifications.

162. The housing and homeless needs assessment, housing market analysis, and strategic plan must be submitted to HUD at least every five years. 24 C.F.R. § 91.15.

163. The action plan and certifications must be submitted on an annual basis. *Id.*

164. The housing and homeless needs assessment must examine the jurisdiction's future housing needs, 24 C.F.R. § 91.205(a), and include an estimate of the number and type of families in need of housing assistance for people with disabilities. 24 C.F.R. § 91.205(b)(1)(J).

165. The housing market analysis must "describe the significant characteristics of the jurisdiction's housing market, including the supply, demand, and condition and cost of housing and the housing stock available to serve persons with disabilities . . . ." 24 C.F.R. § 91.210(a).

166. The strategic plan must set forth the jurisdiction's general priorities for allocating investments among its different housing activities and needs, 24 C.F.R. § 91.215(a), and provide a summary of the priority housing and supportive service needs for people with disabilities. 24 C.F.R. § 91.215(e).

167. In order to obtain Formula Grants, the City submitted, at a minimum, the following four Consolidated Plans to HUD during the relevant period that included a housing and homeless needs assessment, housing market analysis, and strategic plan: (1) 2003-2008; (2) 2008-2013; (3) 2013-2018; and (4) 2018-2022.

168. HUD requires local jurisdictions to analyze the housing needs of people with disabilities in the Consolidated Plan submissions to HUD.

169. The housing and homeless needs assessment must include an estimate of the number and type of families in need of housing assistance for people with disabilities. 24 C.F.R. § 91.205(b)(1)(J).

170. The housing market analysis must "describe the significant characteristics of the jurisdiction's housing market, including the supply, demand, and condition and cost of housing and the housing stock available to serve persons with disabilities . . . ." 24 C.F.R. § 91.210(a).

171. The strategic plan must set forth the jurisdiction's general priorities for allocating investments among its different housing activities and needs, 24 C.F.R. § 91.215(a), and provide a summary of the priority housing and supportive service needs for people with disabilities.

172. Each year, the jurisdiction must submit as part of the Consolidated Plan an Action Plan describing the activities the jurisdiction will undertake during the next year to address priority needs and objectives, including the housing and supportive service needs of people with disabilities. 24 C.F.R. §§ 91.220(d); 91.220(i)(2).

173. A jurisdiction's Action Plan serves as the application for CDBG, HOME, and HOPWA funds. 24 C.F.R. § 91.515(a). Each action plan must include Standard Form 424 (SF 424), Application for Federal Assistance. 24 C.F.R. § 91.220(a).

174. On each SF 424, the jurisdiction certifies to "statements contained in [a] list of certifications," acknowledges providing HUD "the required assurances," and agrees "to comply with any resulting terms if [it] accept[s] an award."

175. SF 424B, Assurances – Non-Construction Programs, which the City completed and included at the least with its 2006-2007 Action Plan, contains a list certifications and/or assurances, including that the jurisdiction:

Will administer the grant in compliance with Section 504 of the Rehabilitation Act of 1973, as amended, and implementing regulations . . . which . . . provide that no person in the United States shall, on the grounds of disability . . . be excluded from participation in, be denied the benefits of, or otherwise be

30

subjected to discrimination under any program or activity that receives Federal financial assistance . . . . [and]

Will comply with the Fair Housing Act, as amended, and the implementing regulations . . . which prohibit discrimination in housing on the basis of . . . disability . . . .

176.   The bottom of SF 424B expressly states:

These certifications and assurances are material representations of the fact upon which HUD can rely when awarding a grant. If it is later determined that, I the applicant, knowingly made an erroneous certification or assurance, I may be subject to criminal prosecution. HUD may also terminate the grant and take other available remedies.

**ii.    Annual Certifications**

177.   Each year, in addition to the certifications accompanying the Action Plan discussed above, a jurisdiction must make other program-specific certifications which HUD requires in awarding Formula Grant Program Funds.

178.   A jurisdiction seeking any Formula Grant Program Funds must certify the following:

(1) *Affirmatively further fair housing*. Each jurisdiction is required to submit a certification that it will affirmatively further fair housing . . . .

. . .

(5) *Consistency with plan*. The jurisdiction must submit a certification that the housing activities to be undertaken with CDBG, HOME, and HOPWA funds are consistent with the strategic plan.

24 C.F.R. § 91.225(a)(5).

179.   A jurisdiction seeking CDBG funds must additionally certify the following:

(6) *Compliance with anti-discrimination laws.* The jurisdiction must submit a certification that the grant will be conducted and administered in conformity

with title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d), the Fair Housing Act (42 U.S.C. 3601–3619), and implementing regulations.

. . .

(8) *Compliance with laws.* A certification that the jurisdiction will comply with applicable laws.

24 C.F.R. §§ 91.225(b)(6), (8). The phrase "applicable laws" includes Section 504, the FHA, the ADA, and the duty to affirmatively further fair housing.

180. Congress expressly required jurisdictions to make such certifications as a precondition to receiving CDBG funds. 42 U.S.C. § 5304(b)(2).

181. Since at least July 24, 2013, a jurisdiction seeking HOME funds must certify, in addition to the certifications listed above, the following:

[T]hat [the jurisdiction] is using and will use HOME funds for eligible activities and costs, as described in §§ 92.205 through 92.209 of this subtitle and that it is not using and will not use HOME funds for prohibited activities, as described in § 92.214 of this subtitle.

24 C.F.R. § 92.225(d)(2).

182. Pursuant to § 92.205, which was revised in 2013, *see* 142 Fed. Reg. 446 (July 24, 2013), HOME "activities and costs are eligible only if the housing meets the property standards in § 92.251 upon project completion." The property standards in § 92.251 incorporate the requirements of Section 504, the FHA, and the ADA.

183. During the relevant period, the City submitted annual action plans and the certifications discussed above to HUD as a prerequisite to obtaining Formula Grant Program Funds.

### iii. Grant Agreements

184. After a jurisdiction submits the Consolidated Plan and required certifications to HUD, HUD executes with the jurisdiction a grant agreement for each of the Formula Grants for the fiscal year appropriation.

185.    For each fiscal year appropriation, the jurisdiction and HUD enter into a separate grant agreement for CDBG, HOME, and HOPWA grants.

### a.    The CDBG Program

186.    Congress established the CDBG Program with passage of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633 (1974) (codified at 42 U.S.C. 5301 *et seq*.), by which Congress sought to develop viable urban communities by providing decent housing and suitable living environments for people of low and moderate income. 42 U.S.C. § 5301.

187.    HUD implements the CDBG Program through 24 C.F.R. Part 570.

188.    In each grant agreement for CDBG funds, the jurisdiction expressly acknowledges that CDBG Program regulations "constitute part of the agreement," and HUD agrees to make CDBG funds available to the jurisdiction "subject to the provisions of the agreement."  Each agreement also incorporates the jurisdiction's Consolidated Plan, including its strategy to increase decent housing for people with disabilities.

189.    The regulations governing CDBG grants plainly require compliance with Section 504, the FHA, the ADA, and the duty to affirmatively further fair housing.

190.    First, as noted above, 24 C.F.R. Parts 5 and 8—applicable to each Formula Grant Program and incorporated in the grant agreements—expressly prohibit discrimination in any program or activity receiving HUD funds.

191.    Second, Part 570 expressly requires that each recipient adhere to the requirements of the federal accessibility laws. *See* 24 C.F.R. § 570.601(a)(2) (requiring compliance with the FHA and the duty to affirmatively further fair housing); 24 C.F.R. § 570.602 (requiring compliance with Section 504); 24 C.F.R. § 570.614 (requiring compliance with the ADA).

### b.    The HOME Program

192.    Congress established the HOME Program with passage of the HOME Investment Partnership Act, Pub. L. No. 101-625, § 202, 104 Stat. 4094 (codified at 42 U.S.C. § 12721).

193.   HUD implements the HOME Program through 24 C.F.R. Part 92.

194.   Under the HOME Program, HUD allocates funds by formula among eligible state and local governments "for use solely to invest in affordable housing."  42 U.S.C. § 12748(a).

195.   Such jurisdictions, in turn, provide assistance for acquisition, new construction, and rehabilitation of housing. 24 C.F.R. § 92.503(a).

196.   In each grant agreement for HOME funds, the jurisdiction expressly acknowledges that HOME Program regulations "constitute part of the agreement," and HUD agrees to make program funds available to the jurisdiction "subject to the provisions of the agreement." Each agreement also incorporates the jurisdiction's Consolidated Plan, including its strategy to increase decent housing for people with disabilities.

197.   In addition to the anti-discrimination provisions of 24 C.F.R. Part 5 and 8 which are made applicable to the HOME program in 24 C.F.R. § 92.350, Part 92's property standards expressly require each recipient to adhere to the requirements of the federal accessibility laws. *See* 24 C.F.R. § 92.251(a)(2)(i) (requiring that new construction projects comply with Section 504, the ADA, and the FHA); 24 C.F.R. § 92.251 (b)(1)(iv) (requiring that rehabilitation projects comply with Section 504, the ADA, and the FHA).

### c.   The HOPWA Program

198.   Congress established the HOPWA Program with passage of the AIDS Housing Opportunity Act, 42 U.S.C. § 12901 *et seq.*

199.   HUD implements the HOPWA program through 24 C.F.R. Part 574.

200.   HOPWA provides housing assistance and related supportive services for low-income people living with HIV/AIDS and their families.

201.   The City's HOPWA grant agreements provide that they are governed by "The Housing Opportunities for Persons with AIDS (HOPWA) Program Rule, 24 CFR

574 as amended, and the Consolidated Plan rule, 24 CFR 91 as amended." *See, e.g.*, City of LA HOPWA Performance Grant Agreements for FY 2007.

202.   In addition to the Consolidated Plan accessibility requirements noted above, the City's HOPWA agreements included the requirement that it comply with Part 574's nondiscrimination provisions, which provide:

> [T]he nondiscrimination and equal opportunity requirements set forth in 24 CFR part 5 and the following requirements apply:
>
> *Fair housing requirements.* (1) Grantees and project sponsors shall comply with the applicable provisions of the Americans with Disabilities Act (42 U.S.C. 12101–12213) and implementing regulations at 28 CFR part 35 (States and local government grantees) and part 36 (public accommodations and requirements for certain types of short-term housing assistance).
>
> . . . .
>
> (b) *Affirmative outreach.* A grantee or project sponsor must adopt procedures to ensure that all persons who qualify for the assistance, regardless of their . . . handicap . . . know of the availability of the HOPWA program, including facilities and services accessible to persons with a handicap, and maintain evidence of implementation of the procedures.

*See, e.g.*, 24 C.F.R. § 574.603 (2010).

203.   The nondiscriminatory provisions at 24 C.F.R. Parts 5 and 8 apply as well to HOPWA funds pursuant to 24 C.F.R. § 574.603.

**iv.   Accessing Formula Grant Program Funds**

204.   Once HUD and the City execute a grant agreement for a specific Formula Grant Program fiscal year grant, HUD puts the program funds for the City in a line of credit with the United States Treasury. *E.g.*, 24 C.F.R. § 92.500.

205.   That line of credit with the United States Treasury is managed through HUD's Integrated Disbursement and Information System (IDIS), which disburses

Formula Grant Program Funds and collects and reports information on the use of such funds by the City.

206. For example, upon committing HOME funds to a housing project, the jurisdiction must input specific project set-up information in IDIS, including the name and location of the project, whether the project is new construction or rehabilitation, and the HUD program from which the funds will be taken. The HOME project is then assigned a unique identification number (IDIS Activity ID). Once the City inputs project set-up information, it may then draw down HOME funds through IDIS for the housing project.

207. Similarly, for CDBG and HOPWA, a grantee must input information about multifamily housing activities, including the name and location of the activity, as well as the eligible activity code, into IDIS.

208. For all Formula Grant Programs, each draw is conditioned on compliance with HUD rules and procedures. *E.g.*, 24 C.F.R. § 92.502(c).

209. Since at least December 30, 2009, each time the City requests a drawdown of HOME funds, a pop-up box appears—before confirming the draw—in which the City must make specific certifications that:

> [T]he funds that the Participating Jurisdiction has drawn and will draw shall be used pursuant to the Participating Jurisdiction['s] approved housing strategy and shall be used in compliance with all requirements of the HOME Investment Partnerships Act, 42 U.S.C. 12701, et seq., and HUDs regulations; and

> [A]ll of the statements and claims, financial and otherwise, made herein are true and correct. Pursuant to 18 USC § 1001, 31 USC § 3729, et seq., and 24 CFR Part 28, false or fraudulent statements and claims made pursuant to these certifications are subject to up to 5 years imprisonment and civil penalties up to $10,000 plus up to 3 times the amount of damages sustained by the Government for each fraudulent act committed.

210. Each draw generates a voucher that is submitted to HUD specifying, among other things, the amount drawn, the date drawn, and the IDIS Activity ID.

211. Throughout the relevant period, the City generated and submitted thousands of vouchers to HUD for Formula Grant Program Funds that were to be used for affordable housing activities, including rehabilitation and construction of multifamily rental housing.

212. With each draw, the City expressly and/or impliedly certified the funds would be used in compliance with the federal accessibility laws.

213. Once the City completes a HOME project, the City inputs into IDIS certain information pertaining to project completion, including the number of units within the project that are accessible in accordance with Section 504.

### v.   Using grant funds to pay administrative costs

214. The Formula Grant Program regulations allow grantees to spend a portion of their grants on reasonable administrative and planning costs of the grants.

215. The City used Formula Grant Program Funds to pay for administrative and planning activities under the Formula Grant Programs.

216. The City used Formula Grant Program Funds to pay the salaries of certain City employees.

217. As a subrecipient, and consistent with its agreement with the City, the CRA/LA was able to use a portion of the Formula Grant Program Funds provided by HUD to the City to pay for the CRA/LA's administrative expenses.

218. On information and belief, the CRA/LA used a portion of its grant funds to pay for administrative expenses.

### B.   Notice of Funding Availability (NOFA) Grants

219. In addition to nondiscretionary Formula Grant Program Funds, HUD makes discretionary grants available to state and local governments and other entities on a competitive basis through the Notice of Funding Availability (NOFA).

220. For example, one NOFA discretionary grant is the Choice Neighborhoods Implementation Grant, which supports the development of comprehensive neighborhood revitalization.

221. HUD also awards Lead-Based Paint Hazard Control Grants and Lead Hazard Reduction Demonstration Grants through the NOFA process. These grants assist local governments in identifying and controlling lead-based paint hazards in certain housing.

222. During the relevant period, HUD's Policy Requirements and General Section for the NOFA programs provided that applicants and their subrecipients had to comply with all applicable fair housing and civil rights requirements in 24 C.F.R. § 5.105(a), including but not limited to the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990.

C. **Neighborhood Stabilization Program**

223. Between 2008 and 2011, HUD awarded grants to eligible local governments under the Neighborhood Stabilization Program (NSP).

224. Jurisdictions could use NSP funds to purchase, rehabilitate, and redevelop foreclosed or abandoned homes and residential properties as part of the effort to stabilize neighborhoods.

225. NSP grants were a component of the CDBG program, and HUD considered grants made under NSP to be CDBG funds. Except as explicitly described in HUD's NSP notices, the statutory and regulatory provisions governing the CDBG program applied to the use of NSP funds.

226. HUD made available three rounds of NSP funding: NSP1 in 2008, NSP2 in 2009, and NSP3 in 2010.

227. HUD awarded NSP1 and NSP3 funds by formula to eligible local jurisdictions.

228. HUD awarded NSP2 funds competitively through HUD's NOFA process.

229. On October 6, 2008, HUD published "NSP1, Notice of Allocations,

38

Application Procedures, Regulatory Waivers Granted to and Alternative Requirements for Emergency Assistance for Redevelopment of Abandoned and Foreclosed Homes Grantees Under the Housing and Economic Recovery Act, 2008" (referred to below as NSP1 Notice), where HUD explicitly stated: "Nothing in this notice may be construed as affecting each grantee's responsibility to carry out its certification to affirmatively further fair housing."

230.   Also in the NSP1 Notice, HUD required grantees to certify, "The Jurisdiction . . . will affirmatively further fair housing," and "[t]he NSP grant will be conducted and administered in conformity with . . .the Fair Housing Act (42 U.S.C. 3601–3619), and implementing regulations."

231.   Additionally, the NSP1 Notice expressly provided that the statutory and regulatory provisions governing the CDBG program, including those at 24 C.F.R. Part 570, Subpart K applied to the use of NSP1 funds.

232.   Those Part 570 provisions included the requirement that grantees comply with the Fair Housing Act, the duty to affirmatively further fair housing, and Section 504. *See* 24 C.F.R. §§ 570.601 and 570.602.

233.   On May 4, 2009, HUD published "Notice of Funding Availability for the Neighborhood Stabilization Program 2 under the American Recovery and Reinvestment Act, 2009" (referred to below as NSP2 Notice), where HUD required applicants to certify they would affirmatively further fair housing, conduct and administer the grant in conformity with the Fair Housing Act, and comply with all applicable laws.

234.   The NSP2 Notice also expressly provided the statutory and regulatory provisions governing the CDBG program, including those at 24 C.F.R. Part 570, Subpart K applied to the use of NSP2 funds.

235.   Those Part 570 provisions included the requirement that grantees comply with the Fair Housing Act, the duty to affirmatively further fair housing, and Section 504. 24 C.F.R. §§ 570.601 and 570.602.

236.   On December 29, 2008, HUD Published "Fiscal Year (FY) 2009 Notice of

Funding Availability (NOFA); Policy Requirements and General Section to HUD's FY2009 NOFAs for Discretionary Programs" (referred to below as FY2009 Notice), which applied to all 2009 NOFA applications, including the NSP2 application.

237. In the FY2009 Notice, HUD stated that grantees were required to comply with all applicable fair housing and civil rights requirements in 24 C.F.R. § 5.105(a), which as noted above sets forth the requirements of the FHA, Section 504, and Title II of the ADA, applicable to all HUD programs.

238. On October 19, 2010, HUD published "NSP1 and NSP 3 Notice of Formula Allocations and Program Requirements for Neighborhood Stabilization Program Formula Grants" (referred to below as NSP3 Notice), where HUD again stated that grantees were "subject to Section 504 of the Rehabilitation Act of 1973 and the Fair Housing Act, including their respective provisions related to physical accessibility standards for persons with disabilities."

239. The NSP3 Notice repeated that "[n]othing in this notice may be construed as affecting each grantee's responsibility to carry out its certification to affirmatively further fair housing," and noted that NSP grantees had to "carry out NSP3 activities that further fair housing through innovative housing design or construction to increase access for persons with disabilities . . . [and] in a manner that provides greater housing choice or mobility for persons in classes protected by the Fair Housing Act."

240. The NSP3 Notice also required grantees to certify that "[t]he Jurisdiction . . . will affirmatively further fair housing" and "[t]he NSP grant will be conducted and administered in conformity with . . .the Fair Housing Act (42 U.S.C. 3601–3619), and implementing regulations."

241. The NSP 3 Notice additionally provided that the statutory and regulatory provisions governing the CDBG program, including those at 24 C.F.R. Part 570, Subpart K applied to the use of NSP3 funds.

242. Those Part 570 provisions included the requirement that grantees comply with the FHA, the duty to affirmatively further fair housing, and Section 504. 24 C.F.R.

§§ 570.601 and 570.602.

243.    Applicants for all three NSP grants were required to use SF 424, either in conjunction with the SF 424 used for the City's CDBG application or as an independent component.

244.    In 2008, 2009 and 2010, the City made the same certifications a jurisdiction would under the CDBG Program with respect to the federal accessibility laws, and made the same SF 424 certifications it did for Formula Grant Programs Funds.

245.    In reliance on the City's certifications, HUD awarded the City at least $70 million in NSP grants for use in projects involving the construction or rehabilitation of multi-family housing, or for administration of the City's NSP program, from 2008 to 2010.

246.    Specifically, the City received $6,275,461 in NSP1 funds, $43,636,638 in NSP2 funds, and $3,000,000 in NSP3 funds.

247.    From 2009 to 2010, as identified in Attachment C, the City committed at least $18,039,189 in NSP funds to its costs for administration of its NSP programs, and $52,912,100  in NSP funds, at a minimum, to the following multifamily buildings, each of which was subject to the federal accessibility laws:  Dunbar Village (which is comprised of Dunbar Hotel, Somerville I Apartments, and Somerville II Apartments), Chinatown Metro Apartments, Figueroa Senior Housing, Linda Vista Hospital and Nurses Building (aka Hollenbeck Terrace), Sherman Village Apartments, Taylor Yard, Florence Morehouse, Beverly Terrace, Plaza Vermont, three properties on S. Figeroa Street, a property on E. Imperial Highway, a property on S. Rampart Blvd., a property on 10th Avenue, a property on W. 81st Street, John Williams, and a property on S. Main Street. For the properties identified by street names, the United States will provide street numbers to Defendants on request, but does not include them here for confidentiality reasons.

## VII.   FACTS

**A.   The City's Housing Program Has Been and Is Inaccessible on a Systemic Level**

248.   During the relevant period, over two hundred (200) of the City's multifamily housing projects were constructed, rehabilitated, or altered with HUD funds (referred to below as the City's Housing Portfolio and identified in Attachments A and C), including Formula Grants, Choice Neighborhood grants, and NSP grants.

249.   All of the properties in the City's Housing Portfolio are multifamily housing developments designed, constructed, or altered after July 11, 1988, with five or more dwelling units that received federal financial assistance, and therefore subject to Section 504.

250.   Most, if not all, of the properties in the City's Housing Portfolio are multifamily housing developments with four (4) or more dwelling units constructed for first occupancy after March 13, 1991, and therefore subject to the FHA.

251.   The City is a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. §12131(1).

252.   Most of the public and common-use areas of the properties in the City's Housing Portfolio were designed and constructed for first occupancy on or after January 26, 1993, and therefore subject to the ADA.

253.   Throughout the relevant period, the City failed to enforce the federal accessibility laws in its housing program, resulting in systemic noncompliance, including inaccessible housing projects assisted with federal funds and a housing program inaccessible to people with disabilities in the City.

### i.   Architectural Violations

254.   The properties in the City's Housing Portfolio are largely inaccessible. Among other things:

a.   slopes, ramps, and thresholds are too steep for safe passage by persons with mobility disabilities;

b.    balconies are too narrow for wheelchair access;

c.    steps prohibit access to common areas for individuals with mobility disabilities;

d.    kitchen cabinets, shelves, and surfaces are outside of accessible reach ranges of persons who use wheelchairs;

e.    sinks, grab bars, mailboxes, and circuit breakers are mounted so they are outside of accessible reach ranges for persons who use wheelchairs;

f.    pipes below sinks and lavatories are uninsulated, thereby posing physical threats to persons who use wheelchairs;

g.    there are insufficient numbers of designated accessible parking spaces in garages and parking lots; and

h.    buildings lack visual alarms and tactile signs for people with hearing and visual impairments. Examples of particular violations found at projects in the City's Housing Portfolio are identified in Attachment D.

255.    The findings of violations of accessibility requirements are based on multiple surveys conducted by the United States of properties including in the City's Housing Portfolio.

256.    The examples noted above and included in Attachment D are merely some of the types of accessibility defects found at some of the City's projects; these examples are illustrative only, and are not intended to be a complete catalogue of the accessibility violations. The same and similar additional accessibility violations were found by the United States at most, if not all, of the other surveyed properties within the City's Housing Portfolio funded with federal dollars subject to the federal accessibility laws.

257.    As a result of the City's failure to create or otherwise provide accessible housing, the City failed to comply with Section 504's minimum 5 Percent/2 Percent rule; in other words, the City failed to monitor and enforce requirements that the owners and developers of multifamily housing to which the City provided funds make at least five percent of all units per multifamily housing project accessible for people with mobility

impairments, and an additional two percent of the units in such buildings accessible for people with hearing or vision impairments.

258.  At least up until May 2014, the City—including its departments, agencies, and housing authorities acting on its behalf—did not monitor or enforce the federal accessibility laws: specifically, they failed to monitor or enforce the federal accessibility laws before issuing permits, during inspections, prior to releasing funds to owners and developers of federally-assisted multifamily housing developments, and for purposes of code enforcement.

259.  The City required that owners and developers of City-funded multifamily housing developments submit detailed architectural plans to the City for review and approval; however, the City failed to evaluate architectural plans for compliance with the federal accessibility laws and nonetheless allowed owners and developers to proceed with the development of the inaccessible multifamily housing.

260.  At least up until November 2014, the City did not deny requests from owners and developers or other entities for federal housing funds based on a failure by those owners and developers or entities to comply with the federal accessibility laws on prior City-funded developments.

261.  From time to time, the City published architectural requirements to inform owners and developers, design professionals, and other members of the public, of the design review process required to obtain funds, including federal financial assistance from the City for multifamily projects.

262.  Annually, the City reviewed its published architectural requirements and the City Council approved any modifications thereto.

263.  In each bid solicitation issued by the City, the City appended the City Council-approved architectural requirements.

264.  At least up until 2010, the City's architectural requirements did not reference Section 504, the FHA, or UFAS.

265.    During the relevant period, the City made regular presentations to owners and developers and other housing stakeholders and bidders, highlighting, among other things, issues of concern related to noncompliance with state, local, and federal law. At least until 2012, the City did not make a presentation to its stakeholders or bidders addressing compliance with Section 504, including compliance with UFAS requirements.

266.    The City did not ensure the properties were readily accessible to and usable by persons with disabilities, as required by Title II of the ADA, 42 U.S.C. § 12132, as well as the Department of Justice's implementing regulations, 28 C.F.R. part 35, including the applicable architectural standards. See Attachment D.

267.    The United States asserts claims against the City for architectural violations of the federal accessibility laws for the period February 1, 2005 to the present.

**ii.    Operational violations: additional accessibility violations in the administration of the City's housing program.**

268.    The City did not comply with program accessibility requirements under the federal accessibility laws pertaining to housing programs, services, and activities.

269.    Before 2012, the City did not appoint a Section 504/ADA coordinator to coordinate the City's efforts to comply with Section 504 and the ADA with respect to housing.

270.    Before November 2015, the City did not appoint a Section 504/ADA coordinator with any experience with accessibility issues, including federal architectural requirements, to coordinate the City's efforts to comply with Section 504 and the ADA with respect to housing.

271.    Before late 2015, the City did not conduct a self-evaluation concerning the program accessibility of its housing programs, as required by law of all recipients and subrecipients of federal financial assistance. As a result, the City neither identified nor corrected accessibility deficiencies in its programs and policies.

272. The City did not maintain an accurate list of accessible units sufficient to identify the locations of such units or the units' accessibility features.

273. The City did not identify the location of accessible units in response to requests from members of the public, including people with disabilities who required the accessibility features of such units, concerning the location of purportedly accessible units.

274. The City did not adopt policies and procedures to ensure housing units and common areas of housing developments within the City's Housing Portfolio met federal accessibility requirements.

275. The City did not comply with Section 504 and ADA requirements to communicate effectively with people with disabilities, notify people with disabilities of the existence and availability of any accessible units, or provide an accessible method of applying for those units.

276. The City did not comply with the legally required tenanting priorities, including monitoring owners and developers of federally-assisted multifamily housing, designed to ensure that the relatively small number of units that are required to be designated accessible were actually occupied by individuals with disabilities who need the accessibility features that those units were required to provide.

277. The City did not ensure that people with disabilities were provided an opportunity to live in units with the accessibility features they needed; nor did it ensure that the units required to have accessible features for people with mobility disabilities and sensory disabilities were prioritized for use by people with disabilities who needed those accessibility features, as required by HUD's Section 504 regulations.

278. Before March 2013, the City did not include in its communications with owners and developers of federally-assisted multifamily housing the federal provisions requiring compliance with the 5 Percent/2 Percent Rule, or that the common areas of buildings were accessible, in accordance with the federal accessibility requirements.

279.    The City did not develop or enforce policies requiring owners and developers of properties within the City's Housing Portfolio to effectively communicate with people with sensory disabilities (*i.e.*, hearing or vision disabilities).

280.    The City did not develop or enforce policies requiring compliance with federal accessibility laws by owners and developers of federally-assisted housing developments.

281.    The City did not adopt admission policies or procedures that comply with federal accessibility laws for its housing program.

282.    The City did not adopt occupancy policies and procedures that comply with federal accessibility laws for its housing program.

283.    The City did not adopt reasonable accommodation policies and procedures that comply with federal accessibility laws for its housing program.

284.    The City did not have housing policies or procedures that complied with the accessibility requirements of Section 504.

285.    The City did not have housing policies or procedures that complied with the accessibility requirements of the ADA.

286.    The City did not monitor its subrecipients for compliance with the federal accessibility laws.

287.    For purposes of this case only, the United States asserts claims against the City for its failure to operate an accessible housing program for the period from February 1, 2005 to and including November 29, 2017.

**B.    The City Failed To Affirmatively Further Fair Housing**

288.    During the relevant period, the City had to, and did, certify it would affirmatively further fair housing.

289.    To affirmatively further fair housing, the City had to undertake three tasks: "[1] conduct an analysis of impediments to fair housing choice within the area, [2] take appropriate action to overcome the effects of any impediments identified through that

analysis, and [3] maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225(a)(1) (2015).

290.   Before and during the relevant period, the City was aware of its obligation to take appropriate actions to overcome impediments to fair housing for people with disabilities.

291.   The City's 2003 Consolidated Plan explained it would:  "Ensure that new and rehabilitated multifamily housing developments meet state and federal accessibility requirements." 2003 Consolidated Plan at p. 61. The City explained it would do so by "[m]eet[ing] and confer[ring] with the City's Department of Building and Safety and Housing Department personnel to ensure that new and rehabilitated multifamily housing developments meet state and federal accessibility requirements." *Id*. at p. 62.

292.   The City did not take sufficient actions to overcome the effects of discrimination on fair housing choice for people with disabilities.

293.   For instance, despite the numerous accessibility violations throughout the relevant period, the City did not find any owner or developer was in violation of federal accessibility laws in either the design, construction, or alteration of multifamily housing, or in the operation and management of the multifamily housing, which could have been actions taken by the City in an effort to affirmatively further fair housing.

294.   The City did not withhold funds or impose any sanctions on any property owner or developer for failing to design, construct, or alter multifamily housing—or operate and manage multifamily housing—in accordance with federal accessibility laws, which could have been actions taken by the City in an effort to affirmatively further fair housing.

295.   The City did not assess its own laws, regulations, and housing policies to ensure they complied with the federal accessibility laws, which could have been actions taken by the City in an effort to affirmatively further fair housing.

296.   The City knew it was responsible for ensuring that recipients of federal financial assistance—including the CRA/LA and other owners and developers of

48

multifamily properties—complied with federal accessibility laws, but did not do so. Such direction could have been action taken by the City in an effort to comply with its duty to affirmatively further fair housing.

297. Despite its failure to take appropriate actions to address impediments to fair housing for people with disabilities, the City knowingly and falsely certified it had been affirmatively furthering fair housing and would do so in the future.

298. The United States asserts claims against the City for its failure to affirmatively further fair housing during the relevant period.

**C.    The City's Applications to HUD for Formula Grant Program Funds and Other Grants**

299. During the relevant period, the City applied for and received many millions of dollars in Formula Grant Program Funds and NSP funds, a large portion of which it used for rehabilitation or construction of multifamily housing projects. *See* Attachment A.

300. Every year throughout the relevant period, the City applied for and received Formula Grant Program Funds under the CDBG Program, HOME Program, and HOPWA Program.

301. Every year throughout the relevant period, the City executed a grant agreement with HUD for CDBG Program, HOME Program, and HOPWA Program grants, in which the City agreed to comply with each program's requirements, including the federal accessibility laws.

302. Every year throughout the relevant period, the City submitted to HUD the requisite action plan and certifications as part of the Consolidated Plan process.

303. During the relevant period, the City submitted to HUD the assurances and certifications set forth in SF 424.

304. With at least its 2006-2007 Action Plan, the City submitted to HUD the assurances and certifications set forth in SF 424B.

305. The City submitted at least forty-two (42) claims, in the form of funding agreements executed with HUD, as part of the consolidated planning process for Formula Grant Program Funds throughout the relevant period.

306. During the relevant period, the City drew down Formula Grant Program Funds from IDIS for multifamily housing, expressly and/or impliedly certifying compliance with the federal accessibility laws.

307. To make each draw down in IDIS, the City created a corresponding voucher to HUD expressly and/or impliedly certifying compliance with the federal accessibility laws.

308. The City created and sent to HUD over 2,000 vouchers during the relevant period pertaining to multifamily housing. *See* Attachment E.

309. For HOME-funded projects in particular, once each project assisted with HOME funds was completed, the City inputted into IDIS false statements concerning the project's number of designated accessible units.

310. The City applied for and received NSP funds, either through the Formula Grant or NOFA process, expressly and/or impliedly certifying compliance with the federal accessibility laws.

311. The City also requested and drew down NSP funds, for which the City expressly and/or impliedly certified compliance with the federal accessibility laws.

312. In short, the City received Formula Grant Program Funds and NSP funds after certifying, assuring, and otherwise promising to HUD that it had complied, and would continue to comply, with the federal accessibility laws.

313. The certifications—identified above in applications, grant agreements between the City and HUD, and requests for funds (through IDIS or otherwise)—were material to HUD's decision to provide funding to the City under the Formula Grant Programs and NOFA process, by awarding funds or allowing funds to be drawn down.

**D.** **With Respect to the CRA/LA Properties, the City and the CRA/LA Failed to Provide Accessible Housing on a Systemic Level**

314. During the relevant period, the City provided a portion of the Formula Grant Program Funds and NSP funds to the CRA/LA.

315. The Formula Grant Program Funds and NSP funds received by the CRA/LA were used for, at a minimum, the ten (10) multifamily housing projects included in Attachment B (referred to below as the CRA/LA Properties).

316. All of the CRA/LA Properties are multifamily housing developments designed, constructed, or altered after July 11, 1988, with five or more dwelling units that received federal financial assistance, and therefore subject to Section 504.

317. All of the CRA/LA Properties are multifamily housing developments with four or more dwelling units constructed for first occupancy after March 13, 1991, and therefore subject to the FHA.

318. Because the CRA/LA is a public entity that provided services, programs, and activities to the public, including housing services, programs, and activities, the CRA/LA must comply with Title II of the ADA.

319. The CRA/LA is a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. §12131(1), and the CRA/LA properties are subject to the requirements of Title II.

320. As a recipient of federal financial assistance, the CRA/LA was required to administer its federal financial assistance in accordance with Section 504, the FHA, and the ADA. Both the City and the CRA/LA had an obligation to ensure the CRA/LA Properties complied with the federal accessibility laws.

**i.** **Architectural violations**

321. According to surveys conducted by the United States of every project in the CRA/LA Properties, each and every project failed to meet the design and construction requirements of the federal accessibility laws. Thus, the CRA/LA Properties and housing program were not accessible in accordance with 24 C.F.R. Part 8.

322. Examples of the CRA/LA's failure to comply with the federal accessibility laws include:

a. slopes, ramps, and thresholds are too steep for safe passage by persons with mobility disabilities;

b. balconies are too narrow for wheelchair access;

c. mounted objects prohibit access to common areas for individuals with mobility disabilities;

d. kitchen cabinets, shelves, and surfaces are outside of accessible reach ranges of persons who use wheelchairs;

e. sinks, grab bars, and mailboxes are mounted so they are outside of accessible reach ranges for persons who use wheelchairs;

f. pipes below sinks and lavatories are uninsulated, thereby posing physical threats to persons who use wheelchairs; and

g. insufficient numbers of designated accessible parking spaces in garages and parking lots; and

h. buildings lack visual alarms and tactile signs for people with hearing and visual impairments.

323. Examples of particular defects or other violations are found throughout the CRA/LA Properties and identified in Attachment D. The findings of violations of accessibility requirements are based on surveys conducted by the United States of all ten of the CRA/LA Properties.

324. The CRA/LA Properties lack units accessible to people with mobility and/or auditory or visual impairments in sufficient numbers, sizes, and locations to provide meaningful access to people with disabilities.

325. Neither the City nor the CRA/LA ensured the CRA/LA Properties and housing program complied with the federal accessibility laws.

326. The United States asserts claims against the CRA/LA for its architectural violations identified above for the period from February 1, 2005, to and including February 1, 2012.

**ii.    Operational violations: additional accessibility violations in the administration of the CRA/LA's housing program**

327. The CRA/LA also did not comply with the operational requirements of the federal accessibility laws.

328. Before 2010, the CRA/LA did not appoint a Section 504/ADA coordinator to coordinate the CRA/LA's efforts to comply with Section 504 and the ADA as to housing; nor did it appoint a Section 504/ADA coordinator with any experience with accessibility issues during the relevant period.

329. The CRA/LA did not identify the scope of the overall need for accessible rental housing in its service areas.

330. The CRA/LA did not develop a transition plan, a plan required by Section 504 and the ADA in which jurisdictions and entities must perform a self-evaluation survey and develop a compliance plan correcting any accessibility deficiencies identified in the survey.

331. For example, the CRA/LA did not maintain a list of accessible units and the locations of such units; nor did it identify a unit's accessibility features.

332. The CRA/LA did not adopt policies and procedures to ensure housing units and common areas were designed and constructed consistent with UFAS or the 2010 ADA Standards for Accessible Design.

333. The CRA/LA did not comply with Section 504 and ADA requirements to communicate effectively with people with disabilities, notify people with disabilities of the existence and availability of any designated accessible units, or provide an accessible method of applying for those units.

334. The CRA/LA did not adopt policies and procedures to ensure that people who needed the accessibility features of particular units occupied such units.

335.   For example, the CRA/LA did not have a centralized application and waiting list process for matching accessible units with people with disabilities who needed the accessibility features of such units.

336.   The CRA/LA failed to monitor owners and developers of federally-assisted multifamily housing for compliance with the federal provisions ensuring at least five (5) percent of the housing units in each building met federal accessibility requirements for people with mobility disabilities.

337.   The CRA/LA failed to monitor such owners and developers for ensuring an additional two (2) percent of the housing units in each building met federal accessibility requirements for people with sensory disabilities.

338.   The CRA/LA did not develop or enforce policies requiring owners and developers of CRA/LA Properties to ensure that they had effective communications with people with sensory disabilities (*i.e.*, hearing or vision disabilities).

339.   The CRA/LA did not enforce policies requiring compliance with federal accessibility laws by owners and developers of federally-assisted multifamily housing developments.

340.   The CRA/LA did not adopt admission policies or procedures to ensure that people with disabilities are admitted to the CRA/LA's housing programs in accordance with federal accessibility laws for its federally-assisted housing projects.

341.   The CRA/LA did not adopt occupancy policies and procedures to ensure that the occupancy of its federally-assisted housing developments is consistent with federal accessibility laws.

342.   In administering its federally-assisted housing programs, the CRA/LA did not adopt reasonable accommodation policies and procedures as required by federal accessibility laws.

343.   The CRA/LA did not have adequate policies or procedures that complied with the accessibility requirements of Section 504 concerning housing.

344. The CRA/LA did not have any policies or procedures that complied with the accessibility requirements of the ADA concerning housing.

345. For instance, the CRA/LA did not maintain sufficient policies or practices so that federally-assisted multifamily housing contained the required number of units accessible to people with mobility or sensory impairments as required by Section 504 and UFAS.

346. Additionally, the CRA/LA did not have sufficient occupancy policies or procedures to ensure that people with disabilities who needed the accessibility features of a particular housing unit occupied those purportedly designated accessible units in federally-funded multifamily housing.

347. On numerous occasions, members of the public, including members of the public with disabilities, told the CRA/LA that its properties did not comply with the federal accessibility laws.

348. Before 2011, in meetings and other communications with the public, the CRA/LA disclaimed any knowledge of, or interest in, statutory, regulatory or HUD guidance concerning federal accessibility requirements.

**E. The CRA/LA's Claims for Formula Grant Program and Other Funds**

349. In light of the accessibility violations noted above, the CRA/LA submitted, and knowingly caused the City's submission of, false claims or statements to HUD that the CRA/LA Properties complied with the federal accessibility laws.

350. Specifically, during the relevant period, the CRA/LA submitted at least twenty (20) requisitions to the City for HUD funds to benefit its housing portfolio, including Formula Grant Program, and NSP funds, including but not limited to requisition nos. 2008-029, 2005-042, 2007-062, 2007-070, 2008-008, 2008-12, 2008-23, 2008-29, 2008-45, 2009-10, 2006-045, 2006-056, 2006-076, 2007-023, 2008-021R, 2006-046, 2007-054, 2007-064, and 2008-009R.

351. In turn, the City either provided the requested funds or requested the funds from HUD.

352.    The CRA/LA knew it was requesting the payment of federal funds, and knew its requests would cause the City to request payment from HUD federal funds.

353.    The CRA/LA kept track of the payments it received from the City, including the specific Formula Grant Program or other federal program grant from where the funds originated.

354.    During the relevant period, the CRA/LA entered into numerous loan agreements, cooperative agreements, master cooperative agreements, sub-agreements to master cooperative agreements, restatements of cooperative agreements, and first and second amendments to such agreements, and exhibits thereto, with the City, including City contract numbers and/or subagreement numbers C-92257, C-105704; C-92257, C-96306, C-503635, C-502920, C-102396, C-111300, C-111242, C-105156, C-108022, C-502958, C-502946, C-109091, C-502675, C-113125, and C-502817, for the disbursement of HUD funds under the Formula Grant Programs and other HUD programs.

355.    In the agreements with the City noted above, the CRA/LA contractually agreed to comply with the federal accessibility laws.

356.    As a public entity and recipient of federal financial assistance, the CRA/LA additionally was obligated to comply with Section 504 and the ADA.

357.    HUD requires that grantees have written agreements in effect with each subrecipient before paying any HUD funds, and that such agreements include nondiscrimination provisions, including promises to comply with the federal accessibility laws. *See, e.g.*, 24 C.F.R. § 570.503.

358.    HUD reasonably relied on its regulatory requirements that agreements with subrecipients of federal funds include nondiscrimination provisions in making federal grant payments to the City.

359.    The CRA/LA's contractual promises to comply with the federal accessibility laws were false.

360. The CRA/LA's submission of requisitions were false claims to a recipient of federal financial assistance.

361. The CRA/LA's submission of requisitions under agreements containing promises to comply with federal accessibility laws caused the City's submission of false claims to HUD for Formula Grant Program Funds and NSP funds.

362. The City paid the CRA/LA's requisitions using the Formula Grant Program Funds and NSP funds.

363. The CRA/LA caused the City to submit to HUD approximately 197 vouchers for housing-related costs to obtain many millions of dollars of federal financial assistance for the CRA/LA housing program. *See* Attachment E.

364. Because the CRA/LA Properties and the CRA/LA's multifamily rental projects did not comply with the federal accessibility laws, the Defendants' claims were false.

365. The CRA/LA's requisitions to the City and agreements with the City identified above were material to the City's claims and statements to HUD.

D. **Compliance with the Federal Accessibility Laws was Material to HUD's Payment Decision**

366. The City's compliance with the federal accessibility laws was material to HUD's decision to provide Formula Grant Program Funds and NSP funds, and to allow such funding to be drawn down during the relevant period.

i. **Condition of payment**

367. Congress and HUD require grantees to expressly certify compliance with the duty to affirmatively further fair housing as a precondition to receiving any Formula Grant Program Funds.

368. HUD requires grantees to expressly certify compliance with Section 504, the FHA and the duty to affirmatively further fair housing, as a precondition to receiving CDBG and/or HOME funds.

369.   HUD may terminate Formula Grant Program Funds or take other corrective action should it find a jurisdiction's certifications to be false. 24 C.F.R. §§ 570.910-913 (CDBG); 92.551 to 92.552 (HOME); 574.500(c) (HOPWA).

370.   HUD's regulations, including those that are generally applicable to all HUD programs such as 24 C.F.R. § 5.105(a), and other program-specific regulations described above, require compliance with the ADA, Section 504 and the FHA.

371.   HUD expressly and/or impliedly incorporated its regulations requiring compliance with Section 504, the FHA and the ADA into all grant agreements for CDBG, HOME and HOPWA funds executed between HUD and the City.

372.   The City's contractual obligation to comply with Section 504, the FHA, and the ADA was a material aspect of the agreements.

373.   Additionally, HUD's Policy Requirements and General Section for the NOFA programs described above, and requirements for the NSP Program provided that applicants and their subrecipients had to comply with Section 504, the FHA, and Title II of the ADA.

**ii.     Essence of the bargain**

374.   In light of Congress' findings and declared purpose in passing Section 504, the ADA, and the FHA—and Congress' amendments to the CDBG statute in 1981 and HOME statute in 1990 expressly incorporating protections for people with disabilities as conditions for receiving federal financial assistance—as well as Congress' stated goals of providing people with disabilities equal opportunity under the law and the tools necessary to achieve independent living, the United States does not get the benefit of the bargain when local entities use federal funds for rehabilitation or construction of multifamily housing in a manner that fails to comply with accessibility requirements.

375.   That HUD bargains for accessible housing is evidenced in the certifications and grant agreements, which require compliance with the federal accessibility laws.

376. That HUD bargains for accessible housing is evidenced in the Consolidated Planning process for Formula Grant Program Funds, for which HUD requires that the jurisdiction analyze and assess housing needs of people with disabilities.

377. For instance, the City must conduct a housing and homeless needs assessment that includes an estimate of the number and type of families in need of housing assistance for people with disabilities. 24 C.F.R. § 91.205(b)(1)(J).

378. The City must also conduct a housing market analysis that includes "the supply, demand, and condition and cost of housing and the housing stock available to serve persons with disabilities . . . ." 24 C.F.R. § 91.210(a).

379. Likewise, the City must set forth a strategic plan for allocating Formula Grant Program Funds, including priority housing and supportive service needs for people with disabilities. 24 C.F.R. § 91.215(e).

380. Moreover, HUD requires that grantees of Formula Grant Program Funds analyze impediments to fair housing choice for people with disabilities, take actions to overcome such impediments, and maintain records reflecting actions taken in that regard. That HUD requires such analysis, actions, and record maintenance further demonstrates accessibility is an essential part of the bargain with grantees.

381. Additionally, HUD expressly promulgated regulations under Section 504—found at 24 C.F.R. Part 8—to effectuate Section 504 of the Rehabilitation Act of 1973, as amended. HUD expressly reiterated that those regulations are applicable to all applicants for, and recipients of, HUD assistance in the operations of programs or activities receiving such assistance.

**iii. The violations were not minor or insubstantial**

382. Defendants' architectural and operational violations of the federal accessibility laws are significant, substantial, and systemic. The United States' survey of Defendants' housing and evaluation of Defendants' housing programs revealed almost total noncompliance going back fifteen years.

1    383.   Failure to comply with the design and construction requirements of the

2    federal accessibility laws not only is a form of discrimination under the law, but creates a

3    serious risk of physical injury to people with disabilities. For example, HUD's Fair

4    Housing Act Design Manual at 7.14 cautions that "[m]any people who use wheelchairs

5    or scooters have limited sensation in their legs and cannot feel that they are touching a

6    hot pipe or sharp edge and may be unaware that a serious injury has occurred. In

7    addition, the need for protection from burns is an important safety consideration for all

8    persons." As a result, "the two most common design standards on accessibility (ANSI

9    A117.1, 1986 and UFAS) require that the bottom of cooktops and sink supply lines and

10   drain pipes be insulated or enclosed." UFAS expressly provides, "If ovens or cooktops

11   have knee spaces underneath, then they shall be insulated or otherwise protected on the

12   exposed contact surfaces to prevent burns, abrasions, or electrical shock." Section

13   4.34.6.6.

14   384.   Defendants' failures to ensure that their housing programs were accessible

15   to people with disabilities further compounded the architectural violations by effectively

16   denying people with disabilities any opportunity to participate in or benefit from

17   Defendants' affordable housing programs.

18   **iv.    The United States' actions**

19   **a.      HUD was limited in its ability to withhold Formula Grant Funds**

20   **by the applicable legal requirements**

21   385.   The federal accessibility laws and HUD's implementing regulations

22   allowed the City to draw down Formula Grant Program Funds and obtain new Formula

23   grants while HUD evaluated the City's compliance with federal accessibility laws and

24   sought the City's voluntary compliance.

25   386.   In the Formula Grant Programs, the amounts of the City's grants were

26   determined by formulas based on the amount of Congressional appropriations and

27   statutory and regulatory demographic factors, including population, poverty,

28   overcrowding, the age and condition of housing, and disease rates in the jurisdiction. 42

60

U.S.C. §§ 12746 (HOME); 5306 (CDBG); 12901 (HOPWA); 24 C.F.R. §§ 570.4 (CDBG); 92.50 (HOME); 574.130 (HOPWA).

387. A local government must submit a Consolidated Plan, Action Plan, certifications of compliance with, among other things, the anti-discrimination provisions identified in the complaint, and a signed grant agreement, before it can receive a Formula Grant.

388. It will receive the grant unless HUD takes an affirmative action to reject the Consolidated Plan or Action Plan, 42 U.S.C. § 12705(c); 24 C.F.R. 91.500(a), or HUD completes the procedures required of it to seek sanctions based on substantial failure to comply with the requirements found at 42 U.S.C. §§ 12753 (HOME) and 5311 (CDBG).

389. Participating jurisdictions or grant recipients may use grant funds only for defined eligible activities and costs. 24 C.F.R. §§ 92.205 to 92.209 (HOME); §§ 570.200 to 570.206 (CDBG); §§ 574.300 to 574.340 (HOPWA).

390. After the grant agreement is executed, the City can continue to draw down and expend funds under the grant for the period of the performance of the grant, which is typically two to five years.

391. In general, HUD does not provide front-end reviews of draw requests unless the grant is operating on a reimbursement basis.

392. HUD may seek corrective action or impose sanctions—including terminating, reducing, suspending, limiting, or withholding all or part of the current grant or future grants for failure to comply with the grant requirements—but only after following the procedures in its program regulations. 24 C.F.R. §§ 570.910–913 (CDBG); 92.551 to 92.552 (HOME); 574.500(c) (HOPWA).

393. In addition, when HUD has information indicating a possible failure to comply with federal accessibility requirements, HUD must comply with the procedures and requirements of the accessibility regulations, *i.e.*, send notice to the grantee, conduct a prompt investigation which may include an on-site review, give the grantee the opportunity to demonstrate there has been no violation, and attempt to resolve any

61

violation informally whenever possible. 24 C.F.R. §§ 8.56(b), (d) and (e) (Section 504); 103.200, 103.202, 103.204, 103.300 (FHA); 28 C.F.R. § 35.171(a)(3) (ADA).

394.    HUD's regulations embody the strong policy goals articulated in Section 504, the ADA, and the FHA, that it must try to obtain voluntary compliance at the earliest possible stage of an investigation. 24 C.F.R. §§ 8.56(j), § 8.56(e)(2) (Section 504); 103.300(a) and (b) (FHA); 28 C.F.R. § 35.171(a)(3) (ADA).

395.    Informal resolutions must remedy the violation, mitigate its effects and eliminate its reoccurrence in the future. 24 C.F.R. §§ 8.56(j)(2) (Section 504); 103.300(b) (FHA); 28 C.F.R. § 35.171(a)(3) (ADA).

396.    If initial steps do not result in voluntary compliance, HUD sends the grantee a letter describing HUD's findings of noncompliance. That letter includes findings of fact and a description of appropriate remedies to resolve the violations. 24 C.F.R. § 8.56(g) (Section 504); 28 C.F.R. § 35.171(a)(3) (ADA).

397.    The grantee can ask for a HUD review of the letter of findings. Following this review, HUD issues a letter of determination (LOD), which serves as HUD's formal written determination. 24 C.F.R. § 8.56(h) (Section 504); 28 C.F.R. § 35.171(a)(3) (ADA).

398.    Following either the letter of finding or LOD, HUD and the grantee can still resolve the findings through a voluntary compliance agreement. 24 C.F.R. § 8.56(j)(2) (Section 504); 28 C.F.R. § 35.171(a)(3) (ADA).

399.    If HUD is unable to secure voluntary compliance, it can refer the matter to the Department of Justice for a civil rights action, terminate or reduce payments, limit the availability of payments, take such other action as allowed by law, or initiate suspension or debarment proceedings. 24 C.F.R. §§ 8.57(a), (c) and (d) (Section 504).

400.    To terminate, reduce, or limit all or part of current Formula Grants to the City—or to not award all or part of future Formula Grants—HUD has to comply with a number of additional and lengthy procedural hurdles.

401.    For instance, no order suspending, terminating, or refusing to grant or continue federal financial assistance shall become effective until:

a.    the responsible civil rights official has advised the City of its failure to comply and has determined that compliance cannot be secured by voluntary means;

b.    there has been an express finding on the record, after opportunity for hearing, of a failure by the City to comply with a requirement imposed by law;

c.    the action has been approved by the HUD Secretary; and

d.    the expiration of 30 days after the HUD Secretary has filed with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. 24 C.F.R. § 8.57(c)(1)–(2).

402.    For CDBG funds in particular, whenever the Secretary determines that a local government has failed to comply with a requirement under Part 8, the HUD Secretary must notify the chief executive officer of the local government of the noncompliance and must require that the chief executive officer secure compliance. The notice must be given at least sixty days before an order suspending, terminating, or refusing to grant or continue federal financial assistance becomes effective. 24 C.F.R. § 8.57(d). Any suspension, termination, or refusal to grant funds must be limited to the particular program, or part of the program, where the City was non-compliant. 24 C.F.R. § 8.57(c)(4).

403.    Whenever an opportunity for a hearing is required by 24 C.F.R. § 8.57(c), HUD must advise the City of the action proposed to be taken (*i.e.*, suspension, termination, or refusal to grant funds), the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for the action. 24 C.F.R. § 8.58(a). The notice must fix a date not less than 20 days after the date of the notice for the City to request the administrative law judge (ALJ) to schedule a hearing, or advise the City that the matter has been scheduled for hearing at a stated time and place. *Id.*

404. Subsequent to any finding by the ALJ, the City or HUD would be entitled to seek review from the Secretary.

405. If neither party sought review, the ALJ's decision would be the agency's final determination. If the Secretary reviews the ALJ's decision and makes a determination, the Secretary's determination would be the agency's final determination. Either party can seek judicial review of the final agency determination in federal court. 24 C.F.R. Part 180.

406. The practical consequence of all of these regulatory requirements is that HUD cannot terminate, alter, or suspend all or part of a Formula Grant, or restrict all or part of future Formula Grants, until it concludes, among other things, that compliance cannot be achieved through voluntary means.

### b. Here the United States followed the legal requirements with regard to Formula Grant Funds

407. In November and December 2011, HUD's Office of Fair Housing and Equal Opportunity conducted a review of the City's and CRA/LA's compliance with Section 504 and the ADA in their affordable housing programs.

408. During this review, HUD examined relevant documents, interviewed witnesses, and conducted onsite surveys of thirty-one units at eleven City and CRA/LA projects funded with federal financial assistance.

409. In accordance with 24 C.F.R. § 8.56(g), HUD detailed the results of the compliance review in a January 11, 2012 letter of findings (LOF). Letter from Charles Hauptman, Dir. of Fair Hous. & Equal Opportunity, U.S. Dep't of Hous. & Urban Dev., to the Honorable Antonio Villaraigosa, Mayor of the City of Los Angeles (Jan. 11, 2012).

410. The LOF explained that the City and CRA/LA were in violation of Section 504 and the ADA because they failed to monitor and ensure that the federally-funded housing developments met the accessibility requirements found at 24 C.F.R. Part 8 (Section 504) and 28 C.F.R. part 35 (Title II of the ADA).

411. For example, the LOF noted that HUD "consistently observed accessibility deficiencies throughout the various units, developments, designated accessible routes and common areas."

412. Further, the LOF explained that the City and CRA/LA did not have adequate policies, procedures, and practices in place to ensure their affordable housing program was accessible pursuant to 24 C.F.R. §§ 8.6 and 8.20–8.33. According to the LOF:

> [T]he City and the CRA are not monitoring the policies and procedures of federally-funded recipients in several key areas, and . . . the policies in place are not implemented in a manner that ensures that these policies and practices do not discriminate against qualified individuals with disabilities because of their disability . . . . [T]here is no monitoring of Section 504 compliance and . . . an overall lack of knowledge as to the duties and responsibilities with respect to Section 504.

413. The LOF also found that "a large percentage of residents without disabilities currently occupy the designated accessible units in several HUD-funded developments," and that, with no oversight from the City or the CRA/LA, many housing developments had offered accessible dwelling units to the general population on a lottery or waitlist basis without regard to disability or need for the accessibility features. *Id.*

414. The LOF notified the City and CRA/LA of an array of possible repercussions if the noncompliance was not adequately resolved, including the loss of federal financial assistance and referral to the Department of Justice for enforcement. *See* 24 C.F.R. § 8.57(a).

415. The LOF also noted that HUD may refuse to provide federal grant program funds to any applicant or recipient that fails or refuses to furnish an assurance of Section 504 compliance required under 24 C.F.R. § 8.50. *See* 24 C.F.R. § 8.57(b).

416. On February 17, 2012, HUD issued a Formal Determination of Noncompliance, which stated that HUD was "confident that the parties can resolve the findings through a VCA."

417. The February 17, 2012 letter was accompanied by a draft voluntary compliance agreement (VCA) for purposes of beginning negotiations.

418. Since its LOF in 2012, as required by its regulations, HUD has sought an agreement with the City (and entered a VCA with the CRA/LA) in which Defendants would voluntarily remedy their accessibility violations.

419. During VCA negotiations with the City, the City repeatedly represented to HUD that it was engaged in good faith negotiations to voluntarily resolve HUD's findings of noncompliance with the federal accessibility laws.

420. Also during the negotiations, HUD repeatedly raised the possibility of withholding Formula Grant Program Funds and deeming the City ineligible to compete for certain NOFAs.

421. Despite continuous negotiations, however, the City has yet to sign a VCA.

     **c.**     **Timeline of VCA negotiations**

422. Between 2012 and 2014, HUD and the City discussed the need for a VCA and negotiated the scope and terms of a proposed VCA.

423. In a May 30, 2014 letter from the City to then-Deputy Assistant Secretary for Grant Programs for HUD's Office of Community Planning and Development, Yolanda Chavez, the City:

    a.     represented to HUD that it is "engaged in discussions with [HUD] in an effort to reach a resolution of the matters identified in the [LOF]";

    b.     set forth proposed terms for a VCA;

    c.     noted that it expected HUD to seek revisions to the City's proposal to resolve the outstanding accessibility issues; and

    d.     requested that HUD approve the City's pending Annual Action Plan because "[r]ejection of certifications and a consequent withholding of [Formula Grant]

funds can only have the effect of significantly impeding the ability of [the City] to carry out any aspect of the [2014-2015 Action Plan], including further implementation of the action steps intended to comply with the new HOME requirements to address the concerns expressed in the [LOF]."

424. Subsequently, in a June 24, 2014 letter from the City to then-Deputy Assistant Secretary for Enforcement for HUD's Office of Fair Housing and Equal Opportunity Sara Pratt, the City continued to represent to HUD that a voluntary resolution of the findings was possible, explaining that the City "remains willing to meet with representatives of HUD to discuss the comprehensive and substantive proposal for a resolution."

425. On June 30, 2014, HUD accepted the City's 2014 Annual Action Plan for Formula Grant Funds, but explained to the City:

> HUD notes that the City has incorporated into its annual action plan steps taken to improve its oversight and monitoring of Section 504 and ADA requirements going forward. . . . While HUD is encouraged by these initial steps . . . they are insufficient to satisfy the outstanding findings. The City may only resolve these finding by reaching a [VCA] with [HUD] and it remains critical for the City to continue good faith negotiations. . . . Please note that the failure to achieve resolution by the City through the execution of a [VCA] with [HUD] may lead to further enforcement efforts by the Department and may lead to future termination or refusal to continue Federal financial assistance.

426. During Fiscal Years 2015 and 2016, the City applied for a Choice Neighborhoods Implementation Grant.

427. Because the City had not executed a VCA with HUD, HUD found the City had failed to meet a threshold eligibility requirement for discretionary funding; accordingly, HUD refused to consider the City's applications for Choice Neighborhoods Implementations Grants.

428. In a May 30, 2016 letter from Mayor Eric Garcetti to then-HUD Secretary Julian Castro, Mayor Garcetti said the City would be sending HUD a revised VCA later that week and expressed the City's desire to "reach a final agreement to ensure greater accessibility in [the City's] housing program and to ensure that the City of Los Angeles is eligible to apply for the Choice Neighborhood Grant . . . ."

429. On June 8, 2016, HUD sent the City a revised draft VCA.

430. In response, on June 24, 2016, the City stated it was "eager to resolve this matter so that [it] may begin implementation of the commitments the City is making in the VCA."

431. Also in the June 24, 2016 letter, the City requested that the parties engage in face-to-face negotiations to come to an agreement on the VCA.

432. On June 27, 2016, HUD and the City met face-to-face, reaching agreement on a number of issues in the proposed VCA.

433. On June 28, 2016, HUD and the City executed a Term Sheet memorializing their agreements.

434. Based on the execution of the Term Sheet, HUD believed the City would execute the VCA.

435. By September 29, 2016, the City still had not executed a VCA; nevertheless, the City applied for the Choice Neighborhoods Implementation Grant made available in Fiscal Year 2016.

436. HUD refused to consider the City's application due to the City's outstanding, unresolved civil rights findings.

437. On October 4, 2016, Mayor Garcetti sent another letter to then-HUD Secretary Castro referencing the 2016 Term Sheet and asking HUD to reconsider its decision to deny the City's Choice Neighborhoods Grant application due to the City's failure to meet threshold eligibility requirements based on the outstanding, unresolved civil rights findings.

438.   On March 30, 2017, both HUD's General Deputy Assistant Secretary for Community Planning and Development and Acting Assistant Secretary for Fair Housing and Equal Opportunity sent a joint letter to the City urging it to execute a VCA.

439.   HUD explained in the March 30, 2017 letter "that the City's failure to achieve resolution through the execution of a VCA with [HUD's Office of Fair Housing and Equal Opportunity (FHEO)] may lead to further enforcement efforts by the Department and future termination or refusal to continue Federal financial assistance. The City and FHEO have been engaged in extensive negotiations with agreements memorialized in a June 28, 2016 term sheet."

440.   In a June 12, 2017 letter to the City, HUD notified the City of its intent to conduct an on-site review and requested certain information to, among other things, ascertain whether the City's noncompliance with the federal accessibility laws persisted.

441.   From June 26, to June 30, 2017, HUD representatives surveyed a representative sample of sixteen City housing developments and conducted an on-site review of City documents relating to accessibility in its federally funded housing programs.

442.   HUD again observed significant noncompliance with the federal accessibility laws throughout the representative sample of properties surveyed.

443.   HUD representatives discussed this noncompliance with the City during a close-out meeting on June 30, 2017, and urged the City enter into a VCA.

444.   Subsequently, in an August 18, 2017 letter, the City notified HUD that it was backing away from the commitments it made in the executed Term Sheet, though it also stated that it would continue to "negotiate in good faith the terms of the [VCA]. . . ."

445.   To date, the City and HUD are still negotiating the terms of the VCA.

**d.      HUD refused to make discretionary grants to the City**

446.   As noted above, HUD made available Choice Neighborhoods Implementation Grants through the NOFA process in Fiscal Years 2014/2015 and 2015/2016.

447. Each Choice Neighborhoods Implementation Grant is approximately thirty million dollars.

448. In Fiscal Year 2014/2015, the City submitted an application to HUD for a Choice Neighborhoods Implementation Grant.

449. The NOFA for that grant expressly provided that any applicant must have resolved, to HUD's satisfaction, any outstanding finding of systemic noncompliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, or Title II of the Americans with Disabilities Act.

450. In a July 2015 letter from HUD's Deputy Assistant Secretary for Public Housing Investment to Mayor Garcetti, HUD notified the City that its Choice Neighborhoods Implementation Grant application was not considered for funding.

451. The July 2015 letter stated:

> Based on HUD's records, the [City] failed to meet the threshold regarding Resolution of Civil Rights Matters. As noted above, resolution of outstanding civil rights matters must be completed prior the application deadline date. The [City] did not resolve an outstanding finding of noncompliance to HUD's satisfaction prior to the application deadline . . . .

452. The following year, the City again submitted an application to HUD for a Choice Neighborhoods Implementation Grant.

453. In a letter dated September 29, 2016, HUD explained to the City it would not consider the City's application.

454. The September 29, 2016 letter referenced the same outstanding Section 504 noncompliance as the July 2015 letter.

455. Also in Fiscal Year 2015/2016, the City submitted an application for federal funds HUD makes available through two discretionary grants that assist states and local jurisdictions in undertaking comprehensive programs to identify and control lead-based

paint hazards in certain rental housing, the Lead-Based Paint Hazard Control Grant Program and the Lead Hazard Reduction Demonstration Grant Program.

456. The 2016 NOFA for these grants explicitly provided that any applicant must have resolved, to HUD's satisfaction, any outstanding finding of systemic noncompliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Section 109 of the Housing and Community Development Act of 1974, or Title II of the Americans with Disabilities Act.

457. Eligible applicants may receive up to $1.5 million in federal financial assistance for each program.

458. In response to the City's 2016 application, citing the City's "outstanding 504 complaint," HUD's Office of Lead Hazard Control and Health Homes informed the City that it was deemed ineligible for the Lead-Based Paint Hazard Grant Program and Lead Hazard Reduction Demonstration Grant Program.

### e. Civil Rights referral and ongoing VCA negotiations

459. On June 26, 2017, the City submitted its annual certifications for Formula Grants and attached a letter representing to HUD that, with respect to a VCA, "the City believes that a final agreement is imminent."

460. On August 9, 2017, HUD sent a letter to the City noting it was accepting the City's certifications "with the expectation that the City will negotiate in good faith a [VCA] remedying the City's non-compliance."

461. The letter, also dated August 9, 2017, notified the City that if a VCA was not executed by August 31, 2017, HUD would refer the matter to the U.S. Department of Justice for enforcement of Section 504; Title II of the ADA; and the disability discrimination provisions of the Fair Housing Act, 42 U.S.C. §§ 3601-3619.

462. The letter additionally stated, "HUD also noted that the City's non-compliance is the subject of a pending False Claims Act action. As HUD has noted to the City in letters in 2014 and 2017, failure to execute a VCA may lead to further

enforcement efforts by HUD and future termination or refusal to continue federal financial assistance following notice and opportunity for a hearing."

463. The City did not execute a final VCA with HUD by August 31, 2017.

464. On September 7, 2017, HUD referred the matter to the U.S. Department of Justice Civil Rights Division for enforcement pursuant to Section 504, 24 C.F.R. § 8.57(a)(1); Title II of the ADA, 28 C.F.R. § 35.174; and the pattern or practice referral authority under the FHA, 42 U.S.C. § 36190(e)(2).

465. On November 20, 2017, the Department of Justice's Civil Rights Division and United States Attorney's Office for the Central District of California notified the City it would be opening a civil rights investigation based on the referral from HUD.

466. On December 5, 2017, the City requested via letter that it be granted an additional opportunity to reach a voluntary resolution with HUD. The December 5, 2017 letter stated, "We believe we have narrowed the issues standing in the way of the parties achieving a [VCA], and will continue to work towards such a resolution."

467. The Department of Justice Civil Rights Division agreed to stay its investigation to allow a voluntary resolution to be achieved between HUD and the City.

468. In January 2018, HUD and the City resumed VCA negotiations.

469. Since January 2018, the parties engaged in substantive VCA negotiations on more than a dozen occasions.

470. During the course of the 2018 negotiations, the Department of Justice Civil Rights Division, by letters dated January 30, February 13, and March 6, 2018, continued to stay its investigation in light of ongoing discussions between HUD and the City toward voluntary compliance.

471. On August 6, 2018, HUD's Assistant Secretaries for Fair Housing and Equal Opportunity and Community Planning and Development sent Mayor Garcetti a letter notifying the City that it remained in noncompliance with the FHA, Section 504, and the ADA, and that if the City failed to enter into an acceptable VCA, HUD intended to "renew and broaden its investigative process and commence the administrative

72

process to limit or terminate federal financial assistance to relevant programs for FY 2019 and to otherwise pursue applicable remedies in cooperation with the Department of Justice."

472. In the August 6, 2018 letter, HUD required that the City identify dates to engage in negotiations and explained, "The City's noncompliance with civil rights requirements has been ignored for far too long and the City must act promptly to remedy it or otherwise place at risk resources that would be better employed to address the substantial affordable and accessible housing needs in your community."

473. Since then, HUD and the City have been engaged in negotiations.

### f.    Investigation and intervention by the United States

474. Immediately after this *qui tam* action was filed in February 2011, the Department of Justice and HUD investigated Defendants for alleged violations of the federal accessibility laws.

475. DOJ and HUD each conducted their own physical surveys of federally-assisted multifamily housing for compliance with the federal accessibility laws.

476. On May 30, 2017 pursuant to 31 U.S.C. § 3730(b)(4)(A), the United States intervened in this lawsuit, seeking redress for Defendants' violations of the federal accessibility laws in federally-assisted housing.

### g.    Needs met by Formula Grant Funds are essential

477. HUD's continued Formula Grant funding—while pursing voluntary compliance, referring the matter to the Civil Rights Division for litigation, litigating this FCA matter, and denying the City certain discretionary funding—must be understood in the context of the varied, vital needs the Formula Grant Programs meet, and the absolute crisis in affordable housing that the City recognized and portrayed to HUD. For instance, the first listed purpose of the HOME program is "to expand the supply of decent, safe,

sanitary, and affordable housing, with primary attention to rental housing, for very low-income and low-income Americans." 42 U.S.C. § 12722(1).

478. When it created the HOME program, Congress expressly found that:

      a. the Nation was not making adequate progress toward the goal of providing "decent, safe, sanitary, and affordable living environments for all Americans";

      b. the supply of affordable housing in the country was diminishing;

      c. living environments for an increasing number of Americans were deteriorating; and

      d. many Americans were facing the possibility of homelessness unless Federal, State, and local governments worked together with the private sector to develop and rehabilitate the housing stock of the Nation to provide decent, safe, sanitary, and affordable housing for very-low-income and low-income families.

42 U.S.C. § 12721.

479. HOME program funds support a wide range of housing activities, including building, buying, and rehabilitating affordable housing.

480. HOME grants are the largest Federal block grants to state and local governments to create affordable housing for low-income families.

481. Similarly, the primary objective of the CDBG program and of the community development program of each grantee is development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income. 42 U.S.C. § 5301(c).

482. When it created the CDBG program, Congress expressly found that the future welfare of the Nation and the wellbeing of its citizens depend on, among other

things, systematic and sustained action by Federal, State, and local governments to improve the living environment of low- and moderate-income families.

483.   As such, Congress directed that the Federal assistance provided under the CDBG program be directed toward nine specific objectives, including the conservation and expansion of the Nation's housing stock to provide a decent home and a suitable living environment for all persons, but principally those of low and moderate income. 42 U.S.C. § 5301.

484.   Similarly, the purpose of the HOPWA program is to provide States and localities with the resources and incentives to devise long-term comprehensive strategies for meeting the housing needs of persons and families living with acquired immunodeficiency syndrome. 42 U.S.C. § 12901.

485.   HOPWA is the only Federal program dedicated to the housing needs of people living with HIV/AIDS.

486.   Under the program, HUD makes grants to local communities, States, and nonprofit organizations for projects that benefit low-income persons living with HIV/AIDS and their families.

487.   On the City's website for its Los Angeles Housing and Community Investment Department, it reports there is a "critical shortage of affordable housing in Los Angeles." https://hcidla.lacity.org/Affordable-Housing-Trust-Fund-pipeline..

488.   Mayor Garcetti has described homelessness as "the moral and humanitarian crisis of our time." https://www.lamayor.org/Homelessness..

489.   The Los Angeles City Controller, Ron Galperin, noted that "[a]ffordable housing is one of the most pressing needs [the City] faces and the City has an obligation to develop and implement programs that create substantially more affordable units." LA Controller, http://www.lacontroller.org/density_bonus_press_release.

490.   The City's last four HUD Consolidated Plans—2018 to 2022, 2013 to 2017, 2008 to 2012, and 2003 to 2008—all emphasize the City has been in a continued, extended affordable housing crisis.

491.   In its most recent Consolidated Plan (The City of Los Angeles 2018-2022 Consolidated Plan for Housing and Community Development), the City states that:

a.     "[o]ver the last several decades, the city has faced a serious affordable housing crisis that was, in part, caused by decades of insufficient housing production," 2018-2022 LA Con Plan at 69, 143, 177;

b.     "[i]n addition to the overcrowding and increased housing cost burden that is seen at all income levels, families and individuals in the lowest income brackets have become even more at risk of becoming under-housed or homeless," *id*.;

c.     "there are approximately 550,000 people living in Los Angeles who are at a high risk of falling into homelessness," *id*. at 86;

d.     "[t]he city of Los Angeles and the broader region are in the midst of a longstanding affordable housing crisis, including a recent dramatic increase in homelessness," *id.,* at 172, 235; and

e.     "[o]ver the last several decades, the city has faced a serious affordable housing crisis that was, in part, caused by decades of insufficient housing production." *Id.* at 74, 239.

492.   In its 2013-2017 Consolidated Plan, the City emphasized that it was in a critical point in its history and that it had to respond to growing affordable housing needs. *Id.* at 1.

493.   There, the City reported that:

a.     at public meetings "[m]ore affordable housing continued to be identified as the greatest need within the topic of housing and homeless services," and that "issues were raised regarding the lack of affordable housing and what the City was doing to preserve existing affordable housing." *Id.* at 19.

b. "[d]ata sources, surveys and community meetings have made it clear that Los Angeles needs more affordable housing to serve a variety of local resident needs." *Id.* at 48.

c. "[f]or homeless persons or those at risk of homelessness, the most significant problem is the lack of affordable housing." *Id.* at 59.

d. Los Angeles faced growing affordable housing needs, and had a "demonstrated and continued need for economic and affordable housing development funding." *Id.* at 2.

494. In the City's 2008-2013 Consolidated Plan, the City reported that statistics reveal a housing crisis for poor people living in slum conditions. *Id.* at 111.

495. There, the City refers to a "severe affordable housing crisis," *id.* at 112, 157, 186, and reports that:

a. "shortages of affordable housing have made Los Angeles a less desirable place for businesses to locate";

b. for "its future economic vitality, the City needs an adequate supply of housing that is affordable to all people," *id.* at 111–12; and

c. "[a]ffordable housing continues to be a significant issue facing city residents, especially low-income populations." *Id.* at 158.

496. In the City's 2003 to 2008 Consolidated Plan, the City reported that:

a. complex factors contributed to "an extreme shortage of affordable housing" in the City, *id.* at 18, referred to an "affordable housing crisis" *id.* at 19, and a "shortage of affordable housing inventory." *Id.* at 55.

b. "Los Angeles' low income working families are facing a crisis of housing affordability due to the growing gap between wages and housing costs," *id.* at 57, and that the "housing market cannot meet the housing needs of the City's lower-income households, nor is there

enough housing assistance to prevent widespread homelessness and high rates of overpayment and overcrowding." *Id.* at 69.

c.      "[t]wo of the largest challenges facing the City are to provide adequate, safe, affordable, and appropriate rental and sale housing for its residents, and to formulate permanent solutions to addressing the housing and supportive service needs to the City's large homeless population." 2003-2008 Con Plan at 18.

497.   Moreover, the City reports in its Consolidated Plans that:

a.      a significant percentage of its households are extremely low-income—22 percent in 2018, (2018-2022 Con Plan at 73), 20 percent in the 2013, (2013-2017 Con Plan at 54), 18 percent in 2008, (2008-2012 Con Plan at 91);

b.      hundreds of thousands of City households had a severe housing cost burden – 302,980 in 2013, (2013-2017 Con Plan at 54), 339,575 in 2018, (2018-2022 Con Plan at 73), 488,000 in 2008, (2008-2012 Con Plan at 92); and

c.      a significant percentage of City's households were overcrowded—12 percent in 2018, (2018-2022 Con Plan at 73), 16 percent in 2013, (2013-2017 Con Plan at 54), and 18 percent in 2008, (2008-2012 Con Plan at 92), with half, or more than half of those households, being severely overcrowded. (2013-2017 Con Plan at 54; 2018-2022 Con Plan at 73).

498.   In its 2018-2022 and 2013-2017 Consolidated Plans, the City explains that, going back as far as the 1980s, City reports and strategic planning processes have highlighted and drawn attention to the continuing:

a.      decrease in affordability of the City's housing stock;

b.      lack of homeownership opportunities for most City residents;

c.　mismatch of jobs, wages, rent, and for-sale prices and the shortage of apartments able to accommodate low-income large families;

　　　　　　d.　loss of existing lower cost, unsubsidized rental housing through market and other changes; and

　　　　　　e.　loss of existing affordable housing due to expiring affordability restrictions required by earlier federal, state and local subsidies. 2018-2022 Con Plan at 74; 2013-2018 Con Plan at 70.

499.　In its Consolidated Plans the City reported that, in particular, the Los Angeles housing market was not providing sufficient affordable housing for low-income households, particularly including Hispanic and Latino households, persons with disabilities, the elderly, large families, single parent households, and persons with special needs, including chronically homeless individuals and families, persons living with HIV/AIDS and their families, transition age youth (*i.e.*, emancipated foster care), persons with chronic mental illness, and others. 2018-2022 Con Plan at 132; 2013-2017 Con Plan at 113; 2008-2012 Con Plan at 92; 2003-2008 Con Plan at 77-81.

500.　The funds provided by the United States to the City in the HOME, CDBG and HOPWA grant programs provide vital affordable housing support for low-income Angelenos in general, including the particular groups identified by the City as lacking access to affordable housing.

501.　The City reported that it is struggling with "greatly reduced funding for affordable housing and essential human services, while housing affordability continues to elude renters and homeowners alike." 2018-2022 Con Plan at 1.

502.　The City claimed that resources from the federal grant programs all support the City's affordable housing goals. 2018-2022 Con Plan at 7.

503.　The City told HUD that federal grants provided under these programs "are a critical component" in the City's "efforts to address homelessness and other major challenges." 2018-2022 Con Plan at 9.

504. Between 2010 and the present, the City reported that "there has been a significant reduction in the [HOME, CDBG, and HOPWA] grant resources" and that "[t]he affordable housing-focused resources suffered in particular, with HOME allocations declining from a $43 million award in 2010 to less than $20 million granted in 2017." 2018-2022 Con Plan at 8.

505. Although HUD remains vitally concerned about accessible housing for people with disabilities, cutting off HOME, CDBG, and HOPWA grants could do significant damage to the City's affordable housing programs and put vulnerable Angelenos at risk of serious harm, including homelessness.

506. Upon information and belief, approximately half of the City's $1.68 billion invested in affordable housing during the relevant period came from CDBG, HOME, and HOPWA grants.

### h.     VCA negotiations with other jurisdictions

507. Prior HUD action illustrates that it takes seriously accessibility violations of recipients of federal financial assistance, and takes action when such violations are identified.

508. HUD regularly conducts compliance reviews and monitoring of grantees including municipalities and public housing agencies to ensure compliance with the federal accessibility laws.

509. When HUD identifies Section 504 violations or violations of Title II of the ADA, it takes action against the violators, triggering and implementing its regulatory compliance procedures.

510. As required by statutory and regulatory authorities, as part of that action HUD seeks to achieve a voluntary resolution to any findings of noncompliance with civil rights laws.

511. A recent example involves accessibility violations of the Hawaii Public Housing Authority.

512.   In that case, the Hawaii Public Housing Authority operated a statewide low-income public housing program, for which HUD found significant noncompliance relating to federal accessibility requirements during its investigation.

513.   Following the issuance of a Letter of Findings on October 16, 2017, and a Letter of Determination on February 1, 2018, the Hawaii Public Housing Authority agreed to resolve the findings and remediate widespread accessibility violations by entering into a VCA.  *See* Voluntary Compliance Agreement – Hawaii Public Housing Authority, available at:

https://www.hud.gov.sites/dfiles/FHEO/documents/18VCA_HDRC.pdf.

514.   Another recent example involves ongoing accessibility violations by the Puerto Rico Public Housing Authority (PRPHA).

515.   The PRPHA and HUD executed a VCA on September 26, 2016, to address long-standing accessibility violations. This was the third VCA in a series entered into with the PRPHA.

516.   That VCA states, "Over the past twelve years, the Department and PRPHA have been working cooperatively towards addressing numerous systemic and longstanding accessibility issues in PRPHA's administration of public housing," and that:

> The Department is executing this third and final VCA as a goodwill last opportunity to bring PRPHA into full compliance with its statutory obligations under Section 504, Section 109, the ADA, the FHAct and the ABA. This new Agreement grants an additional, non-extensible five-year period for PRPHA to provide satisfactory proof of full compliance with each of the conditions contained hereunder. Failure to meet any obligation under this Agreement shall put PRPHA's federal subsidies in immediate peril, and trigger the initiation of all enforcement actions that correspond under HUD's statutory authorities and regulations.

Voluntary Compliance Agreement – Puerto Rico Public Housing Authority, available at: https://archives.hud.gov/news/2016/pr16-157-PRPHA_VCA_09292016.pdf.

517.   Additionally, between 2004 and 2016 HUD surveyed the multifamily housing programs, services and activities of multiple recipients of federal financial assistance for compliance with the federal accessibility laws.

518.   These surveys included examination of the jurisdictions' records, policies and procedures, physical surveys of dwelling units, accessible routes, common areas, and non-housing programs including jurisdictions' offices, and interviews with staff and residents.

519.   For each of these jurisdictions and entities, HUD identified noncompliance with the federal accessibility laws.

520.   Some or all of those VCAs required the jurisdictions to:

      a.     hire VCA Administrators;

      b.     employ Section 504 and ADA Coordinators;

      c.     construct or convert five percent of their units into units accessible to people with mobility disabilities;

      d.     construct or convert an additional two percent of their units into units accessible to people with visual or hearing disabilities;

      e.     design, implement, and get HUD approval for UFAS Unit Plans;

      f.     certify units as accessible;

      g.     design and implement Non-Housing (including parking, roads, walkways etc.) accessibility plans;

      h.     design and implement administrative office accessibility plans;

      i.     establish appropriate policies and procedures;

      j.     design and implement occupancy, transfer and waiting list review and remediation plans;

      k.     create and implement remediation plans to address the needs of applicants and existing residents who require UFAS units;

l.      educate and train employees;

m.      make reports to HUD of the progress under the VCA;

n.      keep records; and

o.      accept HUD monitoring.

E.  **Defendants' Knowledge of the Requirements of the Federal Accessibility Laws**

521.    In addition to HUD's statutes, regulations, certifications and agreements, numerous HUD publications provided to the City—or made available to the City and the CRA/LA—detailed guidance for complying with the federal accessibility laws.

522.    The Consolidated Plans the City submitted to HUD acknowledged that a substantial portion of the City's population includes people with disabilities, and that a substantial portion of the City's wait list for public housing includes people with disabilities.

523.    As early as December 26, 2000, HUD sent a notice to the City and other CDBG and HOME Program grantees reminding them of "their obligation to comply with Section 504 . . . , the Fair Housing Act, and HUD's implementing Regulations (24 CFR Part 8 and 100, respectively), which prohibit discrimination based on disability and establish requirements for program accessibility and physical accessibility in connection with housing programs."

524.    From 2000 to 2005 alone, HUD sent such notices on at least five occasions.

525.    The City entered into loan agreements with the CRA/LA and private developers for the construction or rehabilitation of multifamily housing using Formula Grant Program Funds, which explicitly required that recipients, subrecipients, and contractors of the Formula Grant Program Funds comply with the FHA and Section 504.

526.    The City's own HOME Subrecipient Monitoring Manual—a manual that the City adopted in 2009 to establish adequate controls to ensure that HOME Program requirements, including the property standards, which incorporate the federal accessibility laws, were met by all subrecipients—provides:

> On-Site Inspections Remember that the HOME property standards apply to the common areas and the building's exterior, not only the HOME units. Any deficiencies seen in these areas must be addressed. In order to verify compliance with property standards and the information submitted by owners . . . HOME rules require on-site inspections . . . in projects with 5 to 25 units every 2 years and in projects with 26 or more units annually.

527. Nevertheless, the City did not conduct any on-site inspections of the CRA/LA Properties in 2009, 2010, 2011, or the first half of 2012 to determine compliance with the federal accessibility laws.

528. The City did not monitor the CRA/LA to ensure compliance with the federal accessibility laws.

529. The CRA/LA did not monitor owners and developers or other entities receiving HUD funds to ensure compliance with the federal accessibility laws.

530. At all times before January 25, 2012, when the City became the successor housing agency to the CRA/LA, the City had no mechanism in place for conducting the required monitoring of the CRA, and no monitoring plan, strategy, procedures, staff, or schedule addressing the monitoring of the CRA/LA Properties for compliance with the federal accessibility laws.

531. On December 21, 2012, then-City Mayor Villaraigosa signed a directive for the City-wide Compliance with Federal and State Disability Laws. The Directive noted:

> [T]he ADA and Section 504 require the City to perform a self-evaluation survey and develop a compliance plan (called a transition plan), identifying those programs, services and activities that need to be brought into compliance with federal disability laws. The City's last transition plan was finalized in 2000. . . . A new transition plan is needed.

Despite this Directive, the City never adopted a new transition plan.

532.    In 2009, the CRA/LA, with knowledge of its own obligations to comply with the federal accessibility laws, asked the City for assistance in addressing federal accessibility issues at the CRA/LA Properties, through a proposed memorandum of understanding regarding the coordination of accessibility-related issues.

533.    The proposed memorandum of understanding by the CRA/LA asked the City to assist coordination efforts with the CRA/LA for purposes of:

a.      training CRA/LA staff on disability issues;

b.      disseminating information and guidelines for evaluating and ensuring the accessibility of CRA/LA projects and activities receiving federal financial assistance;

c.      assisting with the handling of disability disputes and complaints; and

d.      providing an accessibility policy liaison who would serve as a resource for the CRA/LA, developers, and management companies regarding compliance with the federal accessibility laws.

534.    The City rejected the CRA/LA's proposed memorandum of understanding.

535.    Starting in 2012, as described above, HUD has had extensive communications with the City and the CRA/LA concerning their obligations under federal accessibility laws and their failure to comply.

### FIRST CLAIM FOR RELIEF

**Against All Defendants**
**False Claims Act:  Presentation of False Claims for**
**Conduct Occurring on or After May 20, 2009**
**31 U.S.C. § 3729(a)(1)(A)**

536.    Paragraphs 1 - 535 are incorporated by reference as though fully set forth herein.

537.  Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, including but not limited to:  (1) Formula Grant Program fund agreements executed between HUD and the City annually during the relevant period; (2) agreements for NSP funds executed between the City and HUD during the relevant period; (3) each and every drawdown by the City in IDIS for Formula Grant Program Funds in connection with the City's Housing Portfolio and identified in Attachment A, including each corresponding voucher created and submitted to HUD; (4) each and every request for NSP funds in connection with multifamily housing by the City; and (5) requisition requests submitted by the CRA/LA to the City for HUD funds.

538.  By virtue of the said false or fraudulent claims, the United States incurred losses and therefore is entitled to recover treble damages under the FCA, plus a civil penalty for each FCA violation.

## SECOND CLAIM FOR RELIEF

**Against All Defendants**
**False Claims Act:  Presentation of False Claims for**
**Conduct Occurring Before May 20, 2009**
**31 U.S.C. § 3729(a)(1)**

539.  Paragraphs 1 – 535 are incorporated by reference as though fully set forth herein.

540.  Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, including but not limited to:  (1) Formula Grant Program Fund agreements executed between HUD and the City annually during the relevant period; (2) agreements for NSP funds executed between the City and HUD during the relevant period; (3) each and every drawdown by the City in IDIS for Formula Grant Program Funds in connection with the City's Housing Portfolio and identified in Attachment A, including each corresponding voucher created and submitted to HUD; (4) each and every request

for NSP funds by the City in connection with multifamily housing; and (5) requisitions submitted by the CRA/LA to the City for HUD funds.

541.   By virtue of the said false or fraudulent claims, the United States incurred losses and therefore is entitled to recover treble damages under the FCA, plus a civil penalty for each FCA violation.

### THIRD CLAIM FOR RELIEF

**Against All Defendants**
**False Claims Act: Making or Using False Records or Statements for Claims for Payment Pending on or After June 7, 2008**
**31 U.S.C. § 3729(a)(1)(B)**

542.   Paragraphs 1 - 535 are incorporated by reference as though fully set forth herein.

543.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, including but not limited to: (1) each and every certification regarding compliance with the federal accessibility laws the City made in annual and other submissions to HUD in connection with the Consolidated Plan process for Formula Grant Program Funds during the relevant period; (2) each and every certification regarding compliance with the federal accessibility laws the City made included in SF 424 during the relevant period in connection with Formula Grant Program and NSP funds; (3) each and every certification the City made regarding the federal accessibility laws in connection with applications for NSP funds during the relevant period; (4) each and every certification the City made regarding the federal accessibility laws in connection with drawdowns through IDIS for Formula Grant Program Funds during the relevant period; (5) each and every certification the City made regarding the federal accessibility laws in connection with requests for NSP funds during the relevant period; (6) each requisition by the CRA/LA to the City for HUD funds in connection with the CRA/LA's Housing Portfolio; and (7) cooperative, loan, and other agreements between the City and the CRA/LA in which the parties agreed to comply with the federal accessibility laws. Defendants' knowingly false certifications,

87

assurances, and agreements were material to claims for payment to HUD, and fraudulently induced the United States to pay out funds to which Defendants were not entitled.

544. By virtue of the said false records and statements, the United States suffered losses and therefore is entitled to treble damages under the FCA, plus a civil penalty for each FCA violation.

## FOURTH CLAIM FOR RELIEF

**Against All Defendants**
**False Claims Act: Making or Using False Records or Statements for Claims for Payment Pending Before June 7, 2008**

545. Paragraphs 1 - 535 are incorporated by reference as though fully set forth herein.

546. Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by the United States, including but not limited to: (1) each and every certification regarding compliance with the federal accessibility laws the City made in annual and other submissions to HUD in connection with the Consolidated Plan process for Formula Grant Program Funds during the relevant period; (2) each and every certification regarding compliance with the federal accessibility laws the City made included in SF 424 during the relevant period in connection with Formula Grant Program and NSP funds; (3) each and every certification the City made regarding the federal accessibility laws in connection with applications for NSP funds during the relevant period; (4) each and every certification the City made regarding the federal accessibility laws in connection with drawdowns through IDIS for Formula Grant Program Funds during the relevant period; (5) each and every certification the City made regarding the federal accessibility laws in connection with requests for NSP funds during the relevant period; (6) each requisition by the CRA/LA to the City for HUD funds in connection with the CRA/LA's Housing Portfolio; and (7) cooperative, loan, and other agreements between the City and the CRA/LA in which the

parties agreed to comply with the federal accessibility laws. Defendants' knowingly false certifications, assurances, and agreements were material to claims for payment to HUD, and fraudulently induced the United States to pay out funds to which Defendants were not entitled.

547. By virtue of the said false records and statements, the United States suffered losses and therefore is entitled to treble damages under the FCA, plus a civil penalty for each FCA violation.

## FIFTH CLAIM FOR RELIEF

### Against the City of Los Angeles
### Negligent Misrepresentation

548. Paragraphs 1 - 535 are incorporated by reference as though fully set forth herein.

549. The City made false material representations regarding compliance with the federal accessibility laws without any reasonable ground for believing them to be true, and intended that the United States would act in reliance upon such false representations in awarding grants or allowing funds to be drawn down.

550. The United States justifiably relied upon the City's false representations, and was unaware of the true facts.

551. As a result of its justifiable reliance on the City's false representations, the United States has sustained damage in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Against All Defendants
### Restitution (Unjust Enrichment)

552. Paragraphs 1 - 535 are incorporated by reference as though fully set forth herein.

553. From February 1, 2005, to the present, Defendants have received money from Plaintiff United States to which Defendants were not entitled, unjustly enriching Defendants, and for which Defendants must make restitution. Defendants received such

89

money by claiming and retaining HUD federal financial assistance in the form of HUD grants. In equity and good conscience, such money belongs to Plaintiff United States.

## SEVENTH CLAIM FOR RELIEF

### Against All Defendants
### Payment by Mistake

554.   Paragraphs 1 - 535 are incorporated by reference as though fully set forth herein.

555.   Plaintiff United States paid money to Defendants as a result of a mistaken understanding. Specifically, Plaintiff United States paid claims by the City for HUD federal financial assistance under the erroneous belief the City and the CRA/LA were complying with the federal accessibility laws. Payment therefore was by mistake. Defendant CRA/LA participated in and benefitted from the transactions.

556.   As a result of such mistaken payments, Plaintiff United States has sustained damages for which Defendants are liable in an amount to be determined at trial.

## PRAYER

WHEREFORE, Plaintiff United States demands judgment as follows:

a.   On the First through Fourth Claims for Relief (False Claims Act) against all Defendants for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

b.   On the Fifth Claim for Relief (Negligent Misrepresentation), against the City of Los Angeles for an amount to be determined at trial, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate;

c.   On the Sixth Claim for Relief (Restitution) against all Defendants for an amount equal to the monies that Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate; and

90

d. On the Seventh Claim for Relief (Payment by Mistake) against all Defendants for an amount equal to the United States' damages from each of them, plus costs, pre- and post-judgment interest, and such other and further relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff United States of America hereby demands a trial by jury.

Dated:  December 10, 2018    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
NICOLA T. HANNA
United States Attorney
DAVID K. BARRETT, AUSA
Chief Civil Fraud Section

MICHAEL D. GRANSTON
SARA MCLEAN
WILLIAM C. EDGAR
ERIC SCHMELZER
Attorneys, Civil Division
United States Department of Justice

   /s/ *Lisa A. Palombo*
LISA A. PALOMBO
Assistant United States Attorney

Attorneys for United States of America