# ATTACHMENT A

# TO

**The United States' And The Fair Housing Council Of The San Fernando Valley's Memorandum Of Points And Authorities In Support Of Notice Of Motion And Motion For Approval Of Settlement**

## DECLARATION OF WILLIAM C. EDGAR

I, William C. Edgar, declare:

1.     I am a Senior Trial Counsel in the Fraud Section, Commercial Litigation Branch, Civil Division, of the United States Department of Justice, and one of the attorneys responsible for handling this action.

2.     I submit this declaration in support of the United States' and the Fair Housing Council of the San Fernando Valley's Joint Notice of Motion and Motion for Approval of Settlement, Joined by the City of Los Angeles.

3.     Previously in this case, on July 12, 2019, the United States, the Fair Housing Council of San Fernando Valley ("FHC"), and the Community Redevelopment Agency of the City of Los Angeles ("CRA") executed a settlement agreement resolving all of the United States' claims against the CRA for a payment of $3.1 million.

4.     Relator Fair Housing Council concurred with the United States that the CRA settlement was fair, adequate, and reasonable.

5.     Relator Mei Ling, then *pro se*, objected to the CRA settlement.

6.     This Court held a hearing on December 17, 2019 and agreed after argument that the settlement with the CRA was fair, adequate, and reasonable under all the circumstances.

7.     Litigation continued against the City of Los Angeles and fact discovery in this action lasted from June 2020 until November 2023. During fact discovery, the United States and the City of Los Angeles propounded and responded to multiple rounds of written discovery requests including:

- The United States and the City exchanged initial written disclosures on May 29, 2020. The United States sent the City supplemental initial written disclosures based on facts identified during discovery on November 3, 2023.

1

- The City served its first requests for documents on June 26, 2020. The United States responded and objected on July 30, 2020.

- The United States served its first set of requests for documents on the City on August 25, 2020. The City responded and objected on October 23, 2020, and supplemented its responses and objections on May 16, 2022.

- The United States served its first set of interrogatories on the City on August 25, 2020. The City responded and objected on October 23, 2020, and supplemented its responses and objections on April 13, 2022, July 14, 2022, and August 4, 2023.

- The City served its first set of interrogatories on the United States on December 21, 2020. The United States responded and objected on February 26, 2021.

- The City served its first set of requests for admissions on the United States on April 2, 2021. The United States responded and objected on May 13, 2021.

- The City served its second set of requests for admissions on the United States on May 25, 2021. The United States responded and objected on June 24, 2021.

- The United States served its first set of requests for admissions on the City on June 25, 2021. The City responded and objected on September 24, 2021, and supplemented its responses and objections on April 8, 2022.

- The City served its second set of interrogatories on the United States on September 24, 2021. The United States responded and objected on December 21, 2021.

- The City served its third set of requests for admissions on the United States on December 13, 2021. The United States responded and objected on January 26, 2022.

- The City served its third set of interrogatories on the United States on September 7, 2022. The United States responded and objected on November 18, 2022.

- The City served its second set of requests for documents on the United States on September 7, 2022. The United States responded and objected on October 7, 2022.

2

21                                        Attachment A

- The City served its fourth set of requests for admissions on the United States on September 7, 2022. The United States responded and objected on November 4, 2022.

- The City served its fifth set of requests for admissions on the United States on June 9, 2023. The United States responded and objected on July 7, 2023.

- The City served its fourth set of interrogatories on the United States on June 9, 2023. The United States responded and objected on August 15, 2023.

- The United States served its second set of requests for admissions on the City on October 17, 2023. The City responded and objected on November 17, 2023.

- The United States sent its second set of interrogatories to the City on October 17, 2023. The City responded and objected on November 17, 2023.

8. After almost every written discovery response, the parties corresponded and conferred multiple times to resolve disputes over responses and objections.

9. During fact discovery, the United States issued more than 120 third-party subpoenas related to more than 220 multifamily buildings in the City of Los Angeles.

10. The United States reviewed over 582,000 documents, including documents that were produced by third parties to the United States and reproduced by the United States to the City. Of those documents, the United States produced over 180,000 documents to the City, and the City produced approximately 400,000 documents to the United States.

11. During fact discovery, the United States deposed nine separate City witnesses and a witness from the company that conducted accessibility surveys for the City in their personal capacities. The City deposed ten separate United States fact witnesses in their personal capacities. The City deposed two of those witnesses

twice. The City produced a single Federal Rule of Civil Procedure 30(b)(6) witness. The United States deposed them. The United States produced seven Federal Rule of Civil Procedure 30(b)(6) witnesses. The City deposed all of them.

12.    The City produced reports for two experts who the United States was set to depose. The United States produced reports for four expert witnesses and five non-retained expert witnesses; all but one were deposed by the City.

13.    The United States and the City collectively marked and used more than 400 separate deposition exhibits.

14.    The United States collected, assembled, and analyzed extensive agency accounting records for tens of thousands of City grant draws.

15.    Discovery revealed 221 multifamily properties that did not comply with federal accessibility requirements.

16.    The City and third parties produced architectural records and management files for hundreds of buildings.

17.    The United States' experts surveyed and photographed 219 multifamily buildings, finding accessibility defects in all buildings surveyed.

18.     On March 5, 2024, the United States and the City attended pre-trial mediation, at the end of which the United States' and the City's counsel agreed to recommend a settlement to their respective decisionmakers.

19.    After the March 2024 mediation, while the City and the United States sought approval for the settlement terms negotiated by the trial teams, the parties negotiated and agreed on written terms for the Settlement Agreement.

20.    Multiple levels of responsible DOJ and City officials approved the City Settlement.

21.    After the United States and the City agreed on settlement terms to be recommended but before the Settling Parties executed the City Settlement, counsel for the United States conferred with relator FHC and exchanged numerous emails

4

23                                                        Attachment A

and spoke by phone with relator Mei Ling to discuss the proposed settlement with the City. FHC immediately concurred with the settlement. The United States spoke to Mei Ling on March 19, April 17, and on June 4, 2024 with both Ms. Ling and her new counsel. The United States e-mailed Ms. Ling and/or her counsel in an effort to schedule additional phone calls on March 20, 22, and 26, April 3, 11, 17, 18, 25, and 29, May 28, 29, and 31, 2024. The United States provided Mei Ling with written answers to questions related to the settlement via e-email on May 3, 2024.

22. On May 28, 2024, immediately after DOJ officials approved the City Settlement, the United States shared a copy of the not yet signed draft settlement agreement with Ms. Ling.

23. On June 4, 2024, under Local Rule 7-3, counsel for the United States again met and conferred telephonically with Ms. Ling's newly hired counsel to discuss the substance of the motion this declaration supports and to see if the parties could resolve Ms. Ling's objections.

24. The United States and relator Mei Ling could not achieve a resolution.

25. On June 13, 2024, the United States, the FHC, and the City executed the Settlement Agreement.

26. Before arriving at the City Settlement amount of $38,266,989, over a period of more than nine years, the United States and the City engaged in extensive settlement discussions and two mediations.

27. During the extended settlement negotiations, the parties exchanged data, made presentations regarding the facts and law, and exchanged multiple offers and counter offers.

28. Rulings by the Court, facts uncovered in discovery that revealed details previously unknown or unrecalled, and the evolving development and

analysis of the parties' respective arguments resulted in multiple increased, reduced, withdrawn, or amended settlement offers and counteroffers.

29. In my experience, such negotiations are typical in complex civil litigations.

30. The $38,266,989 settlement amount recognizes that the City received funds for affordable housing that it did not make entirely accessible and takes into account the United States' interests in avoiding litigation risks through a certain recovery, preserving its resources, and sending a message of deterrence.

31. Under the relevant grant program requirements, the United States required the City to provide multifamily housing that was both accessible and affordable.

32. The United States alleges that the City provided inaccessible affordable housing.

33. In the end, after more than nine years of arm's length negotiations, the City offered to settle this case for $38,266,989. The parties agreed to recommend that settlement amount to their respective decision makers.

34. The United States' trial team recommending the City Settlement included experienced attorneys and financial auditors.

35. Multiple levels of sophisticated and experienced lawyers in management, and leadership positions at the Department of Justice, the U.S. Attorney's Office, who are charged with representing the interests of the United States, as well as attorneys and officials at the United States Department of Housing and Urban Development ("HUD"), reviewed the recommended City Settlement. After evaluating the recommendation, these reviewers concluded the City Settlement was fair, adequate, reasonable, and in the interest of the United States.

6

36.     The United States's decisionmakers ultimately accepted the trial team's recommendation, and the parties completed the execution of the $38,266,989 City Settlement on June 13, 2024.

37.     During settlement negotiations, the City repeatedly told the United States that each dollar it paid in settlement is a dollar that it must find in its budget and cannot otherwise spend on affordable, accessible housing, reducing homelessness, and other public goods.

38.     The City aggressively defended this case using facts uncovered during discovery to challenge the United States' claims.

39.     If this case was not settled, proceeding with the case would require the parties to engage in long, complex, and hard-fought litigation encompassing motions practice, remaining pre-trial activities, trial, and potential appeals.

40.     The preceding is based on my personal knowledge or information reported to me by other Department of Justice or HUD employees with personal knowledge as indicated.

I declare under penalty of perjury that the foregoing is true and correct.

This declaration was executed on July 5, 2024, at Washington, District of Columbia.

_____

William C. Edgar

7

26                                                                      Attachment A

# ATTACHMENT B

# TO

**The United States' And The Fair Housing Council Of The San Fernando Valley's Memorandum Of Points And Authorities In Support Of Notice Of Motion And Motion For Approval Of Settlement**

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the United States Department of Housing & Urban Development ("HUD") (collectively the "United States"), the City of Los Angeles ("City"), and the Fair Housing Council of San Fernando Valley ("FHC") (collectively "the Parties"), through their authorized representatives.

RECITALS

A.      The City of Los Angeles is a recipient of federal grant funding administered by HUD.

B.      On February 1, 2011, Mei Ling and the FHC (collectively "Relators") filed a *qui tam* action in the United States District Court for the Central District of California captioned *United States ex rel. Mei Ling and Fair Housing Council of San Fernando Valley v. City of Los Angeles, California and Community Redevelopment Agency of the City of Los Angeles*, Case No. 11-cv-974, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").  The United States intervened in the Civil Action on May 30, 2017, and on July 31, 2017, filed a Complaint-in-Intervention asserting claims for violations of the False Claims Act and claims for negligent misrepresentation, restitution (unjust enrichment) and payment by mistake under common law. The United States filed a First Amended Complaint-in-Intervention on December 10, 2018 asserting the same legal claims. The conduct set forth in the First Amended Complaint-in-Intervention is referred to below as the "Covered Conduct."

1

27                                              Attachment B

C. FHC claims entitlement under 31 U.S.C. § 3730(d) to a *qui tam* share of the proceeds of this Settlement Agreement and to its reasonable expenses, attorneys' fees and costs as a Relator.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1. The City shall pay to the United States Thirty-Eight Million Two Hundred Sixty-Six Thousand Nine Hundred Eighty-Nine Dollars ($38,266,989), plus interest accrued at the rate of four percent per annum from May 15, 2024 ("Interest") and continuing until and including the date of payment ("Settlement Amount") under the terms and conditions set forth in this Agreement. The City shall pay not less than Sixteen Million Dollars ($16,000,000), plus Interest, within ten business days of the entry of the Court Order referenced in Paragraph 2; and the City shall pay any balance of the remaining Twenty-Two Million Two Hundred Sixty-Six Thousand Nine Hundred Eighty-Nine Dollars ($22,266,989), plus Interest, no later than July 8, 2024 or ten business days after entry of the Court Order referenced in Paragraph 2, whichever is later. The City shall pay the Settlement Amount by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice.

2. Upon the Effective Date of this Agreement, the Parties jointly will seek an order from the Court confirming the Settlement Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).

2

Attachment B

3.      Subject to the exceptions in Paragraph 5 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases the City and its agencies from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of fraud, negligent misrepresentation, restitution (unjust enrichment) and payment by mistake.

4.      Subject to the exceptions in Paragraph 5 below, and upon the United States' receipt of the Settlement Amount, FHC and its heirs, successors, attorneys, agents, and assigns, fully and finally release the City and its agencies, officers, agents, employees, and servants from any civil monetary claim FHC has on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; or any other claims that were or could have been brought relating to the Covered Conduct. For avoidance of doubt, this release does not include any claim FHC may bring with respect to this Civil Action pursuant to 31 U.S.C. § 3730(d).

5.      Notwithstanding the releases given in Paragraphs 3 and 4 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.      Any criminal liability;

c.      Except as explicitly stated in this Agreement, any administrative liability or enforcement right, or any administrative remedy,

3

29                                                              Attachment B

including the suspension and debarment rights of any federal

agency;

d.    Any liability to the United States (or its agencies) for any conduct

other than the Covered Conduct;

e.    Any liability based upon obligations created by this Agreement;

f.    Any liability of individuals; and

g.    Any liability for personal injury or property damage or for other

consequential damages arising from the Covered Conduct.

6.    FHC and its heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).  In connection with this Agreement and this Civil Action, FHC and its heirs, successors, attorneys, agents, and assigns agree that neither this Agreement nor any dismissal of the Civil Action, shall waive or otherwise affect the ability of (a) the United States to contend that provisions in the False Claims Act, including 31 U.S.C. §§ 3730(d)(3) and 3730(e), bar Relators from sharing in the proceeds of this Agreement; or (b) the City to contend that any costs or fees sought pursuant to 31 U.S.C. § 3730(d)(1) were neither necessary not reasonable, or that any Relator is otherwise ineligible to recover the same.  Moreover, the United States and FHC and its heirs, successors, attorneys, agents, and assigns agree that they each retain all of their rights pursuant to the False Claims Act on the issue of the *qui tam* award percentage, if any, that Relators should receive of any proceeds of the settlement pursuant to 31 U.S.C 3730(d)(1).

4

30 Attachment B

7.       The City waives and shall not assert any defenses the City may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

8.       The City fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the City has asserted, or could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

9.       The City fully and finally releases the FHC from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that the City has or could have asserted, or may assert in the future against the FHC, related to the Covered Conduct or the FHC's investigation and prosecution thereof.

10.    a.       <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of the City, and its present or former officers, directors, employees, shareholders, and agents in connection with:

1)       the matters covered by this Agreement;

2)       the United States' audit(s), civil investigation(s), and litigation of the matters covered by this Agreement;

5

31                                                        Attachment B

3)      the City's investigation, defense, and corrective actions undertaken in response to the United States' audit(s), civil investigation(s), and litigation in connection with the matters covered by this Agreement (including attorneys' fees);

4)      the negotiation and performance of this Agreement;

5)      the payments the City makes to the United States pursuant to this Agreement and any payments that the City may make to Relators, including costs and attorneys' fees,

are unallowable costs for government contracting purposes (hereinafter referred to as "Unallowable Costs").

b.      <u>Future Treatment of Unallowable Costs</u>:  Unallowable Costs shall be separately determined and accounted for by the City, and the City shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c.      <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Within 90 days of the Effective Date of this Agreement, the City shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by the City or any of its subsidiaries or affiliates from the United States.  The City agrees that the United States, at a minimum, shall be entitled to recoup from the City any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment.  The City shall identify these unallowable costs through: 1) accounting records to the extent that is possible; 2) memorandum records including

6

32                                                  Attachment B

diaries and informal logs, regardless of whether such records are part of official documentation, where accounting records are not available; and 3) itemized estimates where no other accounting basis is available.

The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine the City's books and records and to disagree with any calculations submitted by the City or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by the City, or the effect of any such Unallowable Costs on the amount of such payments.

11.    This Agreement is intended to be for the benefit of the Parties only.

12.     Upon receipt of the Settlement Amount described in Paragraph 1, above, FHC and the United States shall promptly file in the Civil Action, pursuant to Rule 41(a)(2) and the terms and conditions of this Agreement, a Motion to Dismiss, with prejudice, claims against the City in the Civil Action; to which the City shall not object.

13.    Except for any rights of Relators under 31 U.S.C. § 3730(d) against the City (and with respect to which the City retains all rights to object or contest), each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

14.    Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

15.    This Agreement is governed by the laws of the United States.  The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Central District of California.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to

7

33                                                    Attachment B

this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

16.    This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

17.    The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

18.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

19.    This Agreement is binding on the City's successors, transferees, heirs, and assigns.

20.    This Agreement is binding on FHC's successors, transferees, heirs, and assigns.

21.    All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

22.    This Agreement is effective on the date of signature of the last signatory to the Agreement ("Effective Date").  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

[signatures follow]

8

34                                             Attachment B

THE UNITED STATES OF AMERICA

DATED: 6/11/2024 BY: _____

WILLIAM C. EDGAR
DANIEL W. KASTNER
JENNIFER CHORPENING
WESLEY J. HEATH
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: 6/11/2024 BY: _____

ROSS M. CUFF
KAREN Y. PAIK
PAUL B. LASCALA
Assistant United States Attorneys
Central District of California

9

35                                         Attachment B

## CITY OF LOS ANGELES - DEFENDANT

DATED: 6-11-24    BY: _____
                          MICHAEL J. BOSTROM
                          Senior Assistant City Attorney
                          City of Los Angeles


DATED: _____ BY: _____
                          DANIEL B. LEVIN
                          Counsel for City of Los Angeles

10

36                                                   Attachment B

**CITY OF LOS ANGELES - DEFENDANT**

DATED: _____ BY: _____

                                                 MICHAEL J. BOSTROM
                                                 Senior Assistant City Attorney
                                                 City of Los Angeles

DATED: June 11, 2024 BY: _____

                                                 DANIEL B. LEVIN
                                                 Counsel for City of Los Angeles

11

37                                                                    Attachment B

**FAIR HOUSING COUNCIL FOR SAN FERNANDO VALLEY - RELATOR**

DATED: June 13, 2024 BY: _____
                                   SHARON KINLAW
                                   Executive Director
                                   Fair Housing Council of the San Fernando Valley

DATED: June 13, 2024 BY: _____
                                   PHILLIP E. BENSON
                                   DONALD R. WARREN
                                   DAVID O. IYALOMHE
                                   ODION L. OKOJIE
                                   Counsel for Fair Housing Council of the San
                                   Fernando Valley

12

                                                                                    Attachment B

# ATTACHMENT C

# TO

**The United States' And The Fair Housing Council Of The San Fernando Valley's Memorandum Of Points And Authorities In Support Of Notice Of Motion And Motion For Approval Of Settlement**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:94CV-357-H

UNITED STATES OF AMERICA,
Ex Rel FRED M. BURNS

PLAINTIFFS

V.

A.D. ROE COMPANY, INC., et al.

DEFENDANTS

## MEMORANDUM AND ORDER

This case involves a *qui tam* action initially brought by Relator, Fred M. Burns ("Burns"), in the name of the United States Government pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* The complaint sought to recover penalties and damages arising from false and fraudulent billing allegedly submitted to the Department of Navy by Defendants during construction related to the Phalanx Facility Modernization Project at the Naval Ordnance Station in Louisville, Kentucky.

After lengthy settlement negotiations, the United States has settled the action with Defendant A.D. Roe and others. Although this Court has previously determined that Burns could not proceed as a Relator in this case, some might contend that he is entitled to be heard on his objections to the settlement. Consequently, the Court provided Burns such an opportunity both in writing and at a court hearing. The Court now considers all those objections which Burns has submitted as to the settlement.

The question before the Court is whether the proposed settlement is "fair, adequate and

39                                                    Attachment C

*/92*

reasonable under the circumstances." 31 U.S.C. § 3730(c)(2)(B). The settlement resulted in a $171,000 benefit to the United States. Burns claims that the United States settled too cheaply and it could have recovered much more at trial. Of course, whether it is theoretically possible that the United States may have recovered more at trial than through settlement is not the issue before the Court. Rather, the Court must determine, all things considered, whether the settlement was reasonable.

To be successful in a *qui tam* action, the United States must essentially prove that Defendants committed a fraud by intentionally submitting false claims for payment or submitting those claims in reckless disregard for the truth. In this case, the Court believes that convincing a jury of this would have been no easy task. Virtually every claim still at issue has considerable ambiguity attached to it. Many of the claims which Burns continues to insist have value, United States has, for good reasons, long since declined to pursue.

In the course of numerous settlement discussions, the Court became very familiar with the principal issues of this case and with the specific proof as to those issues. The bargaining to reach a settlement in this case was hard-nosed, lengthy and arduous. Neither side gave in easily. However, after awhile it became fairly clear that many of the remaining claims in this case had more the flavor of a contract dispute than fraud. Nothing which Burns has stated in his objections to the proposed settlement, either in writing or at the Court hearing, has altered this general impression. Rather, Burns' arguments enhance that impression. To the extent the jury accepted this same view, recovery by the United States would be unlikely.

To be sure, Defendants made mistakes on this job. Some of them were serious. However, in virtually every instance, Defendants have a logical explanation for those mistakes. In

2

40                                                              Attachment C

some instance, Defendants can point to legitimate disputes about contract language. In other instances, Defendants can point to approval of their action by government representatives. Finally, in other instances, Defendants candidly admit that mistakes were made and that they allowed some contract responsibilities to slip through the cracks. In the Court's view, very few of these instances present a strong case of fraud. Rather, in most cases, serious questions arise about whether the mistakes that were made were merely mistakes of negligence as opposed to reckless disregard.

Moreover, a more serious difficulty looms. Even if the Government were to prove reckless disregard, serious questions remain whether any of these actions caused the Government to be damaged in some measurable way. For instance, the United States might have great difficulty proving that it was damaged. It approved the extent of Defendant's remedial action and it is not clear that the structure is measurably less sound. As a consequence of all these concerns, the Court's view about the likelihood of success in this action may be a great deal more sanguine than that of the United States.

The Court has no doubt that the United States made the difficult but correct decision in settling this case. In doing so, the United States obtained a reasonable recovery, while at the same time eliminating the risk of allocating huge resources to a potentially nonproductive effort. To settle was undoubtedly a difficult decision because it is always unpalatable to admit that claims are less than they may have first appeared. That is certainly the case here. Many of the claims which Burns made initially appear now to have little or no merit.

Most of the objections contained in Burns' memoranda suggest contract violations or disputes on the part of Defendants. The Court has carefully reviewed the response of the United

3

41                                          Attachment C

States and, based upon the Court's own knowledge of this case, the Court believes that it is a balanced and fair appraisal of the evidence. The nature of this proceeding does not require the Court to make specific findings about whether any particular claim might succeed at trial, only that the settlement of them collectively was reasonable considering all factors.

The Court does conclude that counsel for the United States approached the trial of this case and the settlement negotiations in a thorough and professional manner. The decision to settle the case was based upon, in the Court's view, an abundance of caution and a comprehensive analysis of all the evidence. Prior to making that decision, counsel appeared to have made every possible effort to verify and support the claims which Burns made initially. In many instances, through no fault of counsel, the effort came up short on the facts. This evident professionalism and effort on the part of the counsel has given the Court even greater assurance that the decision to settle was correct.

The Court concludes that the proposed settlement in this case is fair, adequate and reasonable under the circumstances.

The Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the objections of the Relator Fred M. Burns are OVERRULED and the proposed settlement is APPROVED.

By a separate order the Court will approve the settlement, bifurcate the case and dismiss that part of the case which is settled.

4

Attachment C

This **23 rd** day of July, 1997.

JOHN G. HEYBURN II
JUDGE, U.S. DISTRICT COURT

cc:    Counsel of Record

ENTERED

JUL 25 1997

JEFFREY A. APPERSON. CLERK
BY

5

43                                                    Attachment C